UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

VERNE DAVIDSON,

                    Plaintiff,

vs.

SPRINGFIELD FOOD SERVICE
CORP. and PERFORMANCE
FOOD GROUP,

                    Defendants.

CIVIL ACTION NO. 05-30094-MAP

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**[1]

1.    Springfield Foodservice Corporation (SFC), located at 340 Taylor Street in
       Springfield, Massachusetts, is a food service marketer and distributor to
       restaurants; catering and banquet facilities; schools and colleges; hospitals,
       nursing homes and retirement communities; correctional facilities; government
       and military installations throughout all of New England, eastern New York,
       northern New Jersey, and northeastern Pennsylvania.  (Complaint ¶10; Affidavit
       of Pamela Burns ¶ 3 (Burns Affidavit) which is attached hereto as Exhibit 8)

2.    SFC was purchased by Defendant Performance Food Group, Inc. ("PFG") on
       September 12, 2001.  SFC, which now does business as PFG- Springfield, is a
       wholly-owned subsidiary of PFG.  PFG is a publicly-held corporation
       headquartered in Richmond, Virginia. (Burns Affidavit ¶ 2)

---

[1]To the extent there is dispute in the facts, the facts herein are presented by the testimony most favorable to Mr. Davidson.  *Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir. 1997); *Timpson v. Transamerica Ins. Co.*, 41 Mass. App. Ct. 344, 669 N.E.2d 1092 (1996).

3.    Mr. Davidson began employment with SFC on August 16, 1988 as a stock handler in the Warehouse. SFC employed Mr. Davidson on an at-will basis. (Burns Affidavit ¶ 4; Davidson 11)[2]

4.    Mr. Davidson has resided at 1815 Roosevelt Avenue in Springfield, Massachusetts with his son Taron since 1998. Mr. Davidson's residence is located miles 2.82 miles from SFC. (See MAPQUEST® printout containing driving distance which is attached hereto as Exhibit 9)

5.    At the time of his deposition, May 18, 2006, Mr. Davidson was forty-five years old and his son Taron was eighteen years old. (Davidson 8)

6.    Mr. Davidson graduated from high school and attended Penn Valley Junior College in Missouri.  (Davidson 9)

7.    During the time of his employment by SFC, Mr. Davidson suffered several injuries which caused him to lose significant time from work, including another back injury prior to April 24, 2003.  (Davidson 14, 27-28, 33)

8.    After one occasion in which Mr. Davidson injured his shoulder at work, his doctor ordered that Mr. Davidson restrict the amount of lifting done at work.  SFC accommodated that restriction. (Davidson 25, 34)

9.    After PFG bought SFC Mr. Davidson was reassigned to an "easier" position in the warehouse. (Davidson 19)

10.    Mr. Rolando Pagan, who as Warehouse Manager from February 2002 until February 2004 managed Mr. Davidson during the period of February 2002 to

---

[2] Relevant portions of the deposition transcripts referenced herein are attached as follows:  Verne Davidson –Exhibit 1; Charles Agganis–Exhibit 2; Peter Brunault-Exhibit 3; Rolando Pagan-Exhibit 4; Donna Szaban-Exhibit 5; Pamela Burns (Rule 30(b)(6)-Exhibit 6; and James Hagberg-Exhibit 7.

May 2003,  helped Mr. Davidson get a pay raise; Mr. Davidson considered that an example of fair treatment.  (Davidson 56)

11.    Mr. Charles Agganis served as SFC's Vice President of Operations from November 2002 until October 2005. (Agganis 12) In that capacity. Mr. Agganis was responsible for oversight of the shipping and receiving function.  The shipping function included the selection and delivery of the product.  And the receiving function involved the intake of the products that were sold to customers.  (Agganis 10, 13)

12.    Mr. Peter Brunault served as of Manager of Human Resources from the Summer of 2002 until September 2003. (Brunault 11, 20)

13.    Mr. Brunault and Mr. Agganis had the authority to fire warehouse employees. (Brunault 16)

14.    SFC required employees to notify their supervisors of their absences.  (Brunault 38) Warehouse employees were required to call the warehouse manager or any warehouse supervisor.  (Brunault 39-40)

15.    Between November 2002 and May 20003, Mr. Agganis and Mr. Brunault revised SFC's "No call, No show" policy so as to provide for termination for any employee that failed to notify SFC of absences on two consecutive days.  (Agganis 33, 102) A two-day "No call, No show" policy is the norm in the food distribution industry. (Agganis 102)  SFC management knew of the revised "No call, No show" policy. (Agganis 68)

16.    For instance, Mr. Pagan and Warehouse Supervisor Jason Sosnowich knew that the company's policy provided for termination after two consecutive days of "no

call, no show."  (Pagan 11, 45; Affidavit of Jason Sosnowich ¶ 4 (Sosnowich Affidavit) which is attached hereto as Exhibit 12)

17.     On Thursday, April 24, 2003 Mr. Davidson strained his back while picking up a case of pizza sauce at work.  He continued to work and did not report the injury to Mr. Pagan because Mr. Davidson did not "feel that bad, at the time." (Davidson 66-67, 73)  As the day progressed, Mr. Davidson's back began to increasingly bother him. That night he had trouble sleeping (Davidson 75)

18.     Mr. Davidson did not report to work on Friday, April 25, 2003 because his back was bothering him. Mr. Davidson left a voicemail for Mr. Pagan to inform him that he would be absent because he had hurt his back. (Davidson 75-76; Pagan 60-61)

19.     Mr. Davidson did not report for work on Monday, April 28, 2003 because his back was bothering him; he believes he left a voicemail for Mr. Pagan to that effect. (Davidson 85-86)

20.     On Monday, April 28, 2003, Mr. Davidson spoke with Ms. Donna Szaban, a human resource generalist at SFC.  (See Note to File by Donna Szaban which is attached hereto as Exhibit 10) Ms. Szaban asked Mr. Davidson to go to the doctor to be treated.  Ms. Szaban directed Mr. Davidson to bring her the doctor's note after he was examined. (Davidson 88-90)  SFC expected employees who were injured at work to go to the doctor and come back to SFC with their medical information and to advise SFC of their work status.  (Brunault 45-46)

21.     Mr. Davidson went to Occu-Health in Springfield to be treated on Tuesday, April 29, 2003.  He was examined there by Dr. Barry Magnus.  Dr. Magnus diagnosed

Mr. Davidson with a back strain for which he recommended rest and physical

therapy.  Dr. Magnus also prescribed Naproxsyn and Vicotin to Mr. Davidson.

Dr. Magnus advised that Mr. Davidson not report for work that day or the next

(April 29th and 30th) but that Mr. Davidson could return to work on May 1, 2003,

with some physical restrictions. Dr. Magnus completed a Patient Status form

containing all this information which was faxed to SFC. (See Patient Status form

which is attached hereto as Exhibit 11; Davidson 91)  However, Mr. Davidson

never brought the report from Dr. Magnus to Ms. Szaban, although she had

directed him to do so. (Davidson 88-90)

22.    Mr. Davidson read the Patient Status Form on Tuesday, April 29, 2003 and he

understood that he was to return to work on May 1, 2003 with the specified

restrictions.  (Davidson 96)

23.    SFC planned to accommodate Mr. Davidson's restrictions with light duty work

when he returned to work on May 1, 2003.  (Pagan 82-83) In fact, it was SFC's

practice, at that time, to accommodate injured employees by providing light duty

work. (Szaban 63)

24.    Despite Dr. Magnus's report indicating that he could return to work, Mr. Davidson

did not report for work on Thursday, May 1, 2003.  Nor did Mr. Davidson attempt

to telephone anyone at SFC to notify them that he would not be reporting for

work that day.  He failed to do so because he was "out of it from the medicine."

(Davidson 110) However, Mr. Davidson did telephone Dr. Magnus at Occu-

Health at 10:00 a.m. or 11:00 a.m. right after waking up to get another doctor's

note.  (Davidson 109) Mr. Davidson left a voicemail for Dr. Magnus, but Dr.

5

Magnus did not return his call. (Davidson 107-108)

25.    Mr. Davidson also did not report for work on Friday, May 2, 2003 because he had
back pain.  Mr. Davidson claims that he left a voicemail for Mr. Pagan to notify
him that he would not be reporting for work that day because his back was still
bothering him. (Davidson 111-112)

26.    Mr. Davidson did not call Dr. Magnus on Friday, May 2, 2003 for a new note
excusing him from work on May 1st and 2nd. (Davidson 112)

27.    Mr. Davidson did, however, drive himself to Occu-Health for his physical therapy
evaluation on Friday, May 2, 2003.  (Davidson 113)  His physical therapy
evaluation took place in the same place location where Mr. Davidson was treated
by Dr. Magnus. (Davidson 113; Exhibit 11)  While he was at Occu-Health on May
2nd Mr. Davidson knew he needed a note excusing him from work and he
requested one but he did not obtain one. (Davidson 117)

28.    When Mr.  Davidson did not report for work on the early morning of Friday, May
2, 2003, Mr. Sosnowich checked his voicemail to see if Mr. Davidson had called
in, but he had no voicemail from Mr. Davidson. Mr. Sosnowich also checked Mr.
Pagan's voicemail for a message from Mr. Davidson after getting Mr. Pagan's
voicemail password from Mr. Pagan, who was at home because he had the day
off.  There was no message from Mr. Davidson on Mr. Pagan's voicemail either.
Mr. Sosnowich checked Mr. Pagan's voicemail and his own again before 8:00
a.m. and there was still no message from Mr. Davidson. So Mr. Sosnowich
informed Mr. Agganis that Mr. Davidson was absent again and that there was no
word from him.  Mr. Sosnowich checked the voicemails through the day but

never heard a voicemail from Mr. Davidson.  Mr. Sosnowich signed Mr. Davidson's termination form around 3:00 p.m. that afternoon right after being informed of the decision to terminate him. (Sosnowich Affidavit ¶ 3)

29.    Based on that information, Mr. Agganis and Mr. Brunault decided to terminate Mr. Davidson for failing to report his absences on two consecutive days (May 1st and 2nd) and for failing to bring in his medical paperwork from Occu-Health despite being specifically directed to do so by Ms. Szaban. (Brunault 69; Agganis 81)

30.    Between April 25, 2003 and May 5, 2003, Mr. Davidson did not speak to Mr. Pagan and he never attempted to notify anyone else at SFC that he would be absent.  (Davidson 137)  SFC did not have a practice or policy of calling employees who, like Mr. Davidson, had failed to call in to report their absences. (Agganis 72-73; See Agganis email dated September 26, 2003, which is attached hereto as Exhibit 13)

31.    On May 5, 2003, Mr. Brunault mailed a letter to Mr. Davidson notifying him that his employment had been terminated because he failed to notify SFC of his absences on May 1 and 2, 2003 and because he had failed to report back to the company following his exam at Occu-Health as directed.  (Brunault 80-81; See Termination Letter dated May 5, 2003, which is attached hereto as Exhibit 14)

32.    On the early morning of Tuesday, May 6, 2003, Mr. Davidson reported for work at SFC. (Davidson 80-81)  Mr. Pagan called Mr. Davidson into his office that morning and informed him that he could not return to work until Mr. Davidson spoke to Mr. Brunault. Mr. Davidson asked Mr. Pagan if he had been fired; Mr.

Pagan did not respond. That was the first and only time Mr. Davidson had ever asked a supervisor if he had been fired. (Davidson 82-83)

33. Mr. Davidson spoke to Mr. Brunault by telephone on the morning of May 6, 2003. Mr. Brunault told that Mr. Davidson that he was terminated on May 2nd because he did not report for work even though SFC had light duty work available for him. (Davidson 105-106)  SFC did not replace Mr. Davidson after he was terminated. (Pagan 14; Davidson 24)

34. On June 5, 2003 Dr. Magnus reported that Mr. Davidson was free to return to work without any physical restriction.  (Davidson 125)  Between April 29, 2003 and June 5, 2003,  Mr. Davidson saw Dr. Magnus on several occasions and attended several physical therapy appointments (Davidson 116, 121-124), but Mr. Davidson did not refill the prescriptions that Dr. Magnus prescribed form him on April 29, 2003.  (Davidson 100-101)  And Mr. Davidson did not seek or receive any other medical treatment for his April 24, 2003 back injury other than that provided at Occu-Health.

35. SFC has terminated other employees for failing to call in on two consecutives days to report absences.  On December 2, 2004, SFC terminated James McMillian for failing to call in on two consecutives days to report absences. (Burns 30(b)(6) 26, 31)   SFC terminated a Hispanic employee in his thirties without any history of workers compensation injuries or claims because he had failed to call in on two consecutives days to report absences some time between 2001 and 2004. (Pagan 87, 94)  Another employee, Albert Larriu, was terminated because he failed to call in on two consecutives days to report absences as well.

(Szaban 79-80)

36.     In addition to Mr. Davidson, during the period of time that Mr. Agganis and Mr. Brunault were both employed at SFC, the following employees were terminated for failing to call in on two consecutives days to report absences: Jim Chancellor; Shaheed Harris; and Miguel Gonzalez.  SFC terminated Mr. Chancellor before Mr. Davidson.  (See Employee Change forms, which are attached hereto as Exhibit 15)

37.     A few months after Mr. Davidson's termination, Mr. Agganis re-stated the company policy that employees who fail to call in on two consecutives days to report absences are considered terminated and that managers need not call the missing employees thereafter. (Exhibit 13)

38.     Mr. Davidson believes that SFC's "No call, No show" policy required three consecutive days absence without notice because that was the policy contained in an employee handbook ("Handbook") dated August 28, 2001.  (Davidson 191; Exhibit 16 at p. 11)

39.     Mr. Davidson did not expressly request FMLA leave and SFC did not provide Mr. Davidson any information relating to FMLA leave, following his April 24, 2003 injury.  (Brunault 61-62, 97)  Mr. Davidson never informed anyone at SFC how long he would need to be out of work, following his April 24, 2003 injury. (Davidson 167)

40.     SFC has granted other employees FMLA leave. (Burns Affidavit ¶ 5)

41.     Mr. Davidson admits that SFC did not deny him the only accommodations he sought: light duty and permission to return to work. (Davidson 171)

42.    Mr. Davidson received workers compensation benefits to compensate him for his April 24, 2003 injury. (Davidson 128)  Mr. Davidson had filed a workers compensation claim after he was verbally notified by Peter Brunault that he had been terminated on May 6, 2003.  (Davidson 161) However, the only thing Mr. Davidson did about a workers' compensation claim before he was terminated was to go to Occu-Health for treatment on April 29, 2003, at Mr. Szaban's direction. (Davidson 162-163)  Mr. Davidson never filled out an accident report regarding his April 24, 2003 workplace injury. (Davidson 90)

43.    Mr. Davidson believes that defendants "frown" on workers compensation, but he is unaware of any other examples of that.  (Davidson 174-175)   Mr. Davidson does not know of any employees, other than himself, who were fired after getting hurt at work.  (Davidson 181)

44.    SFC has promoted employees who have previously had workers compensation injuries.  (Sosnowich Affidavit ¶ 2; Szaban 78)

45.    After PFG purchased SFC, SFC stressed the importance of warehouse safety to employees. (Hagberg 35-37; Pagan 53-55)

46.    James Hagberg, a former co-worker of Mr. Davidson, never observed Mr. Pagan treat employees who were hurt at work or had other physical restrictions harshly. In fact, when Hagberg hurt himself at work Mr. Pagan assigned him to light duty until Mr. Hagberg was ready to return to full duty.  (Hagberg 35-37)

Respectfully Submitted,


/s/ Timothy Murphy
Timothy Murphy, Esq.
BBO #556429
Counsel for Defendants
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, Massachusetts  01144
Dated:   December 1, 2006            Tel.: (413) 737-4753/Fax: (413) 787-1941


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing *Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried* was served upon the attorney of record for each other party via electronic filing on December 1, 2006.

/s/ Timothy Murphy
Timothy Murphy, Esq.

1

1          Volume 1, Pages 1-196

2          UNITED STATES DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4              C.A. No.:  05-30094MAP

5     *******************************

6     VERNE DAVIDSON,

7          Plaintiff

8       vs.

9     SPRINGFIELD FOOD SERVICE CORP.,

10    PERFORMANCE FOOD GROUP AND

11    PERFORMANCE FOOD GROUP,

12         Defendants

13    *******************************

14         DEPOSITION OF:  VERNE DAVIDSON

15         SKOLER, ABBOTT & PRESSER

16             1414 Main Street

17         Springfield, Massachusetts

18         Thursday, May 18, 2006

19         11:35 a.m. - 3:34 p.m.

20         Reporter:  Kelly M. Bruce

21         PERLIK AND COYLE REPORTING

22             1331 Main Street

23         Springfield, MA 01103

24             (413) 731-7931

```
 1        Q.      Asides from your son, have you talked
 2     to anyone else about your deposition?
 3        A.      No.  Not that I can recall.
 4        Q.      Where do you live now?
 5        A.      Springfield.
 6        Q.      Okay.  What's your address?
 7        A.      1815 Roosevelt Avenue.
 8        Q.      Okay.  How long have you lived there?
 9        A.      Since '98.
10        Q.      Who do you live there with now?
11        A.      My son.
12        Q.      Who did you live there with back in
13     April and May of 2003?
14        A.      My son.
15        Q.      How old is your son now?
16        A.      Eighteen.
17        Q.      What's your date of birth?
18        A.      Fourth month, third day, '61.
19        Q.      Where were you born?
20        A.      Springfield.
21        Q.      What's your present marital status?
22        A.      Single.
23        Q.      Were you married at any time in your
24     life?
```

```
 1        A.      No.

 2        Q.      Do you just have one child?

 3        A.      Yes.

 4        Q.      Can you just tell me the highest

 5   level of education that you obtained?

 6        A.      Thirteenth grade, fourteenth.

 7        Q.      So you had some college?

 8        A.      Yes.

 9        Q.      Where?

10        A.      Kansas City, Missouri.

11        Q.      And what did you study there, and

12   what was the name of the school, by the way?

13        A.      Penn Valley Junior College.

14        Q.      What caused you to be out in the

15   Missouri area at that point in your life?

16        A.      A friend of mine was out there and

17   asked me, did I mind going to school out there.

18        Q.      Did you go to college right after

19   getting your high school diploma?

20        A.      Yes.

21        Q.      Did you get your high school diploma

22   here, locally?

23        A.      Yes.

24        Q.      Where?
```

```
 1          A.      No.

 2          Q.      What was the particular injury to

 3     your back, because of that car accident?

 4          A.      I'm not sure.  I don't remember.  I

 5     don't recall.

 6          Q.      Upper back, lower back; do you

 7     recall?

 8          A.      It's like upper.  I believe it was

 9     upper.

10          Q.      Do you remember when you started

11     working at Springfield Food Service Corporation?

12          A.      Yes, I do.

13          Q.      When was that?

14          A.      August of '88.

15          Q.      And what position were you hired for?

16          A.      Warehouse.

17          Q.      Was there a particular job title or

18     description that you had back in 1988?

19          A.      Loader.

20          Q.      Loader?

21          A.      Yes.

22          Q.      Okay.  And what were the loader

23     duties back in that time frame?

24          A.      Well, it was, we'd get the product
```

1        A.        The same.  I was a receiver.  I would

2    take in the products from back hauls, our truck

3    drivers would bring in, receive them, and then

4    put them away.

5        Q.        Did you miss time from work because

6    of your torn knee tendon?

7        A.        Yes, I did.

8        Q.        How much; do you recall?

9        A.        A few months, I believe.

10       Q.        Do you know when this occurred; what

11   year?

12       A.        I can't recall.  I think it was mid

13   '90s.

14       Q.        Okay.  Do you know why Mr. Sheehan

15   assigned you to nights, after you came back to

16   work?

17       A.        No, I don't.

18       Q.        Is that something you had requested?

19       A.        No, it wasn't.

20       Q.        All right.  Is that something that

21   you wanted?

22       A.        No, it wasn't.

23       Q.        Is that something you thought was

24   unfair?

25

```
 1    occasion?
 2         A.      Yes.
 3         Q.      Can you tell me about that?
 4         A.      Yes.
 5         Q.      Please do.
 6         A.      My rotator cuff in my left shoulder
 7    was bothering me.  So I didn't lose any time
 8    from work, but I was injured from repetitive
 9    motion, which is what happens when you're doing
10    the same thing over and over, such as driving a
11    high-low.
12         Q.      Okay.  So your understanding was
13    driving the high-low, you caused a repetitive
14    injury to your rotator cuff?
15         A.      Correct.
16         Q.      Left shoulder.  And what were the
17    symptoms of that injury?
18         A.      Pain in my shoulder, protruding down
19    my arm.
20         Q.      Pain would shoot down your arm?
21         A.      Yes.
22         Q.      Did it actually impede your ability
23    to lift or use your shoulder in any way?
24         A.      Yes.  I would say so.
```

1    handler in letter I aisle similar to what you

2    had described, just a couple of minutes ago,

3    about what a stock handler does?

4        A.    Yes.

5        Q.    All right.  And how long did you work

6    in I aisle?

7        A.    Maybe a year.

8        Q.    Do you know why you were reassigned

9    from PIR to the I aisle?

10       A.    No, sir.

11       Q.    All right.  How did that change

12   affect you?

13       A.    Made my job easier.

14       Q.    I see.  And after your work was --

15   after you were reassigned from I aisle, where

16   did you go in the warehouse?

17       A.    I was terminated.

18       Q.    I see.  So you were a stock handler

19   in I aisle at the time of your termination from

20   employment?

21       A.    Uh-huh.

22       Q.    All right.  And your duties as a

23   stock handler in I aisle were easier than your

24   duties in PIR?

```
1        Q.      All right.  When you were in PIR, who
2    else did you work with there?
3        A.      A few different people.
4        Q.      Did you ever work with a gentleman
5    who looked or seemed Portuguese?
6        A.      Perhaps.
7        Q.      All right.  Can you think of anybody
8    that would fit that description?
9             MS. GARROW:  Objection.
10           You can answer.
11                THE WITNESS:  I'm not sure.  I
12           worked with so many people, I've seen
13           maybe a thousand people come and go at
14           that time.
15       Q.      (By Mr. Murphy)  Well, let me ask
16   you, do you know who replaced you in I aisle, in
17   the warehouse, after you were terminated?
18       A.      No.
19       Q.      Had you -- I know you talked about
20   your car accident, and you missed some time from
21   work as a result of that.  And putting that
22   aside, and also putting aside your back injury
23   shortly before your termination, was there --
24   were you ever hurt at work on any other
```

```
1    in that condition subsiding?

2        A.      Yes.

3        Q.      Just briefly, tell me, what was your

4    course of treatment?

5        A.      Rehab and cortisone shot.

6        Q.      And after you completed that course

7    of treatment, your rotator cuff didn't bother

8    you the way it had before?

9        A.      No.

10       Q.      All right.  Does your rotator cuff in

11   your left shoulder bother you now?

12       A.      Yes.

13       Q.      And you lost no time from work as a

14   result of that injury; is that correct?

15       A.      Correct.

16       Q.      All right.  Did you have any other

17   work-related injuries during the course of your

18   employment at Springfield Food Service?

19       A.      Yes.

20       Q.      Tell me about that, please.

21       A.      I hurt my back prior to that.

22       Q.      And when did that occur?

23       A.      Early '90s, I believe.

24       Q.      And how did you hurt your back?
```

28

```
 1        A.      Lifting.

 2        Q.      Was it a traumatic injury; do you

 3   understand what I mean by that?

 4        A.      No.

 5        Q.      Okay.  Was it the type of thing where

 6   you lifted something and you felt a pop right

 7   away?

 8        A.      Yes.

 9        Q.      Okay.  So you -- so this injury

10   occurred on a particular day and in a particular

11   time; is that correct?

12        A.      Correct.

13        Q.      Did you lose time from work as a

14   result of that?

15        A.      Yes.

16        Q.      Do you recall how much time you lost?

17        A.      No.  I'm not sure.

18        Q.      Did you collect worker's compensation

19   benefits as a result of that?

20        A.      I don't recall.

21        Q.      What did you do right after, other

22   than grab your back, what did you do right after

23   you hurt your back?

24        A.      Said, ow.
```

1    was going between the garage and the kitchen,

2    and I stumbled and fell between the garage door

3    and the kitchen door.

4         Q.    What did you hurt?

5         A.    I hurt my arm and my back, I think I

6    strained it.

7         Q.    Do you remember when that occurred?

8         A.    I'm not sure, but Shane Geeble

9    (phonetic) was my supervisor at the time.

10        Q.    Did you miss time from work?

11        A.    Yes, I did.

12        Q.    How much time; do you recall?

13        A.    A week, I believe.  I believe it was

14    about a week.

15        Q.    Did you use sick leave during that

16    absence?

17        A.    Yes.

18        Q.    When you returned to work on that

19    particular occasion, were you able to perform

20    all your customary duties as a -- were you stock

21    handler at that point?

22        A.    Yes.

23        Q.    Were you able to perform all those

24    duties?

```
 1        A.      Yes.

 2        Q.      Did you require any modifications to

 3   your job, in any way?

 4        A.      No.

 5        Q.      Did you ask for any?

 6        A.      No.

 7        Q.      All right.  On any of these other

 8   occasions where you were hurt, either at work or

 9   away from work, when you returned to work, were

10   you -- did you ever request any modified job

11   duties, lifting restrictions, or anything like

12   that?

13        A.      Just with my shoulder.  I think the

14   doctor asked for that.

15        Q.      Asked for lifting restrictions?

16        A.      Yes.

17        Q.      And the company accommodated those

18   restrictions?

19        A.      Yes, they did.

20        Q.      All right.  And again, do you

21   remember when that happened with your shoulder?

22        A.      I'm not quite sure.  I know it was --

23   I believe it was in the late '90s, I believe.

24   Mid '90s.
```

```
 1      you mean performance review, or something like
 2      that?
 3          A.      Right.  Reevaluation of your
 4      performance.
 5          Q.      Okay.  And was your understanding --
 6      and if you know, how many stock handlers
 7      received this performance review at the same
 8      time you did?
 9          A.      I think it was just myself and Mr.
10      Carter.
11          Q.      All right.  And do you know why that
12      happened?
13          A.      No.  I have no idea.
14          Q.      And if you know -- strike that.
15                  And you ended up getting a quarter
16      raise an hour as a result of that; is that
17      correct?
18                  MS. GARROW:  Objection.
19          You can answer.
20                  THE WITNESS:  Yes.
21          Q.      (By Mr. Murphy)  Was that an example
22      of Mr. Pagan treating you fairly?
23          A.      Yes.
24          Q.      Are there any other occasions in
```

```
 1        A.      Yes.

 2        Q.      All right.  Can you tell me how that

 3   happened?  Tell me what happened and how you

 4   hurt yourself, and so on.

 5        A.      I strained my back while I was

 6   working.

 7        Q.      And what were you doing when you

 8   strained your back?

 9        A.      I was filling a slot in H aisle,

10   picking up a case of some six, ten cans of pizza

11   sauce, Hunt's pizza sauce.

12        Q.      And when did you first realize that

13   you had strained your back?

14        A.      Then.

15        Q.      What happened -- this may sound like

16   a silly question, but what happened that caused

17   you to believe that you had strained your back?

18        A.      I felt a pull.

19        Q.      So what did you do as a result of

20   feeling that pull?

21        A.      I just tried to stretch it out.  It

22   wasn't excruciating pain at the time.

23        Q.      Was anybody else working in H aisle

24   at that moment?
```

| | |
|---|---|
| 1 | A.    No. |
| 2 | Q.    So you tried to stretch it out after |
| 3 | straining it.  Then what did you do? |
| 4 | A.    Continued working. |
| 5 | Q.    Was there a supervisor on duty that |
| 6 | particular day? |
| 7 | A.    I believe so. |
| 8 | Q.    And who was that? |
| 9 | A.    I believe it was Rolando. |
| 10 | Q.    And did you report your injury to Mr. |
| 11 | Pagan, on the 24th of April 2003? |
| 12 | A.    No. |
| 13 | Q.    Why not? |
| 14 | A.    Because it didn't feel that bad, at |
| 15 | the time. |
| 16 | Q.    I thought you said it was |
| 17 | excruciating pain; did you say that there was |
| 18 | excruciating pain at the time that you strained |
| 19 | your back? |
| 20 | A.    No, that's not what I said.  I said, |
| 21 | it wasn't excruciating pain at the time. |
| 22 | Q.    Wasn't? |
| 23 | A.    Right.  At the time. |
| 24 | Q.    My mistake. |

```
 1        Q.      Okay.

 2        A.      I kept it in my locker after that

 3   point.

 4        Q.      Under lock and key?

 5        A.      No.  Just in my locker.

 6        Q.      So tell me about how -- after you

 7   finish lunch, I'm just interested in knowing how

 8   your back was through the rest of the day, the

 9   remaining two hours, or hour and a half, or so.

10   How was your back feeling then?

11        A.      It was okay.  It was getting a little

12   tighter at that point.  And then it felt okay.

13        Q.      So how did your back feel when you

14   went home at around 2:00, on that day?

15        A.      It just progressively got tighter and

16   tighter.

17        Q.      Do you recall what day of the week

18   April 24, 2003 was?

19        A.      Yes.

20        Q.      What day was it?

21        A.      Thursday.

22        Q.      So what did you do after you got out

23   of work at 2:00 at SFC?

24        A.      I went home.
```

75

```
 1        Q.       Did the condition of your back
 2   change, in any way, through the remainder of the
 3   24th of April 2003?
 4        A.       It just got worse.
 5        Q.       Did you have trouble sleeping that
 6   night?
 7        A.       Yes, I did.
 8        Q.       All right.  Were you scheduled to
 9   work at SFC on Friday morning, the 25th?
10        A.       Yes.
11        Q.       Did you report for work?
12        A.       No.
13        Q.       And why not?
14        A.       Because my back was bothering me.
15        Q.       Did you notify anybody at SFC that
16   you weren't going to report for work on Friday
17   the 25th of April?
18        A.       Yes.
19        Q.       Who did you report that to?
20        A.       Rolando.
21        Q.       How did you report it to him?
22        A.       Voicemail.
23        Q.       And what did you say to him?
24        A.       I told him that my back's bothering
```

1    me; I hurt myself at work, and I wouldn't be in

2    today.

3        Q.      And you told him you hurt yourself at

4    work?

5        A.      Correct.

6        Q.      Did you say where?

7        A.      I don't understand.

8        Q.      Did you say hurt you yourself at work

9    at SFC or at Sulco; did you specify the work

10   site?

11       A.      I believe when I said I hurt myself

12   at work, meaning SFC, not Sulco.

13       Q.      I understand what you meant, but I'm

14   just asking about what you said.  Did you say at

15   SFC or would you have said Sulco; do you know?

16       A.      No, I don't remember.

17       Q.      At that point in time, Mr. Pagan

18   would have known you worked at Sulco; is that

19   correct?

20           MS. GARROW:  Objection.

21       You can answer.

22           THE WITNESS:  Yes.

23       Q.      (By Mr. Murphy)  Okay.  And did Mr.

24   Pagan -- you told Mr. Pagan that you worked at

```
1    2003, did you talk with Mr. Pagan?

2         A.      I'm not sure of the question.

3         Q.      Okay.  After Friday the 25th, on any

4    date after that:  the 26th, 27th, 28th, did you

5    talk to Rolando Pagan?

6         A.      No.  You're saying of April?

7         Q.      Yes.  I'm just asking you on -- well,

8    let's just go through it.  On Saturday, April

9    26th, did you talk to Rolando Pagan?

10        A.      No.

11        Q.      Sunday, the 27th?

12        A.      No.

13        Q.      Monday, the 28th, did you talk to

14   Rolando Pagan?

15        A.      No.

16        Q.      The 29th of April, did you talk to

17   him?

18        A.      No.

19        Q.      Was the next time you talked to

20   Rolando Pagan on May 5, 2003?

21        A.      No.

22        Q.      Okay.  Well, when did you talk to Mr.

23   Pagan next, following your voicemail for him on

24   the 25th of April?
```

```
 1        A.        It was May 6th.

 2        Q.        May 6th.  What day of the week was

 3    that?

 4        A.        It was Tuesday.

 5        Q.        And where were you when you spoke to

 6    Mr. Pagan?

 7        A.        I seen him working in the aisle, one

 8    of the aisles.

 9        Q.        You saw him in the warehouse at SFC?

10        A.        Yes.

11        Q.        And did you report for work on May

12    5th?

13        A.        No.

14        Q.        Were you scheduled to?

15        A.        Yes.  I think so.  Yes.

16        Q.        And why is it that you're sure it was

17    May 6th that you saw Rolando Pagan?

18        A.        Because that's the day I returned to

19    work.

20        Q.        All right.  Did you -- tell me, you

21    saw Mr. Pagan in the aisle; did you speak with

22    him on that day?

23        A.        Yes.

24        Q.        And what time of day did you speak
```

```
1    with him?

2        A.      It was in the morning.

3        Q.      All right.  And approximately what

4    time?

5        A.      Early.  It was early.

6        Q.      Okay.  You had reported to work on

7    your usual starting time on Tuesday, the 6th?

8        A.      Correct.

9        Q.      Okay.  And tell me what was said

10   between yourself and Mr. Pagan.

11       A.      He asked me to come to his office so

12   he could speak with me.

13       Q.      And did you?

14       A.      Yes.

15       Q.      And what did he say to you in his

16   office?

17       A.      He said that I couldn't work, that I

18   would have to speak to human resources before I

19   come back to work.

20       Q.      And did he specify who in human

21   resources you'd have to talk to, before you

22   could come back to work?

23       A.      I think it was Peter.  I'm not sure

24   of his last name.
```

```
 1        Q.      Does Bernault sound familiar?

 2        A.      Maybe.

 3        Q.      Okay.  And who did you believe Peter

 4    in human resources was, at the time that Mr.

 5    Pagan said that to you?

 6        A.      The human resource person.  The head

 7    of that department.

 8        Q.      Okay.  And how did you respond to Mr.

 9    Pagan at that -- after he said that to you?

10        A.      I said, okay.

11        Q.      All right.  And what did he say in

12    response to that?

13        A.      I don't recall.

14        Q.      Did you say anything more to him

15    before you left his office?

16        A.      Yes.  I asked him, did I get fired.

17        Q.      What did he say?

18        A.      He didn't say anything.

19        Q.      Not a word?

20        A.      Not to my recollection.

21        Q.      Did he gesture in any way to you?

22        A.      Not to my recollection.

23        Q.      So just absolutely no response from

24    him?
```

```
1          Q.     Every day?

2          A.     Every day I wasn't there, I called.

3          Q.     So you called in every day that you

4     were absent?

5          A.     I believe so.

6          Q.     Why do you believe that?

7          A.     Because I believe I did.

8          Q.     So you were absent on the 25th, you

9     called in and left a message?

10         A.     Yes.

11         Q.     On Saturday and Sunday, the 26th and

12    27th, you were not scheduled for work; is that

13    correct?

14         A.     Yes.

15         Q.     So you did not call in to report an

16    absence on those days; is that correct?

17         A.     Yes.

18         Q.     So on Monday the 28th, you were

19    scheduled to work?

20         A.     Yes.

21         Q.     You didn't report for work, did you?

22         A.     No.

23         Q.     Did you call in to report that you

24    would not be coming to work?
```

1          A.      Yes.

2          Q.      And who did you speak with?

3          A.      No one.

4          Q.      Okay.  How did you communicate, then,

5    that you were not reporting for work on Monday,

6    the 28th of April?

7          A.      Rolando's voicemail.

8          Q.      All right.  And did you hear from Mr.

9    Pagan on the 28th?

10         A.      No.

11         Q.      Did you speak with anyone else who

12   was employed by PFG on Monday, the 28th of

13   April?

14         A.      I don't believe I did.

15         Q.      All right.  On Tuesday, the 29th of

16   April, you were scheduled for work; is that

17   correct?

18         A.      Yes.

19         Q.      You did not report for work?

20         A.      No.

21         Q.      Okay.  And you did not report for

22   work because of your back injury; is that

23   correct?

24         A.      Yes.

```
 1    on Tuesday, the 29th of April?

 2        A.      No.

 3        Q.      Did you hear from anybody else that

 4    was employed by PFG on the 29th of April?

 5        A.      I believe so.

 6        Q.      And who did you hear from?

 7        A.      Mrs. Donna.

 8        Q.      Okay.  And what if you know -- is she

 9    someone you had ever spoken to before, prior to

10    the 29th of April?

11        A.      Not really.

12        Q.      Okay.  And did she call you?

13        A.      I'm not sure.

14        Q.      Okay.  And this conversation, though,

15    regardless, was over the telephone, right?

16        A.      Correct.

17        Q.      You don't know whether she called you

18    or you called her?

19        A.      Yes.

20        Q.      Are you sure that it occurred on

21    Tuesday, the 29th of April?

22        A.      Pretty sure.

23        Q.      Can you tell me about that

24    conversation?
```

```
 1        A.       She asked me to go to the doctor, and
 2    I did.
 3        Q.       Did she tell you which doctor to go
 4    to?
 5        A.       Yes.
 6        Q.       All right.  And who did she tell you
 7    to see?
 8        A.       No one.  She just told me to go to
 9    the doctor.
10        Q.       Okay.  Did she tell you where to go;
11    did she give you directions anywhere?
12        A.       Yes.  Directions to go to the rehab
13    place.
14        Q.       Would that be occuhealth,
15    occupational health?
16        A.       Occupational health.
17        Q.       At the time that you were speaking to
18    her on the telephone, Donna Zabin, did she say
19    anything to you about reporting the time limits,
20    let's say of reporting injuries; was there any
21    discussion of that?
22        A.       I don't recall.
23        Q.       Did she tell you that you have 24
24    hours to fill out an accident report?
```

1       A.      I don't remember that.

2       Q.      At any point in time did you ever

3  fill out an accident report?

4       A.      No.

5       Q.      What did she tell you to do, if

6  anything, after you went to the doctor,

7  occupational health?

8       A.      She told me to bring her the doctor's

9  note.

10      Q.      All right.  Did you do that?

11      A.      No.

12      Q.      Why not?

13      A.      Because I was in excruciating pain

14  and the nurse at the doctor's office said she

15  could fax it to them.

16      Q.      Okay.  And, if you know, is that what

17  happened?

18      A.      Yes.

19      Q.      What else was -- just jumping back

20  now for a second.  Was there a -- did you go to

21  the doctor's on the 29th of April?

22      A.      Yes.

23      Q.      Did the doctor write a note, if you

24  know?

```
 1        A.      Yes.

 2        Q.      And that was faxed, if you know, to

 3    PFG?

 4        A.      Yes.

 5        Q.      All right.  Did you have a copy of

 6    the note?

 7        A.      I believe I did.

 8                (Exhibit 1, occupational health, marked)

 9        Q.      (By Mr. Murphy)  I'm going to show

10    you a document, Mr. Davidson, that's been marked

11    as Exhibit 1.  Do you recognize it?

12        A.      Yes.

13        Q.      What do you recognize it to be?

14        A.      Occupational health and

15    rehabilitation.

16        Q.      When was the first time you saw this

17    document?

18                MS. GARROW:  I'm going to just

19            object here, only because there appears

20            to be writing in the corner, and I'm not

21            sure that he recognizes it in its

22            complete form, so I'm going to object.

23                You can answer.

24                THE WITNESS:  Could you --
```

1      Q.      Okay.  At some point in time did you

2    read this note, Mr. Davidson?

3      A.      Yes, I think I did.

4      Q.      When did you read it?

5      A.      That day.  Right after, or when I was

6    there.

7      Q.      All right.  So on April 29th, one way

8    or the other, you read this note; is that

9    correct?

10      A.      Yes.

11      Q.      And what does the note say, with

12    respect to your ability -- or recommendations,

13    rather, with respect to work?

14      A.      Employee may return to work with the

15    follow restrictions, 5/1/03.

16      Q.      What did you understand that to mean,

17    at the time?

18      A.      That I was supposed to report back to

19    duty on the 1st of May, and that I was under

20    work restrictions, note, do not to lift over

21    five to ten pounds.

22      Q.      And there were other restrictions as

23    well, that are checked off right below there; is

24    that correct?

107

```
 1        Q.      And what was that?

 2        A.      That I called work, and that my back

 3   was bothering me extremely bad, and that I

 4   didn't want to lose my job; that I went to the

 5   doctor to, you know, so he could give me another

 6   note for that Friday.  I called the doctor but

 7   he didn't return my call.

 8        Q.      Okay.  What do you mean, you called

 9   the doctor but he didn't return your call; what

10   do you mean by that?

11        A.      The day I was supposed to report.

12        Q.      What day was that?

13        A.      May 1st.

14        Q.      Okay.  On May 1st -- what did you do

15   on May 1st with respect to calling the doctor;

16   can you explain what you mean?

17        A.      Yes.

18        Q.      Okay.

19        A.      I overslept my start time and the

20   policy was, from my recollection, that you call

21   a half hour or hour before your start time, no

22   exceptions.  And the medicine that I was taking

23   had me sleep through, because I was very groggy

24   and discombobulated from the medicine.  And the
```

```
 1     think that would be a Tuesday, based on what

 2     you've already said.  On Tuesday May 6th, at

 3     4:00, did you know your employment had been

 4     terminated at SFC?

 5          A.    Yes.

 6          Q.    And how did you know that?

 7          A.    I learned it that day.

 8          Q.    And how did you learn it?

 9          A.    From the human resource person,

10     Peter.

11          Q.    Did Peter tell you that your

12     employment was terminated?

13          A.    Yes.

14          Q.    How did he do that?

15          A.    On the phone.

16          Q.    And how did you come to be talking to

17     him on the telephone?

18          A.    Rolando told me to call human

19     resources.

20          Q.    Okay.  And so you called there and

21     spoke to him?

22          A.    Yes.

23          Q.    Do you recall what time of day that

24     was?
```

```
1         A.      In the morning.

2         Q.      In the morning.  And what did Peter

3    say to you?

4         A.      I'm not sure.

5         Q.      You're not sure what he said?

6         A.      I'm not sure of the exact words he

7    used.

8         Q.      Okay.  Aside from his exact words,

9    can you just convey to me the essence of what he

10   said to you?

11        A.      That I was terminated on May 2nd, I

12   believe; that he had work for me, light duty,

13   but I didn't show up, and he terminated me.

14        Q.      Did he say anything to you, at that

15   time, about not calling in to report absences?

16        A.      No.  Not to my recollection.

17        Q.      Okay.  And what did you say to Peter,

18   in response to what he said to you?

19        A.      I'm not sure what I said exactly.

20        Q.      Aside from your exact words, can you

21   convey to me the essence of what you said to him

22   in response to his notifying you of your

23   termination?

24        A.      Yes.
```

```
1       A.      Yes.

2       Q.      Did you exhaust it?

3       A.      I believe I did.

4       Q.      Did you ever refill it?

5       A.      No, I didn't.  I don't think I did.

6       Q.      Do you know what Naproxsyn was for?

7       A.      Pain and inflammation.

8       Q.      Pardon?

9       A.      Inflammation.

10      Q.      Inflammation?

11      A.      Yes.

12      Q.      Let me show you a document.  I'm all

13   done with that one now.  Let me show you a

14   document that's been marked as Exhibit 3.  Do

15   you recognize this document?

16      A.      Yes.  It looks familiar.

17      Q.      Okay.  Again, directing your

18   attention now to that same section.  Quantity is

19   ten here; is that correct?

20      A.      Yes.

21      Q.      And there are directions.  Can you

22   just read the directions that you see there?

23      A.      Take one tablet, by mouth, every

24   night at bedtime, as needed, for pain.
```

1       Q.      Okay.  And did you follow those

2   directions?

3       A.      Yes.

4       Q.      Did you exhaust that prescription?

5       A.      I believe I did.

6       Q.      Did you refill it?

7       A.      I don't think I did.

8       Q.      Okay.  What was this medication for,

9   if you know?

10      A.      For pain.

11      Q.      Did you go back to occupational

12  health at any point in time after your initial

13  appointment on April 29th?

14      A.      Yes.

15      Q.      Okay.  And were you seen again by Dr.

16  Magnus?

17      A.      I believe so.

18      Q.      And were you examined at that point

19  in time?

20      A.      I'm not sure of your question.

21      Q.      Did he see you?

22      A.      Not when I went back to the doctor.

23  I went there for rehab --

24              MR. MURPHY:  Can we mark that.

 1   pain that I felt at the time, I needed the

 2   medicine, so I slept through my start time.  So

 3   I called the doctor's to get another doctor's

 4   note.

 5        Q.    All right.  Did you speak with

 6   anybody?

 7        A.    No.

 8        Q.    So you called -- what do you mean

 9   when you say, called the doctor?

10        A.    I called Dr. Magnus.

11        Q.    Okay.  And who did you speak with;

12   did someone answer the phone?

13        A.    His voicemail.

14        Q.    His voicemail.  And you left him a

15   message?

16        A.    Yes.

17        Q.    And what did your message say?

18        A.    I'm not sure.  I don't recall.

19        Q.    When did you wake up on the morning

20   of May 1st?

21        A.    Late.  Almost in the afternoon.

22   Maybe like 10:00 or 11:00.

23        Q.    10:00 or 11:00 a.m.?

24        A.    Uh-huh.

```
1        Q.      What's the first thing you did, once

2   you realized that it was 10:00 or 11:00 in the

3   morning?

4        A.      I think I called the doctor.

5        Q.      What did you do after calling the

6   doctor and leaving him the message?

7        A.      I don't recall.

8        Q.      Okay.  How were you feeling at that

9   point?

10        A.      Out of it.

11        Q.      All right.  What had you done the

12   night before to ensure that you would wake up on

13   time to start work on May 1st?

14        A.      I set my alarm.

15        Q.      Did you alarm go off?

16        A.      Yes.

17        Q.      And why didn't you get up?

18        A.      I was asleep.

19        Q.      So did you turn off your alarm, or

20   what happened with your alarm?

21        A.      It goes off after an hour.

22        Q.      Was your son at home with you that

23   night and morning?

24        A.      Yes.
```

1    Q.    Okay.  Was he -- he was school age at

2    that point in time, obviously, right?

3    A.    Correct.

4    Q.    Did he go to school?

5    A.    Yes.

6    Q.    If you know, did he try to wake you?

7    A.    No.  I don't know.

8    Q.    Did you call Springfield Food Service

9    on the 1st of May?

10    A.    No.

11    Q.    Why not?

12    A.    Because of the start time rule.

13    Q.    And explain to me what you mean.  I

14    know you said that the start time rule said,

15    call at least a half an hour before start time,

16    and you didn't do that because you were

17    sleeping.  But why didn't you call later in the

18    day?

19    A.    I don't know.  I was just out of it

20    from the medicine.

21    Q.    At some point -- and that was from

22    the medicine you would have taken the night

23    before, right?

24    A.    Correct.

1    Q.    Because the directions said, at least

2    with respect to the Hydrocodone, that you were

3    to take that, one a day, at bedtime, as needed.

4    And you followed those directions, right?

5    A.    Yes.

6    Q.    So May 1st was a Thursday; is that

7    correct?

8    A.    Yes, it was.

9    Q.    All right.  You didn't call work on

10   Thursday, May 1st to report your absence on that

11   day; is that correct?

12   A.    Yes.

13   Q.    Okay.  So Friday May 2nd, you were

14   scheduled for work that day; is that correct?

15   A.    Yes.

16   Q.    Did you report for work?

17   A.    No.

18   Q.    Why not?

19   A.    Because I was still under pain.

20   Q.    Did you report to anyone on Friday,

21   May 2nd that you would not report for work?

22   A.    Yes.

23   Q.    Who was that?

24   A.    Rolando.

```
1        Q.      And how did you report it to him, by

2   what means?

3        A.      Voicemail.

4        Q.      What did you say in the voicemail

5   message?

6        A.      I told him what happened.

7        Q.      What did you say?

8        A.      That I wasn't able to be at work

9   because my back was still bothering me.

10       Q.      Now, as of May 2nd, you were aware

11  that, obviously, that you were supposed to have

12  reported to work the day before, May 1st; is

13  that correct?

14       A.      Yes.

15       Q.      All right.  And I know you told me,

16  you called the doctor on May 1st and left a

17  message for him.  Did you call the doctor on May

18  2nd?

19       A.      No.

20       Q.      Why not?

21       A.      Because I had an appointment to go to

22  rehab on the 2nd?

23       Q.      When you say "rehab," what did you

24  mean?
```

```
1          A.      Rehabilitation.

2          Q.      Did you attend that appointment?

3          A.      Yes.

4          Q.      What time was it at?

5          A.      It was in the afternoon.

6          Q.      How did you get there?

7          A.      Car.

8          Q.      Did you drive?

9          A.      Yes.

10         Q.      And occupational health is located on

11   Carando Drive; is that correct?

12         A.      Yes.

13         Q.      Is that about a couple of miles from

14   your house on Roosevelt Avenue?

15         A.      Yes, it is.

16         Q.      How long is the drive from your home

17   to PFG; how many miles is that?

18         A.      I don't know.  Maybe five.

19         Q.      Ever measure it before?

20         A.      Long time ago.

21         Q.      Okay.  So you attend your rehab

22   appointment on the 2nd, at occupational health?

23         A.      Yes.  I believe I did.

24         Q.      What happened there?
```

1      Q.      Okay.  Among those, there are two

2   really, but primarily it's J period Benoit.

3   Does that name a ring a bell to you?

4      A.      Not really, no.

5      Q.      Okay.  Did you have, when you went

6   for rehab or physical therapy, did you have the

7   same person every time?

8      A.      I'm not -- I don't think so.

9      Q.      All right.  So you don't know whether

10   J. Benoit was the person who assisted with your

11   therapy or rehab; is that correct?

12      A.      I'm not sure.

13      Q.      Did you attend all these

14   appointments:  May 12th, May 13th, May 16th?

15      A.      Yes.

16      Q.      All right.  You indicated that you

17   didn't call the doctor on May 2, 2003, because

18   you knew you were going there for rehab; is that

19   right?

20      A.      Yes.

21      Q.      Okay.  And when you went there for

22   rehab, what did you say, if anything, about your

23   condition?

24      A.      I'm not sure.

```
 1         Q.      Okay.  Well, did you say anything to
 2    anyone at occupational health, that your back
 3    was still bothering you such that you didn't
 4    feel you could report to work?
 5         A.      Yes, I did.
 6         Q.      Who did you say that to?
 7         A.      The rehab person.
 8         Q.      And you said that to that person on
 9    May 2nd, while you were there; is that correct?
10         A.      I believe that was the date.
11         Q.      Did anyone give you a note of any
12    kind, at some point while you were there on May
13    2nd?
14         A.      No.  Not to my recollection.
15         Q.      Did you ask for one?
16         A.      I think I did.
17         Q.      If you know, why didn't you get one?
18              MS. GARROW:  Objection.
19         You can answer if you know.
20              THE WITNESS:  I don't know.
21         Q.      (By Mr. Murphy)  Okay.  Did you
22    think, when you went there on May 2nd, or while
23    you were there, did you think you needed a note?
24         A.      I believe I did.
```

```
 1    period.
 2         Q.    Before April 29th?
 3         A.    Either -- it was either then or after
 4    June, or whatever, it wasn't during that period.
 5         Q.    Did you see her then because of the
 6    injury to your back on April 24, 2003?
 7         A.    No.  No.
 8         Q.    Okay.  Then maybe you misunderstood
 9    my original question, which was:  Did you get
10    any other medical help or treatment because of
11    your April 24, 2003 injury at work, other than
12    Dr. Magnus and the people at occupational
13    health?
14         A.    No.
15              MR. MURPHY:  Mark this as the
16         next exhibit, please.
17              (Exhibit 6, report, marked)
18         Q.    (By Mr. Murphy)  Do you recognize the
19    document I've just -- we've just marked as
20    Exhibit 6, Mr. Davidson?
21         A.    Yes.
22         Q.    And that reflects that you were seen
23    by Dr. Magnus on May 12, 2003, around --
24    sometime that afternoon; is that correct?
```

1          A.      Yes.

2          Q.      Okay.  And it indicates, in the

3     physician report and treatment plan, that he was

4     -- he had diagnosed you with a back strain, it

5     was improving.  He recommended that you continue

6     physical therapy and continue the Naprosyn; is

7     that correct?

8          A.      Yes.

9          Q.      All right.  And he indicated that,

10    with respect to work recommendations there, that

11    you were still on restricted duty; is that

12    correct?

13         A.      Yes.

14         Q.      And he set another appointment for

15    you, for the 21st of May; is that correct?

16         A.      Yes.

17         Q.      And was your back improving at that

18    point in time?

19         A.      Yes, it was.

20                 (Exhibit 7, note from Dr. Magnus, marked)

21         Q.      (By Mr. Murphy)  Do you recognize

22    Exhibit 7?

23         A.      I believe so.

24         Q.      Is that a note from Dr. Magnus, dated

1   the 23rd of May?

2       A.      Yes.

3       Q.      Do you know if you ever saw him on

4   the 21st of May?

5       A.      I'm not sure.

6       Q.      Okay.  And does this note indicate

7   that your back strain had improved and that he

8   wanted you to complete physical therapy the next

9   week?

10      A.      Yes.

11      Q.      Okay.  He indicated, the prognosis

12  was good, expected full duties next -- well, I'm

13  not sure what it says, but -- and scheduled

14  another appointment for you on May 29th; is that

15  correct?

16      A.      Yes.

17              MR. MURPHY:  Mark this as Exhibit

18      No. 8, please.

19              (Exhibit 8, note from Dr. Magnus, marked)

20      Q.      (By Mr. Murphy)  I'm showing you a

21  document that's marked as Exhibit 8.

22              Have you had a chance to look at

23  that?

24      A.      No.

1        Q.      Take a moment.

2        A.      (Witness complying)  Okay.  Yes.

3        Q.      Is this a doctor's note from Dr.

4    Magnus on May 29, 2003?

5        A.      Yes.  I believe so.

6        Q.      Okay.  And this is a note where he

7    indicates he thought there was overall

8    improvement to your persistent back strain; is

9    that correct?

10       A.      Yes.

11       Q.      Suggested that you complete two more

12   physical therapy appointments; is that right?

13       A.      Yes.

14       Q.      And how was your back feeling on May

15   29, 2003?

16       A.      Much better.

17               MR. MURPHY:  Mark this as Exhibit

18       9, please.

19               (Exhibit 9, note from Dr. Magnus, marked)

20       Q.      (By Mr. Murphy)  This is the last one

21   of these I want to show you.  Handing you

22   Exhibit 9.  Do you recognize it as a note from

23   Dr. Magnus, dated June 5, 2003, based on his

24   examination of you that afternoon?

```
 1        A.      Yes.

 2        Q.      Okay.  He indicated that your back

 3   strain was resolving; is that correct?

 4        A.      Yes.

 5        Q.      Was that true, at that point in time?

 6        A.      Yes.

 7        Q.      All right.  And he indicated that you

 8   could return to work without restrictions,

 9   effective that same day; is that true?

10        A.      I'm not sure.  I believe so.

11        Q.      Okay.  I'm sorry.  I'm in this work

12   recommendation section, right in the middle; do

13   you see it?

14        A.      Oh, right here.

15        Q.      Yes.  And there's a check mark there.

16   Do you see that?

17        A.      Yes, I do.

18        Q.      And that's in a box next to, employee

19   may return to work without restrictions,

20   effective June 5th; is that right?

21        A.      Yes.

22        Q.      And he indicated that, in terms of

23   follow up, it looks like you should do some home

24   exercises and see him if needed; is that right?
```

1    claim denied by the company's insurer?

2        A.    Yes.

3        Q.    Did you get a copy of that denial at

4    home on or around May 12, 2003?

5        A.    I'm not sure.

6        Q.    At some point in time did you retain

7    an attorney?

8        A.    Yes.

9        Q.    All right.  Was your worker's

10   compensation claim settled sometime -- well, was

11   it settled at some point in time, and you

12   received a payment, various payments, as a

13   result?

14       A.    Yes.

15       Q.    All right.  And if you know, did the

16   payments cover a period of April 25th to June

17   5th, 2003?

18       A.    I'm not sure.

19       Q.    You've indicated that on May 1st,

20   Mr. Davidson, that you overslept because of

21   medication you were taking as a result of your

22   back injury; is that correct?

23       A.    Yes.

24       Q.    All right.  Were there any other

1          Q.      Okay.  And that was a Friday.  And

2     then you didn't hear from him Monday the 28th,

3     29th, 30th, 1st, 2nd, correct?

4          A.      Correct.

5          Q.      Okay.  Even though you were leaving

6     him some messages in that time frame; correct?

7          A.      Correct.

8          Q.      You didn't leave any messages for him

9     on the 29th or 30th of April, when the doctor

10    had put you out of work; did you?

11         A.      No.

12         Q.      Okay.  And that's because you knew

13    the note said you didn't have to report for work

14    on those days; is that right?

15         A.      Correct.

16         Q.      All right.  And at some point in time

17    did you think that you ought to try do something

18    else to get in touch with Rolando Pagan or

19    somebody else at PFG, to let them know what was

20    going on?

21         A.      No.

22         Q.      So you never thought you ought to

23    drive there or anything like that?

24         A.      No.

```
 1        Q.      I take it that you were tall in April
 2   2003, right?
 3        A.      Yes.
 4        Q.      Do you know how much you weighed back
 5   in April 2003?
 6        A.      About 270, 260.
 7        Q.      How much do you weigh today?
 8        A.      I weigh about 280, 290.
 9        Q.      In Paragraph 28 of your complaint,
10   you indicate that Ms. Zabin filled out a notice
11   of injury accident report and that you filed a
12   worker's compensation claim; that's true, isn't
13   it?
14        A.      I believe so, yes.
15        Q.      All right.  And you filed that
16   worker's compensation claim after you were
17   terminated; is that correct?
18        A.      I'm not sure.
19        Q.      I think you indicated, a short while
20   ago, that you went to a lawyer, filed a worker's
21   compensation claim, after Peter Branault told
22   you, on May 6th, that you were fired; is that
23   true?
24        A.      Yes.  But --
```

162

1    Q.    I'm sorry?

2    A.    But --

3    Q.    But what?

4    A.    When I went to the doctor's, when she

5    sent me there, that was worker's compensation.

6    Q.    You're referring to Ms. Zabin?

7    A.    I'm referring to occupational health.

8    Q.    When who sent you there, Ms. Zabin?

9    A.    Exactly.

10    Q.    So in going to occupational health

11    that day, that was worker's comp?

12    A.    Correct.

13    Q.    Okay.  So is that when you say you

14    filed your worker's comp claim, as of that day,

15    April 29, 2003?

16    A.    Yes.

17    Q.    All right.  And did you do anything

18    else to exercise your rights under worker's

19    comp, before you were terminated?

20        MS. GARROW:  Objection.

21    You can answer if you understand the

22    question.

23        THE WITNESS:  I don't understand

24    it.

1    Q.    (By Mr. Murphy)  All right.  Did you

2    do anything about your worker's compensation

3    claim, other than what you've already told me,

4    before you were fired?

5    A.    No.

6    Q.    You said when you were taking the

7    painkillers, they incapacitated you and that

8    caused you not to be able to wake up on May 1st.

9    Other than that, was there times when you were

10   asleep at home because of the medication, during

11   this time period, the 29th of April to May 2nd

12   2003?

13        MS. GARROW:  Other than what he's

14     already testified to?

15        MR. MURPHY:  Right.

16        THE WITNESS:  Restate it, please.

17    Q.    (By Mr. Murphy)  Well, were you

18   sleeping more than usual when you were taking

19   these pain medications, other than what you've

20   already told me about?

21    A.    Yes.

22    Q.    And you didn't have an answering

23   machine at home at that time?

24        MS. GARROW:  Objection.  He's

```
 1                 MS. GARROW:  Objection.
 2           You can answer.
 3                 THE WITNESS:  No.
 4           Q.     (By Mr. Murphy)  Did you tell them
 5      how long you would need to be out of work?
 6           A.     No.
 7           Q.     And when you called in, again, you
 8      mean leaving messages on Mr. Pagan's voicemail;
 9      is that true?
10           A.     Yes.
11           Q.     About your back injury, I'm just
12      going to ask you some question about the claims
13      that you made in your complaint.  And it talks
14      about your having a disability.  What -- by
15      that, are you referring to your back injury of
16      April 24, 2003?
17           A.     What was the question?
18           Q.     Well, what was your disability that
19      you're claiming you were discriminated against
20      for?
21           A.     For being injured.
22           Q.     That was your disability.  Your back
23      itself, your back injury, what did that -- how
24      did that affect your everyday life?
```

1    Springfield Food Service Corporation to do for

2    you?

3         A.        To give me light duty and let me

4    work.

5         Q.        Did they refuse to give you light

6    duty?

7         A.        I don't know.

8         Q.        All right.  So your doctor's note

9    from Dr. Magnus, on April 29, 2003 said that

10   after a couple of days, as of May 1st, you could

11   return and work light duty; is that correct?

12        A.        Yes.

13        Q.        All right.  Is it your contention

14   that Performance Food Group and Springfield Food

15   Service denied that accommodation?

16        A.        No.

17        Q.        Were there any other accommodations

18   that you were seeking, because of your back

19   injury in April of 2003, that the defendants

20   didn't give you?

21        A.        I can't think of any.

22        Q.        In Count 3 of your complaint, you

23   indicate that you believe you were discriminated

24   against because of being African American.

1          A.      Not to my recollection.

2          Q.      Count 5 of your complaint claims that

3     you were retaliated against for filing a

4     worker's compensation claim, or exercising your

5     rights to worker's compensation.

6               Can you tell me what you mean by

7     that?

8          A.      I believe that's why I was fired.

9          Q.      Okay.  Can you tell me why you

10    believe that?

11         A.      Because the company frowned on

12    worker's comp.

13         Q.      What makes you say that?

14         A.      Just my experience working there for

15    14 and a half years.

16         Q.      Okay.  I'm going to ask you to focus

17    now on the time that PFG owned the company, and

18    operated it, which I think you indicated you

19    thought was in 2001, 2002.

20               Since that time, can you give me some

21    examples of how PFG frowned on the filing of

22    worker's comp?

23         A.      Not at this time.  I can't recall.

24         Q.      So you can't think of any examples of

1    frowning upon worker's compensation by PFG?

2        A.    No.

3        Q.    In Count 6 of your complaint, Mr.

4    Davidson, you contend that the defendants

5    interfered with your rights to Family Medical

6    Leave; are you aware of that?

7        A.    Yes.

8        Q.    Okay.  Can you tell me what you mean;

9    in what way, if any, did they interfere with

10   your rights under that law?

11       A.    Because they terminated me.

12       Q.    Okay.  Any other reason why you

13   believe they interfered with your FMLA rights?

14            MS. GARROW:  Other than what he's

15       testified to today?

16            MR. MURPHY:  That's right, yes.

17       Q.    (By Mr. Murphy)  Other than what

18   you've testified to today.

19       A.    Because they had doctor's notes and

20   they didn't ask for -- no one called me to seek

21   any more information about my well-being or

22   accident.

23       Q.    All right.  Just so we're -- we've

24   established that the doctor's note that they

1   one is expulsion.

2       Q.      Expulsion?

3       A.      Termination, possibly.

4       Q.      Do you know any employees who

5   underwent that process?

6       A.      Yes.

7       Q.      Who's that?

8       A.      Troy Geeble (phonetic).  He went

9   through that and it was no call, no show for

10  him, for more than three or four days, and he

11  wasn't terminated.

12      Q.      He was not terminated?

13      A.      Correct.

14      Q.      When did that happen, or not happen,

15  I should say?

16      A.      Back when he was working there.

17      Q.      Can you help me with the time frame?

18      A.      The last few years.  He was there

19  when I was there.

20      Q.      All right.  Did he have the three,

21  four days of no call, no show after PFG bought

22  the company?

23      A.      I'm not sure.  Possibly.

24      Q.      Is he still working there, as far as

1    A.    I don't recall.

2    Q.    Was it more than one supervisor who

3    told you about the three warning and possible

4    termination policy on no call, no shows?

5    A.    I'm not sure.

6    Q.    During the -- after Performance Food

7    Group bought the company, are you aware of any

8    employees who were terminated, other than

9    yourself, after getting hurt at work?

10    A.    No.

11    Q.    All right.  Are you aware of any

12    employees, while you were employed at PFG, who

13    got hurt at work, missed some time from work,

14    and then returned to work?

15    A.    Not sure.

16    Q.    Okay.  Do you remember when you

17    started work at Sulco?

18    A.    Yes, I do.

19    Q.    When was that?

20    A.    October, 2001.

21    Q.    All right.  And what position were

22    you hired for?

23    A.    Fork truck driver, picker.

24    Q.    And how long did those duties remain

1    SFC, did you ever receive any other policies

2    that relate to no call, no show?

3        A.      Not to my recollection.

4             MR. MURPHY:  I have no further

5        questions.

6             MS. GARROW:  Just one question,

7        because I'm not sure that the record is

8        clear at this point.

9

10    EXAMINATION BY MS. GARROW:

11

12        Q.      Attendance Policy No. 2, does that

13    generally conform with what you understand the

14    no call, no show policy to have been at the time

15    you were terminated from PFG?

16             MR. MURPHY:  Did you mean 22,

17        Counsel?

18             MS. GARROW:  I'm sorry, 22.

19             THE WITNESS:  Yes.  Pretty much.

20             MS. GARROW:  All right.  That's

21        all I've got.

22             THE COURT REPORTER:  Attorney

23        Garrow, do you need a copy of the

24        transcript?

Pages 1-110
Exhibits 1-6

------------------------------------------------

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA NO.: 05-30094-MAP

VERNE DAVIDSON,
                    Plaintiff

v.

SPRINGFIELD FOOD SERVICE CORP.,
PERFORMANCE FOOD GROUP and
PERFORMANCE FOOD GROUP,
                    Defendants

------------------------------------------------

DEPOSITION OF CHARLES L. AGGANIS

MAY 31, 2006

AT THE LAW OFFICES OF

HEISLER, FELDMAN, McCORMICK & GARROW

1145 MAIN STREET

SPRINGFIELD, MASSACHUSETTS

Reporter:  Raymond F. Catuogno, Jr.

1        A.      That is a division.  They have

2   seventy-two divisions.

3        Q.      And the division -- what's the name

4   of the division that you work for?

5        A.      It's US Food Service, Boston South.

6   And the address is 201 Beecham Street, 02149, I

7   believe.

8        Q.      You said that was in Everett?

9        A.      Everett, Massachusetts.

10       Q.      And how long have you worked there?

11       A.      Six months.

12       Q.      What is your job title there?

13       A.      Vice President of Operations.

14       Q.      What are your general

15   responsibilities as Vice President of Operations

16   at US Food Service?

17       A.      I oversee the shipping and

18   receiving part of the business.  Shipping would

19   be selecting product for our customers at night.

20   Shipping also would include the drivers and

21   delivery to our customers.  And receiving would

22   be the receiving of product that we sell to our

23   customers.

24       Q.      Are those pretty much the bulk of

1  Q.    So sometime in 2002 is when you

2  assumed that position?

3  A.    Yes, November of 2002.  And I

4  believe it was October of 2005.

5  Q.    Did you work for Springfield Food

6  Service Corporation before PFG?

7  A.    My understanding is Springfield

8  Food Corporation was purchased by Performance

9  Food Group.  But when you look at like -- the

10  W-2s come out, it says Springfield Food

11  Corporation Acquisition.  So I don't know if I

12  worked for the Acquisition or I worked for

13  Performance Food Group, but my understanding was

14  that I worked for Performance Food Group.

15  Q.    Who hired you to PFG Springfield?

16  A.    I was recruited by Mr. Dan

17  Peckskamp.  He is the Corporate Vice President

18  of Operations.  And the offer came from him.

19  Q.    You said that he's the Corporate VP

20  of Operations?

21  A.    Correct.

22  Q.    For Performance Food Group?

23  A.    Yes.

24  Q.    Where were you working prior to PFG

```
 1  Springfield?

 2       A.      US Food Service, Peabody,

 3  Massachusetts.

 4       Q.      So same company you're working for

 5  now, different division?

 6       A.      Correct.

 7       Q.      What position did you hold with

 8  Peabody?

 9       A.      My latest position was Vice

10  President of Operations.

11       Q.      Were your duties, when you were at

12  US Food Service at the Peabody location, were

13  they essentially the same as the duties you have

14  now?

15       A.      Yes.

16       Q.      What about when you worked for PFG,

17  were your duties essentially the same as the

18  ones you have now?

19       A.      Yes.

20       Q.      Could you identify any differences

21  between your current position and the position

22  you held when you were with PFG?

23       A.      No.  They're all basically the

24  same.
```

1    A.    Twenty-two would have been the

2  occurrence as opposed to days.  It would have

3  been three sick days -- as I mentioned earlier,

4  three sick days with a doctor's note would have

5  been considered one occurrence.  And I was

6  looking through the rest of the book for a

7  tardiness, and I haven't seen that yet.  It

8  would have included tardiness and left early

9  from the job, and it also would have included

10 the -- as it says in here, consecutive days

11 without notice is considered a voluntary quit.

12 We would have used termination, resignation.

13 And we would have moved that from three days to

14 two days.  Well, I know that it was moved from

15 three days to two days.

16    Q.    And you believe that was announced

17 in a new policy manual as well?

18    A.    Yes.

19    Q.    And eventually put into a handbook?

20    A.    Yes.  The handbook would have

21 consisted of PFG's corporate policies, and then

22 there would have been a section for PFG

23 Springfield specifically.  I'm trying to look

24 through this whole thing relatively quick.

```
 1        A.        Correct.

 2        Q.        And when did he tell you that?

 3        A.        It would have been the second day

 4  that he was a no-call, no-show.

 5        Q.        How do you know that?

 6        A.        Everybody knew our policy.  Two

 7  consecutive no-calls, no-shows was considered

 8  voluntary resignation.

 9        Q.        When you say everybody knew the

10  policy, who do you mean?

11        A.        Everybody.  It was covered in

12  meetings.  Management knew.

13                    MS. GARROW:  Could we mark

14        both of these?

15        (Exhibit 3, Handbook Dated Effective 6/03;

16        Exhibit 4, Undated Handbook, marked for

17        identification)

18                    MS. GARROW:  Let's take a

19        break, and I will give you an opportunity

20        to review these.  Off the record.

21        (A recess was taken)

22                    MS. GARROW:  Back on the

23        record.

24        Q.        (By Ms. Garrow)  Have you had an
```

**REAL-TIME COURT REPORTING**

```
 1          Q.      Okay.   At some point -- well, I
 2    think you have already testified -- and correct
 3    me if I'm wrong -- that Rolando told you that
 4    Mr. Davidson was a no-call, no-show?
 5          A.      For two days, correct.
 6          Q.      What did you do then?
 7          A.      I would have consulted with Peter
 8    Brunault.
 9          Q.      Did you consult with Mr. Brunault?
10          A.      Yes.
11          Q.      Do you recall the conversation that
12    you had with Rolando about the no-call, no-show?
13          A.      I don't remember.  But like I
14    mentioned earlier, I've had a lot of
15    conversations with a lot of associates on other
16    things.  And I don't recall, but there is
17    definitely -- in order for me to discuss a
18    situation that we have, I would have needed to
19    have acknowledgment from the manager in charge
20    of the shift.
21          Q.      Did you try and call Mr. Davidson
22    yourself?
23          A.      No.  It wasn't our policy to call
24    individuals.
```

```
 1        Q.      Did you ask him to call
 2  Mr. Davidson?
 3        A.      I don't recall.  But if I was going
 4  to say anything, I would have said no.
 5        Q.      So your testimony is you didn't?
 6        A.      I didn't.
 7        Q.      What about, did you ask him if he
 8  was aware if anybody that may try to consult
 9  with Mr. Davidson's doctor?
10        A.      I don't recall that.
11        Q.      You don't recall doing that, or you
12  didn't do that?
13        A.      I don't recall.  I specifically
14  don't remember the conversation in general.
15        Q.      Did you direct Rolando to find out
16  what was up by consulting his doctor or having
17  HR consult his doctor?
18        A.      No.  We would have had paperwork
19  stating that he was to return to work at a
20  certain date, or he was expected to be returned
21  at a certain date.
22        Q.      But you never saw that paperwork,
23  correct?
24        A.      Not at that time.
```

```
 1   (phonetic).  He was a supervisor in the
 2   warehouse; is that correct?
 3          A.     Correct.
 4          Q.     Is it correct that he did not have
 5   the power to fire Mr. Davidson?
 6          A.     No.  Every person in management has
 7   the right to dismiss an employee, depending
 8   always on the circumstances.  If somebody throws
 9   a punch at somebody and there's a member of
10   management there, they have the right to
11   dismiss.
12          Q.     Let me ask a different question.
13   It's true that it was you who actually made the
14   decision to terminate Mr. Davidson, correct?
15          A.     I was part of the decision, yes.
16          Q.     In conjunction with Peter Brunault?
17          A.     Yes.
18          Q.     And the two of you were the
19   decision makers?
20          A.     Correct.
21          Q.     Why did Jason sign this document?
22   Do you have any idea?
23          A.     He would be the person that was
24   working that day.  I don't know if Rolando was
```

```
 1        A.       Correct.

 2        Q.       Could you explain what the process

 3   was in developing the change in the no-call,

 4   no-show policy to change from three consecutive

 5   days, no-call, no-show, to two?

 6        A.       I would -- everything that I was

 7   putting in place, or we were working on, was

 8   based on years of experience and trying to

 9   develop a consistency of what I was used to in

10   the past.  I felt that three days was a long

11   period of time.  And I was accustomed to the

12   years in the industry that two was the "norm".

13        Q.       How was that policy implemented?

14   What was the process of getting that changed?

15        A.       As I stated earlier, when I first

16   got there, there was a lot of policies that

17   needed to be enhanced -- or I felt needed to be

18   enhanced.  We were enhancing them and we were

19   updating them, and the process was just

20   basically to be consistent throughout what I

21   have been used to throughout the industry.  And

22   when we were going to address the attendance,

23   attendance also included lates and left-earlies.

24   And we were going to address all areas as best
```

1

Pages 1-101

Exhibits 1-6

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------------------------------

VERNE DAVIDSON,

      Plaintiff

VS.                   Docket No. 05-30094-MAP

SPRINGFIELD FOOD SERVICE CORP.,

PERFORMANCE FOOD GROUP and

PERFORMANCE FOOD GROUP,

      Defendants

--------------------------------------------------------

DEPOSITION OF: PETER BRUNAULT

May 26, 2006

10:00 a.m. - 12:41 p.m.

HEISLER, FELDMAN & MCCORMICK

1145 Main Street

Springfield, Massachusetts

Reporter: Danita Boutiette

Peter Brunault
May 26, 2006

```
 1         A.    Yes.

 2         Q.    And when you were hired in October of

 3    2001, what was your position with PFG?

 4         A.    I believe it was a human resources

 5    generalist, if I remember the title properly.

 6         Q.    And at some point did your position

 7    change?

 8         A.    I was promoted to the manager of human

 9    resources.

10         Q.    Were you the sole manager of human

11    resources?

12         A.    Yes.

13         Q.    And at PFG Springfield?

14         A.    Yes.

15         Q.    And do you remember approximately when

16    that was?

17         A.    I believe it to be in the summer of

18    2002, but I don't remember the exact date.

19         Q.    And what kind of law do you practice

20    now?

21         A.    Our firm is based around mostly real

22    estate, probate, divorce and bankruptcy.

23         Q.    Do you do any employment law?

24         A.    No, I don't.
```

Peter Brunault
May 26, 2006

16

```
 1         Q.    -- to hire people?
 2              Did Rolando have the authority to fire
 3   people independent of anyone else?
 4         A.    No.
 5         Q.    Who had the authority to fire people?
 6         A.    The vice presidents of the area of
 7   responsibility together with human resources.
 8         Q.    And so in Mr. Davidson's case, it would
 9   be Mr. Agganis and yourself?
10         A.    Yes.
11         Q.    And together you had the authority to
12   fire Mr. Davidson?
13         A.    If I understand the question, in terms
14   of the firing, to make the decision to fire, yes.
15         Q.    Who actually made the decision to fire
16   Mr. Davidson?
17         A.    Made cooperatively with myself and
18   Mr. Agganis.
19         Q.    In the employee relations area, you
20   mentioned that was another human resources
21   responsibility, correct?
22         A.    Yes.
23         Q.    What did that include?
24         A.    Probably most notably, any issues
```

Peter Brunault
May 26, 2006

20

1           mark that here as well.

2           (Exhibit 1, Employee Handbook Effective 6/03,

3           marked for identification.)

4           Q.     (By Ms. Garrow)  So your testimony is

5    that you recall one time during the time that you were

6    a human resources manager that you created a new

7    handbook; is that correct?

8           A.     Yes.

9           Q.     And I'm sorry if I asked you this

10   already, but when did you leave PFG?

11          A.     In September of '03.

12          Q.     And when do you recall drafting this

13   handbook in terms of your tenure?

14          A.     That I remember the last handbook issued

15   was fall of '02 was we had a group to try to issue,

16   you know, get it out in the fall of '02.

17          Q.     And let me just -- so you think that is

18   when you drafted that handbook?

19          A.     That is what I recall.

20          Q.     I'm going to show you what is marked as

21   Exhibit 1 to this deposition, and this has been

22   represented to me by your lawyer, as you will see on

23   the bottom, that this was effective in June of '03

24   while you were still there.  So can you tell me if

Peter Brunault
May 26, 2006

39

```
 1   someone were coming in for a six a.m. shift as a

 2   warehouse worker, that is a potential shift right,

 3   coming in at six a.m. and doing stock handling in the

 4   warehouse?

 5        A.    Potentially.

 6        Q.    And if someone were coming in at six

 7   a.m., is it possible that that person could call in as

 8   early as maybe four a.m. if they got up and felt sick?

 9        A.    Possible, yes.

10        Q.    Did that happen on occasion?

11        A.    That I remember, employees would call

12   in, yes.

13        Q.    And so if they did something like that,

14   if they got up at four o'clock and felt lousy and were

15   not going into work, would Rolando be there at four

16   o'clock?

17        A.    Sometimes yes, sometimes no.

18        Q.    And they were supposed to call in, if

19   they worked in the warehouse, to Rolando; is that

20   correct?

21        A.    They were supposed to call in to their

22   -- Rolando would be one person they would call.

23        Q.    Their supervisor; is that correct?

24        A.    Yes.
```

Peter Brunault
May 26, 2006

40

```
 1          Q.    And if you are a stock handler, Rolando
 2    would be a person that you would call in sick to; is
 3    that fair to say?
 4          A.    That I recall.
 5          Q.    So what would happen if the employee
 6    would call in let's say at four a.m. and Rolando
 7    wasn't there, would they leave a message on the voice
 8    mail?
 9          A.    That I recall, yes.
10          Q.    And was there a voice mail system in
11    place for the entire time that you were human
12    resources manager?
13          A.    That I recall, yes.
14          Q.    So to the best of your recollection as
15    you sit here?
16          A.    Yes.
17          Q.    And you have voice mail, I assume?
18          A.    Yes.
19          Q.    Mr. Agganis had voice mail?
20          A.    Yes.
21          Q.    And Rolando had voice mail?
22          A.    Yes.
23          Q.    What about, I believe there was somebody
24    named Jason Sonsowich?
```

1   about May 1st.

2          Q.    And who did you learn that from?

3          A.    I believe I would have learned it from

4   Donna Szabin.

5          Q.    Is that your best recollection that you

6   learned it from Donna Szabin?

7          A.    Yes.

8          Q.    When you got that information, what did

9   you do?

10         A.    That I recall, I asked her to, you know,

11  check further into it and keep me apprised of what was

12  happening, because it was a serious situation.

13         Q.    What did you mean by check further into

14  it?

15         A.    That I recall, she was concerned that

16  she had heard from Occupational Health and not from

17  him, and the employees are instructed to return back

18  to work, go to the doctors and come back and let us

19  know.  It's their responsibility to let us know what

20  is going on.  They have the direct responsibility the

21  way we had structured it that the employee would come

22  with the information and present themselves to us and

23  say this is what is happening, because we had to speak

24  with them face-to-face and determine what we could or

Peter Brunault
May 26, 2006

46

```
 1    could not do for them.  They were supposed to bring

 2    the medical information back to us.  That's what was

 3    clear.

 4          Q.    Did she -- well, that was clear to whom?

 5          A.    To my knowledge, to the employee in

 6    terms of working on, you know, through being injured

 7    on the job.  She worked with employees.  She had

 8    meetings.  She had discussed being injured on the job

 9    and what her responsibility and duties were in terms

10    of notifying us immediately of any accident or

11    injuries.

12          Q.    When were those meetings?

13          A.    That I recall, they were done in various

14    shifts throughout Donna's employment.

15          Q.    And how many meetings did you attend

16    like that?

17          A.    That I recall -- I couldn't recall a

18    specific number.  I probably tried to attend one or

19    two a month.

20          Q.    Do you recall if you saw Mr. Davidson in

21    any of those meetings?

22          A.    That I recall, we would have gathered

23    groups of employees, and he would have been part of.

24    I remember seeing Vern at meetings.  I don't know if I
```

Peter Brunault
May 26, 2006

61

1   that correct?

2        A.    Vern was kind of a loner, you know.  He

3   did his job and was quiet.

4        Q.    Did you ever provide Mr. Davidson with a

5   written statement outlining the -- well, let me strike

6   that.

7             Who was responsible for any employee

8   exercise -- any employee who was going to exercise the

9   FMLA policy; who was responsible to administer the

10  FMLA policy at PFG Springfield?

11       A.    Human resources was.

12       Q.    That would be you, essentially, right;

13  you were responsible for FMLA leave?

14       A.    Combination of myself working together

15  with the benefits department.

16       Q.    Well, who would make the decision

17  whether or not to grant FMLA leave?

18       A.    I would be the one.

19       Q.    Did you ever provide Mr. Davidson with

20  any written statement outlining the details of his

21  rights and obligations for FMLA leave?

22       A.    He never requested, or we didn't have a

23  conversation.  I didn't get a chance to talk to him,

24  so I don't know.  The only thing would be the employee

**Peter Brunault**
**May 26, 2006**

62

```
 1   handbook.

 2         Q.    So is that a no?

 3         A.    I would say a no.

 4         Q.    Did you ever provide Mr. Davidson with

 5   any written statement outlining the consequences to

 6   the employer of a failure to meet those obligations?

 7         A.    No.

 8         Q.    Or of the employee for failing to meet

 9   the FMLA obligations, did you ever give him a written

10   statement?

11         A.    No.

12         Q.    Did you ever request further medical

13   certification from Mr. Davidson regarding the

14   work-related injury that he suffered on April 24,

15   2003?

16         A.    I'm not sure I understand the question.

17         Q.    Did you ever provide him with a medical

18   certification form regarding his April 24, 2003

19   injury?

20         A.    Certification form.  Myself, I did not

21   provide him with, no.

22         Q.    Did you personally ever see the notes

23   from the doctor that were faxed to Ms. Szabin

24   regarding Mr. Davidson?
```

Peter Brunault
May 26, 2006

69

```
 1   did as a result of that first meeting?
 2          A.     Yes.
 3          Q.     And that you were aware what Mr. Agganis
 4   or Ms. Szabin did as a result of that first meeting,
 5   you already told me everything about that first
 6   meeting?
 7          A.     Yes.
 8          Q.     I would like to take you to the second
 9   meeting.
10          A.     Sure.
11          Q.     What do you recall about that meeting?
12          A.     My recollection is that when
13   Mr. Davidson did not call in for a second day, it
14   raised the level of concern about combination of not
15   bringing the paperwork back from the doctor, which was
16   deemed by Mr. Agganis as insubordinate, and his
17   no-call, no-show, and basically we felt was blatant
18   disregard to company policy and rules at that point,
19   and he was kind of doing what he wanted to do.
20          Q.     And just so we're clear, you were
21   already aware that he was injured at that time,
22   correct?
23          A.     We had knowledge of his injury, yes.
24          Q.     And you had known he had been to the
```

Peter Brunault
May 26, 2006

80

```
 1        A.    I don't know.

 2        Q.    Is there any way that he could have

 3  independent knowledge of that, Mr. Sonsowich in his

 4  position, that Mr. Davidson failed to bring paperwork

 5  back from the doctor?

 6        A.    I would say no.

 7              MS. GARROW:  I'm going to ask that you

 8        mark this.

 9        (Exhibit 4, Termination Letter, marked for

10        identification.)

11              MS. GARROW:  Off the record.

12         (Short recess taken.)

13              MS. GARROW:  Back on the record.

14        Q.    (By Ms. Garrow)  I'm showing what has

15  been marked as Exhibit 4 to your deposition.

16        A.    Okay.

17        Q.    And this is the letter of termination

18  that you sent to Mr. Davidson; is that correct?

19        A.    Yes.

20        Q.    And I guess it was mailed on May 5th,

21  certified mail; is that correct?

22        A.    Yes.

23        Q.    Is that the date that is on there?

24        A.    Correct.
```

Peter Brunault
May 26, 2006

81

1        Q.    So presumably he would have gotten it
2   the next day or so; is that your understanding?
3        A.    Yes.
4        Q.    And so you start off by saying that this
5   letter is regarding your employment at PFG
6   Springfield, correct?
7        A.    Correct.
8        Q.    And that you cite that on April 28 he
9   contacted human resources to inform us that you felt
10  you hurt yourself at work on April 24.  Am I reading
11  that correctly?
12       A.    Yes.
13       Q.    And then it says, You were immediately
14  informed that reporting of your injury was less than
15  timely.  What did you mean by that?
16       A.    There was a time lag between the 24th
17  and 28th.
18       Q.    But you had already agreed that
19  Plaintiff's Exhibit 2, which is the DIA handout, was
20  essentially a correct statement of the law; is that
21  correct?
22       A.    That I recall, yes.
23       Q.    And so according to this, and I'll have
24  you take a look at it, it would not appear to be

Peter Brunault
May 26, 2006

97

1    2nd, 2003 was eligible for family medical leave?

2            A.    I don't know.  I mean he never requested

3    any family medical leave.

4            Q.    So is it your position that Mr. Davidson

5    never requested family medical leave?

6            A.    Correct.

7            Q.    Is there any other basis other than that

8    that you did not grant his family medical leave at

9    that time?

10           A.    I had no idea whether the circumstances

11   would warrant it.

12           Q.    And did you do any investigation into as

13   to whether they would?

14           A.    No.

15           Q.    Did you conduct any research?

16           A.    No.

17           Q.    Did you contact counsel?

18           A.    I don't recall.

19           Q.    You don't recall, or you don't think you

20   did?

21           A.    I don't think I did.

22           Q.    Any other basis for denying family

23   medical leave other than what you just testified to?

24                 MR. MURPHY:  Objection to denying.

**Rolando Pagan**
**May 11, 2006**

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

No. 05-30094-MAP

VERNE DAVIDSON

Plaintiff

vs

SPRINGFIELD FOOD SERVICE CORP.,

PERFORMANCE FOOD GROUP

Defendants



DEPOSITION OF ROLANDO PAGAN

May 11, 2006, 2:00

Heisler, Feldman, McCormick and Garrow

1145 Main Street

Springfield, Massachusetts

Ann A. Preston

Certified Shorthand Reporter

REAL-TIME COURT REPORTING

1331 Main Street                     807 Main Street

Springfield, MA  01103        Worcester, MA  01610

413.732.1157                          508.612.3432

Rolando Pagan
May 11, 2006

11

1    -- I'm not going to hold you to the exact dates

2    -- but that you were day warehouse manager

3    sometime between maybe February or so of 2002 and

4    February or so of 2004; does that sound about

5    right?

6        A.    That's about right, yes.

7        Q.    What were your duties as day warehouse

8    manager?

9        A.    As a warehouse manager, I watched the

10   floors, position people in their, you know --

11   move people as needed to see that the work got

12   done for the day.  Also manager of the

13   departments like customer service, receiving,

14   damages, returns, which is product that comes

15   back from the customer.

16       Q.    Are those for separate departments --

17   customer service, receiving, damages, and

18   returns?

19       A.    Yes.

20       Q.    Do each of them have people working in

21   those departments?

22       A.    Yes.

23       Q.    Is the floor a different department?

24       A.    Yes.

Rolando Pagan
May 11, 2006

14

```
1         Q.   So you had no selectors working for

2    you?

3         A.   No -- one.  The customer service guy

4    would be a selector.  He'll pick small orders,

5    but nothing like the night shift does.  The night

6    shift, they pick -- that's their main function.

7    They pick pallets, load the trucks, and ship the

8    product out.

9         Q.   I understand.  So in the first half of

10   2003, based on what you told me, it sounds like

11   you had maybe twenty, twenty-two stock handlers

12   working for you.  Does that sound about right?

13        A.   Yes, it sounds about right.

14        Q.   Do you recall a stock handler Verne

15   Davidson?

16        A.   Yes.

17        Q.   Do you recall -- if I told you that he

18   was terminated from his employment around May 2,

19   2003 -- I'm telling you that fact, okay, on or

20   around May 2, 2003 -- do you recall who were the

21   next stock handlers who were hired to replace

22   Mr. Davidson?

23        A.   To replace Mr. Davidson -- I don't

24   think anybody was really hired to replace him.
```

**REAL-TIME COURT REPORTING**
413-732-1157 Springfield                    508-612-3432 Worcester

**Rolando Pagan**
**May 11, 2006**

45

```
 1      no-call/no-show policy at PFG Springfield?

 2           A.   Yes.  I want to say it's --

 3           Q.   First of all, let me just ask you, is

 4      there a policy?

 5           A.   Yes.

 6           Q.   Was that policy the same for the

 7      entire time you were the warehouse manager?

 8           A.   Yes.  That I know of, yes.

 9           Q.   Can you describe the no-call/no-show

10      policy as you understood it when you were the

11      manager?

12           A.   I understood a no-call/no-show, two

13      consecutive days would be an automatic

14      termination.

15           Q.   How did you get that understanding?

16           A.   I want to say maybe by speaking with

17      Peter Brunault.  For example, if an individual

18      didn't show up for work and he didn't call in,

19      I'd seek Human Resources' advice on the matter.

20           Q.   That was your practice?

21           A.   Yes.

22           Q.   When did Peter Brunault start there;

23      was it before you began, was he already there?

24           A.   No.
```

**REAL-TIME COURT REPORTING**
413-732-1157 Springfield          508-612-3432 Worcester

53

```
 1          A.   We call the employees to the

 2     conference room and we would watch the video, and

 3     after the video there's a small test on what

 4     you've seen.

 5          Q.   Do you know who would call those

 6     employees to the conference room, whose idea that

 7     was?

 8          A.   At the time?

 9          Q.   Yes, around April of 2002?

10          A.   I don't know.

11          Q.   Do you know whose idea it was to call

12     employees to the conference room to see these

13     videos around April 2003?

14          A.   I can't remember.

15          Q.   Do you know if employees were still

16     seeing videos in April 2003 with the same

17     frequency that you've described?

18          A.   I think we've always -- the time that

19     I've been there, we've always had safety issues.

20     I feel that we -- after merging with PFG, it

21     became more of a policy to watch them on a more

22     frequent basis.  With SFC, it wasn't the same.

23          Q.   So there was a greater emphasis, you

24     believe, on safety with PFG; is that fair to say?
```

Rolando Pagan
May 11, 2006

54

| | |
|---|---|
| 1 | A.    Yes. |
| 2 | Q.    Were you ever instructed about what to |
| 3 | do with relation to workers' compensation |
| 4 | injuries? |
| 5 | A.    No. |
| 6 | Q.    Were you ever told by anybody from |
| 7 | PFG -- well, let me ask you this; strike that. |
| 8 | You said you believe it became more of a concern |
| 9 | of PFG, that safety became more of a concern, is |
| 10 | that correct? |
| 11 | A.    Yes. |
| 12 | Q.    How did you get that impression? |
| 13 | A.    Just in the amount of times that we |
| 14 | watch videos. |
| 15 | Q.    So -- |
| 16 | A.    We seemed to watch them more -- I'm |
| 17 | sorry. We seemed to watch them more often ever |
| 18 | since PFG came along. |
| 19 | Q.    So the frequency with which you watch |
| 20 | videos is the only reason that you can point to |
| 21 | for the increased concern over safety with PFG, |
| 22 | or is there something other than that? |
| 23 | A.    There's more signs put up. |
| 24 | Q.    Did Charlie or Peter ever talk to you |

Rolando Fagan
May 11, 2006

55

1    about safety issues?

2        A.   Yes, we talked about safety issues in

3    the warehouse -- heightened awareness is what I

4    want to say.

5        Q.   Are you talking about your heightened

6    awareness or --

7        A.   The employees'.

8        Q.   And sort of the word is -- in other

9    words, you were trying to heighten employee

10    awareness?

11        A.   Yes.

12        Q.   Did somebody tell you to heighten

13    employees' awareness?

14        A.   From conversations we had, Charlie,

15    Peter, myself.

16        Q.   Do you remember about how often you

17    talked about safety concerns or issues with

18    Charlie and/or Peter?

19        A.   I can't recall.

20        Q.   Do you think it was five times, more

21    than five times, less than five times?

22        A.   I would say it was more than five

23    times.

24        Q.   Maybe ten times?

Rolando Pagan
May 11, 2006

60

```
 1      or do something that's not going to cause them to

 2      twist and turn.

 3          Q.    Anything else that you remember about

 4      any of these conversations you said you've had

 5      about safety concerns with either Charlie or

 6      Peter?

 7          A.    No.

 8          Q.    Do you remember anything else at this

 9      time about any of those conversations?

10          A.    No.

11          Q.    Did you ever know that Verne Davidson

12      was injured at work; did you ever become aware of

13      that?

14          A.    Yes.

15          Q.    How did you become aware of that?

16          A.    I want to say that, my best knowledge,

17      that, from what I can remember, he called me.  I

18      want to say he left a message saying that he

19      wouldn't be into work because he hurt his back.

20      Now, I wasn't aware whether he hurt -- because he

21      had a second job.  So I wasn't aware whether he

22      got hurt on our job or whether he got hurt on the

23      other job, because I spoke to Donna -- Donna or

24      Peter, I don't remember which -- and I told them
```

Rolando Pagan
May 11, 2006

61

1    that he was out because his back was hurt.  And

2    they said -- they asked me, Did he got hurt here

3    or was it out of work.  I said, I don't know.  I

4    said, He didn't mention anything to me last time

5    I saw him.  I just got a message from him saying

6    he wasn't going to come into work because he hurt

7    his back.

8        Q.   Do you remember when you got that

9    message?

10       A.   I don't.

11       Q.   Do you remember if you were there when

12   he hurt his back at work?

13       A.   If I was there the day?

14       Q.   Yes.

15       A.   Yes, I would have been there that day.

16       Q.   Because you were there every day

17   probably at that point, right?

18       A.   Yes.

19       Q.   And so your understanding is that --

20   well, at some point he called you and left a

21   message, said his back hurt, he wasn't coming in?

22       A.   Yes.

23       Q.   Did you call him back?

24       A.   I can't recall.

Rolando Pagan
May 11, 2006

82

```
 1          Q.    Sure.
 2                      (Reporter read back)
 3          A.    Yes.
 4          Q.    Thank you.  Did you ever become aware
 5     whether Mr. Davidson did apply?
 6          A.    No, I wasn't aware.
 7          Q.    Did anyone at PFG ever ask you to
 8     consider giving Mr. Davidson an accommodation so
 9     that he would be able to work at PFG?
10          A.    What do you mean by an accommodation?
11          Q.    Do you know what an accommodation is?
12          A.    Yes, I know what an accommodation is,
13     but accommodation for what?
14          Q.    Why don't you describe for me what you
15     understand an accommodation to be, then I can
16     better ask the question.
17          A.    Well, if a person can't lift, then you
18     accommodate him with putting him on a job where
19     he doesn't have to lift.  When they come in with
20     light duty, they come in with restriction, so you
21     kind of have to accommodate with, you know --
22          Q.    Light duty work?
23          A.    So they can work.
24          Q.    Did anyone ever ask you to find some
```

83

1    kind of work that Mr. Davidson could do?

2         A.    For light duty?

3         Q.    Yes, or any kind of accommodation?

4         A.    Yes.

5         Q.    When was that?

6         A.    When he was supposed to go back to

7    work.  I was told my Human Resources that he was

8    released to work on light duty and that he would

9    be coming back to work, to make sure that we have

10   work for him.

11        Q.    Who told you that?

12        A.    I don't know if it was Donna or Peter.

13        Q.    But it was one of those two?

14        A.    I want to say it was one of those two,

15   yes.

16        Q.    Was that in one conversation or over

17   several conversations?

18        A.    I can't recall.  I don't remember.

19        Q.    Do you remember what you said in

20   response?

21        A.    Yes, like I always do.

22        Q.    Okay.  Do you ever fill out workers'

23   comp. injury reports, or did you ever do that

24   while you were a warehouse manager?

**Rolando Pagan**
**May 11, 2006**

87

```
 1          Q.   Is it fair to say that there are a
 2    good number of people who get terminated from
 3    either SFC or PFG for no-call/no-show?
 4          A.   Normally if you are no-call/no-show,
 5    it's the same for everybody, no matter who it is;
 6    you would be terminated.
 7          Q.   About how many people a year are
 8    no-call/no-show; do you have any idea?
 9          A.   It hasn't happened in a long time.
10    That I can recall, I've known of Verne, and there
11    was other guy that was nicknamed Tiger.  I don't
12    know his real name, but -- out of those two, I
13    don't remember anybody.
14          Q.   So those are the only two people that
15    you can recall, no-call/no-show?
16          A.   Yep.
17          Q.   And is that while you were a warehouse
18    manager you're talking about?
19          A.   Yes.
20          Q.   Do you know how long Tiger had been
21    working for the company when he was terminated
22    for no-call/no-show?
23          A.   Maybe getting close to a year.
24          Q.   Do you think it was less than a year?
```

Rolando Pagan
May 11, 2006

94

```
1          A.    If he filed a --
2          Q.    Yes, did Tiger ever file a workers'
3    compensation claim while he was working at PFG?
4          A.    No, I don't think so.
5          Q.    Did he ever hurt himself at work, to
6    your knowledge?
7          A.    No.
8          Q.    What is his race?
9          A.    Hispanic.
10         Q.    And do you know about how old he was?
11         A.    I want to say maybe like thirty-three.
12         Q.    Are you aware of anybody who was out
13   for two consecutive days at any time that you
14   have been at either SFC or PFG who was not
15   terminated?
16         A.    No.
17         Q.    You're not aware of anybody?
18         A.    No.
19                (Exhibit 6, Earning Statement,
20                 marked for identification)
21         Q.    (By Ms. Garrow)  I'm showing you
22   Plaintiff's Exhibit 6, and I'm wondering if you
23   know what any of these numbers mean here.  It's
24   an earning statement front page.
```

Pages 1-122
Exhibits 1-11

------------------------------------------------

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CA NO.: 05-30094-MAP


VERNE DAVIDSON,
                    Plaintiff

v.

SPRINGFIELD FOOD SERVICE CORP.,
PERFORMANCE FOOD GROUP and
PERFORMANCE FOOD GROUP,
                    Defendants


------------------------------------------------


DEPOSITION OF DONNA SZABAN

MAY 10, 2006

AT THE LAW OFFICES OF

HEISLER, FELDMAN, McCORMICK & GARROW

1145 MAIN STREET

SPRINGFIELD, MASSACHUSETTS


Reporter:  Raymond F. Catuogno, Jr.

**REAL-TIME COURT REPORTING**
*1331 Main Street*                      *807 Main Street*
*Springfield, MA   01103*        *Worcester, MA   01610*
*413.732.1157*                          *508.612.3432*

```
 1          A.      Possibly, yes.
 2          Q.      Do you recall if any accommodations
 3   were considered for Mr. Davidson based on his
 4   work-related injury?
 5          A.      I don't recall.  Our practice is to
 6   make accommodations for anyone that comes back
 7   light duty.
 8          Q.      To give them light duty, is that
 9   the accommodation you're claiming, or something
10   else?
11          A.      What do you mean?
12          Q.      Well, you said our practice is to
13   give accommodations to anybody that comes back
14   light duty?
15          A.      Correct.
16          Q.      But my question is, is light duty
17   the accommodation you're claiming, or is this
18   something other than light duty that you have
19   considered in the past?
20          A.      I still don't understand the
21   question.
22          Q.      Is it light duty accommodation that
23   you offer at Performance Food Group Springfield?
24          A.      Yes.
```

```
 1        A.      I would assume payroll.

 2        Q.      But you don't know?

 3        A.      No.

 4        Q.      Of the stock handlers that you

 5   remember, do you know if any of them are

 6   disabled?

 7        A.      No, I don't.  Not to my knowledge.

 8        Q.      What about -- have any of them had

 9   Workers' Comp injuries?

10        A.      Yes.

11        Q.      Who?

12        A.      Of all the ones I just answered, or

13   all the stock handlers that we have?

14        Q.      Let's start with the ones you just

15   mentioned.  Did any of them ever have Workers'

16   Comp injuries?

17        A.      I know that Kevin did when he was a

18   selector.  He was the African-American that got

19   promoted to supervisor.  When he was a selector,

20   he had a Workers' Comp injury.

21        Q.      Is selector the same as stock

22   handler?

23        A.      No.  It's working third shift.

24        Q.      And is Kevin still there?
```

```
 1        A.      Yes.

 2        Q.      What is his last name?

 3        A.      Holbrook.  And of the newest ones I

 4  just went through, I don't think so.

 5        Q.      Do you know who Scott Urban is?

 6        A.      He's a selector.

 7        Q.      What is his race?

 8        A.      He's white.

 9        Q.      What about Albert Larriu, what is

10  his position?  Do you know who that is?

11        A.      He's a driver.

12        Q.      And does he still work there?

13        A.      No.

14        Q.      Was he terminated?

15        A.      Yes.

16        Q.      Why?

17        A.      No call, no show.

18        Q.      And how many days in a row was he a

19  no call, no show?

20        A.      Two.  The third day he was

21  terminated.

22        Q.      And the third day he didn't show,

23  he was terminated?

24        A.      Yes.
```

| | | |
|---|---|---|
| 1 | Q. | Is that your policy? |
| 2 | A. | Yes. |
| 3 | Q. | What about Richard Clifford? |
| 4 | A. | He's a driver. |
| 5 | Q. | Does he still work there? |
| 6 | A. | Yes. |
| 7 | Q. | What is his race? |
| 8 | A. | He is white. |
| 9 | Q. | Scott Michaud? |
| 10 | A. | He still works there.  He's a |
| 11 | driver. | |
| 12 | Q. | And what is his race? |
| 13 | A. | White. |
| 14 | Q. | And Donald Carty? |
| 15 | A. | He's a forklift -- he loads the |
| 16 | trucks at night.  He's still there. | |
| 17 | Q. | At night? |
| 18 | A. | Yes. |
| 19 | Q. | What is his race? |
| 20 | A. | African-American. |
| 21 | Q. | And how long has he been there, do |
| 22 | you know? | |
| 23 | A. | No, I don't know. |
| 24 | Q. | Was he there before you were? |

Pages 1-164
Exhibits 1-6

---------------------------------------------------------

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CA NO.: 05-30094-MAP

VERNE DAVIDSON,
                    Plaintiff

v.

SPRINGFIELD FOOD SERVICE CORP.,
PERFORMANCE FOOD GROUP and
PERFORMANCE FOOD GROUP,
                    Defendants

---------------------------------------------------------

DEPOSITION OF 30(b)(6) DESIGNEE

PAMELA JEANNE BURNS

JULY 7, 2006

AT THE OFFICES OF

REAL-TIME COURT REPORTING

1331 MAIN STREET

SPRINGFIELD, MASSACHUSETTS

Reporter:  Raymond F. Catuogno, Jr.

**REAL-TIME COURT REPORTING**
**1331 Main Street**          **807 Main Street**
**Springfield, MA   01103**   **Worcester, MA   01610**
**413.732.1157**                   **508.612.3432**

```
 1        A.      Yes.

 2        Q.      Can we go on to the next

 3   individual?

 4        A.      Sure.  In 2004, at the bottom of

 5   the page, James McMillian.  Termination date,

 6   December 2, 2004.

 7        Q.      Bear with me one minute,if you

 8   don't mind.

 9        A.      Sure.

10        Q.      Okay.

11        A.      Okay.  Based on the information

12   that I was able to pull out of his file, it

13   shows here that he had called out sick for one

14   shift but then was a no-call, no-show for the

15   rest of that week.

16        Q.      Who was his supervisor; do you

17   know?

18        A.      At the time it would have been

19   Tami, T-A-M-I, Aldrich, A-L-D-R-I-C-H.

20        Q.      When was Mr. McMillian's no-call,

21   no-show?

22        A.      It may be in the -- there may be

23   supporting documents in the information that we

24   provided for you.  I would have pulled his
```

```
 1        A.      That he called out sick for one

 2  shift, and the subsequent two shifts he was

 3  no-call, no-show.

 4        Q.      So for three shifts total he was

 5  no-call, no-show?

 6        A.      No.  He called out, so he had

 7  called our line and called out on the first day.

 8  So that's not a no-call, no-show.  I mean, he

 9  called out, but then the subsequent two days

10  following that he was no-call, no-show.

11        Q.      And Mr. McMillian -- it

12  appears looking at the following -- one of the

13  following documents that has his name on it,

14  date issued, 11/12/04, in the same packet of

15  information, that he was involved in progressive

16  discipline; is that fair to say?

17        A.      Yes, it is.

18        Q.      And can you explain what I'm

19  looking at here?

20        A.      This is a form that we utilize to

21  document progressive discipline for associates.

22  You can see there is basically four levels to

23  the progressive discipline process.  You see

24  coaching and counseling, written warning,
```

1               Volume 1, Pages 1-69

2           UNITED STATES DISTRICT COURT

3            DISTRICT OF MASSACHUSETTS

4               C.A. No.:  05-30094MAP

5    *******************************

6    VERNE DAVIDSON,

7            Plaintiff

8       vs.

9    SPRINGFIELD FOOD SERVICE CORP.,

10   PERFORMANCE FOOD GROUP AND

11   PERFORMANCE FOOD GROUP,

12           Defendants

13   *******************************

14       DEPOSITION OF:  JAMES HAGBERG

15         SKOLER, ABBOTT & PRESSER

16            1414 Main Street

17         Springfield, Massachusetts

18         Thursday, May 18, 2006

19         10:20 a.m.  -  11:25 a.m.

20         Reporter:  Kelly M. Bruce

21       PERLIK AND COYLE REPORTING

22            1331 Main Street

23         Springfield, MA 01103

24            (413) 731-7931

1    before?

2        A.      No.

3        Q.      All right.  Was that only occasion

4    you filled it out?

5        A.      Yes.

6        Q.      And what, if anything, happened after

7    you filled out the form?

8        A.      It depends on the injury.

9        Q.      I guess what I mean is:  In your

10   particular case, what happened after you filled

11   out the form?

12       A.      I think I went back to work.

13       Q.      All right.  You didn't go to the

14   doctor?

15       A.      No.

16       Q.      No one asked you to go to the doctor?

17       A.      It wasn't broken or nothing, it was

18   just swollen, but I was able to go back to work.

19       Q.      Did it affect your ability to do your

20   job afterwards?

21       A.      No.

22       Q.      All right.  Were you assigned to any

23   light duty as a result of the injury?

24       A.      Yes.  Maybe for like a day.

```
 1          Q.      What did that consist of?

 2          A.      Cleaning, sweeping up the

 3     warehouse --

 4          Q.      Okay.  So those were duties that are

 5     different --

 6          A.      -- doing damage.

 7          Q.      Sorry.  I interrupted you.  So

 8     cleaning, sweeping, and doing damage, those were

 9     duties that you didn't ordinarily perform; is

10     that correct?

11          A.      Correct.

12          Q.      And was it your understanding those

13     were light or restricted types of duties?

14          A.      Correct.

15          Q.      And who assigned you those duties?

16          A.      Rolando Pagan.

17               (Jan Brewster enters room)

18               MS. GARROW:  I'm sorry.  I'm

19          going to interrupt.  Somebody just

20          walked in.  I just want to know who that

21          is.

22               MR. MURPHY:  Okay.  Yes.  This is

23          Jan Brewster from Performance Food

24          Group.
```

1          MS. GARROW:  What is her position

2      with Performance Food Group?

3          MS. BREWSTER:  I'm here for Pam

4      Burns, she is out on short-term

5      disability.  So I'm just here to listen.

6      I kind of represent her, but quietly.

7          Q.    (By Mr. Murphy)  And Mr. Pagan

8   assigned you to those light duties; is that

9   correct?

10         A.    Correct.

11         Q.    Do you know why he did that?

12         A.    I'm not sure.

13         Q.    Did you ask him to assign you to

14   light or restricted duty?

15         A.    No.

16         Q.    And your understanding is, that lasts

17   for a day or so?

18         A.    Correct.

19         Q.    And how did it come to an end, the

20   light duty, in your case?

21         A.    I basically told him I can get back

22   to my regular duties.

23         Q.    How did he respond?

24         A.    He said, sure.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VERNE DAVIDSON,<br><br>     Plaintiff,<br><br>vs.<br><br>SPRINGFIELD FOOD SERVICE<br>CORP. and PERFORMANCE<br>FOOD GROUP,<br><br>     Defendants. | CIVIL ACTION NO. 05-30094-MAP |

## AFFIDAVIT OF PAMELA J. BURNS IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Pamela J. Burns, under the pains and penalties of perjury, do hereby state:

1.  I am the Regional Vice President for Human Resources for Performance Food Group. In that capacity, I oversee the human resource function at Defendant Springfield Foodservice Corporation (SFC).

2.  SFC was purchased by Defendant Performance Food Group, Inc. (APFG@) on September 12, 2001. SFC, which now does business as PFG-Springfield, is a wholly-owned subsidiary of PFG. PFG is a publicly-held corporation headquartered in Richmond, Virginia.

3.  SFC is a food service marketer and distributor to restaurants; catering and banquet facilities; schools and colleges; hospitals, nursing homes and retirement communities; correctional facilities; government and military installations throughout all of New England, eastern New York, northern New Jersey, and northeastern Pennsylvania.

4.  SFC hired Mr. Davidson as a stock handler and he began work on August 16, 1988. At all times during his employment by SFC, Mr. Davidson was an at-will employee.

5.  SFC has granted employees FMLA leave.

6.  I oversaw the compilation of the list of employees terminated for violating SFC's "No call, No show" policy at the request of Mr. Davidson's attorney.  I also oversaw the compilation of the Employee Change forms reflecting the separation from employment of each listed employee.  The list and the Employee Change forms attached as Exhibit 15 to *Defendants' Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried*, were provided to Attorney Garrow on July 7, 2006.

I have read the above and swear that it is true.

_____
Pamela J. Burns

Case 3:05-cv-30094-MAP    Document 21-10    Filed 12/01/2006    Page 1 of 1



**Start:** **1815 Roosevelt Ave**
Springfield, MA 01109-2439, US

**End:** **340 Taylor St**
Springfield, MA 01105-1110, US

**Notes:**



| Directions | Distance |
|---|---|
| **Total Est. Time:** 7 minutes    **Total Est. Distance:** 2.82 miles | |
| **START** **1:** Start out going NORTH on ROOSEVELT AVE toward BAY ST. | 0.1 miles |
| **2:** Turn LEFT onto BAY ST. | 0.7 miles |
| **3:** Turn SLIGHT RIGHT onto TAPLEY ST. | 0.5 miles |
| **4:** Turn LEFT onto ST JAMES AVE. | 0.2 miles |
| **5:** Turn SLIGHT RIGHT onto ALBANY ST. | 0.7 miles |
| **6:** Turn LEFT onto ARMORY ST. | <0.1 miles |
| **7:** Turn RIGHT onto TAYLOR ST. | 0.3 miles |
| **END** **8:** End at **340 Taylor St** Springfield, MA 01105-1110, US | |

**Total Est. Time:** 7 minutes    **Total Est. Distance:** 2.82 miles

**ORBITZ** Map out great hotel rates on Orbitz

11/28/2006 2:59 PM

Verne Davidson called me (Donna Szaban) on 4/28 stating that he got hurt on 4/24. I told him that he only had 24 hours to fill out the report. Then I told him to go to Occupational Health and come back to work to fill out the report and bring me the doctor's note. He never came in. The doctor's note said that he was released light duty on 5/1. We had made several attempts to contact Verne, with no response.

HEALTH REHAB

**Occupational Health + Rehabilitation Inc (DSPRING)** PATIENT STATUS FORM

Orlando Drive          Springfield MA 01104    Phone:413-746-4806 Fax: 413-746-3238

**Date:** 04/29/03    04:15P
**Patient name:** Davidson, Verne
**Physician:** B. Magnus, MD
**Injury ID:** 2    **Diag. Code:**

**Visit type:** WC Initial Visit (in advance)
**SS#:** 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    **DOI:** 04/25/03
**Date of first visit:** 04/29/03
**Description:**

**COMPANY**
**Name:** Springfield Food Service Corp.
**Contact:** Donna Szaban
**Phone:** 413-733-3053
**Fax:** 413-781-7139
**Patient description of injury/illness:**
BACK INJURY. ALS

**INSURER**
**Name:** CNA/Rskco Ins
**Phone:** 800 405-9378
**Fax:** 800-845-5331

OOC trying
to reach Verne
4137361528

| | | | |
|---|---|---|---|
| **Previous treatment?** ☐ yes ☐ no | were x-rays taken? ☐ yes ☐ no facility ____ | | |

| | |
|---|---|
| **Physician report and treatment plan** | diagnosis (L) L/I Strain c sprain |
| | treatment plan rest / neurontin / vicodin (W) |
| | begin P.T. |

medication ☐ anti-inflammatory/analgesic ☐ antibiotic ☐ other

**Therapy Rx*** ☐ physical therapy ☐ job simulation ☐ hand therapy ☐ splinting [ ] discharge from therapy

workplace ☐ rehabilitation ☐ job analysis ☐ other ____

frequency ☐ daily ☐ TIW ☐ BIW duration ____ weeks/treatments

**Work recommendations**
☐ Employee may return to work without restrictions. Effective ____
☑ Employee may return to work with the following restrictions. Effective 5-1-03

☑ No lifting over (5/-10) 25 lbs.
☑ No repetitive pushing, pulling
☑ No repetitive twisting, bending, squatting
☐ No repetitive stooping, kneeling
☑ No prolonged standing, walking 20-30 minutes/hour
☐ Alternate standing / sitting ____ minutes/hour
☐ No work involving use of right / left
☐ No restraints
☐ No repetitive bending / twisting using right / left

☐ No reaching above shoulder level
☐ No moving or transferring patients
☐ No work requiring depth perception (i.e., operating machinery, driving)
☐ Must keep area clean and dry
☐ Sit down work only
☐ Wear splint
☐ Limit work involving use of right / left
☑ No driving community
☐ Other

☑ Unable to return to work    Estimated time out of work 4/28-4/30 Total number of restrictions ____

**\*for approval of therapy services**
☐ approval ☐ denial signature ____ date ____

prognosis                                                    #20918!

special instructions
follow-up 5/6  4:00 pm  signature Barry M. Magnus  date 4-29-03

After employee is evaluated and treated, company contact called:

person contacted ____ call ☐ fax ☐ date ____ initials ____

☐ Patient no-showed for MD follow-up appointment    ☐ Patient cancelled

EXHIBIT
① Davidson

Reschedule

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

VERNE DAVIDSON,

                    Plaintiff,

vs.                                                    CIVIL ACTION NO. 05-30094-MAP

SPRINGFIELD FOOD SERVICE
CORP. and PERFORMANCE
FOOD GROUP,

                    Defendants.

## AFFIDAVIT OF JASON SOSNOWICH IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Jason Sosnowich, under the pains and penalties of perjury, do hereby state:

1. I am presently employed by SFC as a stock handler. In May 2003 I was a warehouse supervisor. In that capacity, I supervised Verne Davidson.

2. Before I became a warehouse supervisor, I was a stock handler. During that time, I got hurt at work. My injury caused me to lose time for work. I received workers compensation during the time that I was out of work. Some time after I returned to work from my workplace injury, I was promoted to warehouse supervisor.

3. When Mr. Davidson did not report for work on the early morning of Friday, May 2, 2003, I checked my voicemail to see if Mr. Davidson had called in. I had no voicemail from him. I also checked Mr. Pagan's voicemail for a message from Mr. Davidson after getting Mr. Pagan's voicemail password from him. Mr. Pagan was at home because he had the day off. There was no message from Mr. Davidson on Mr. Pagan's voicemail either. I checked Mr. Pagan's voicemail again and my own before 8:00 a.m. and there was still no message from Mr. Davidson. So I informed my manager, Charles Agganis, that Mr. Davidson was absent again and that we had no word from him. I checked the voicemails through the day but never heard a voicemail from Mr. Davidson. I signed Mr. Davidson's termination form around 3:00 p.m. that afternoon right after being informed of the decision to terminate him.

1

4.  In May 2003 I understood the company's "No call, No show" policy to provide for termination after two consecutive days of failing to report absences.

I have read the above and swear that it is true.

Jason Sosnowich

2

**Jan Brewster**

| | |
|---|---|
| **From:** | Charles Agganis |
| **Sent:** | Friday, September 26, 2003 7:49 AM |
| **To:** | Mark Allen; Trans Support Team; Jan Brewster; Donna Szaban |
| **Subject:** | RE: Gary Michaelis |

2 consecutive days without notice is volunteer termination.  No need to call anybody.  Thanks

-----Original Message-----
**From:  Mark Allen**
**Sent:**    Thursday, September 25, 2003 9:20 PM
**To:**       Trans Support Team; Jan Brewster; Donna Szaban
**Subject:**      Gary Michaelis

Gary Michaelis has not reported to work in 2 days.  No call/ No show.  I have left a message on his home machine requesting that he call in to inform us of his intentions.  I would think that he isn't coming back.  Mark

1



Certified Mail

May 5, 2003

Mr. Verne Davidison
32 Dawes Street
Springfield, Ma

Dear Verne,

Please be informed that this letter is being sent to regarding your employment at PFG Springfield. On April 28th you contacted Human Resources to inform us that you felt you hurt yourself at work on April 24th. You were immediately informed that the reporting of your injury was less than timely. You were then instructed by Donna Szaban, Human Resources Generalist to go to Occupational Health for a post- accident urinalysis and medical exam. You were further instructed to return to the company to complete an accident report and discuss your work status following the exam. You never reported back to the company following your exam on 4/28 thus violating a direct instruction of the company. Your failure to follow through on work rules has subjected you to disciplinary action up to and including termination.

The doctors note received by the company released you to light duty on 5/1. Based on this doctors note it was our expectation that you would return to work on restricted duty on 5/1. We have not heard from you on either 5/1 or 5/2. Under our company handbook your failure to report to work for two consecutive days work has resulted in your termination of employment.

Sincerely,

Peter M. Brunault
Director of Human Resources

# SPRINGFIELD FOODSERVICE CORPORATION
# EMPLOYEE CHANGE FORM

TO: Payroll Department

**PLEASE ENTER THE FOLLOWING CHANGES IN YOUR RECORDS:**

Effective Date & Time: _____

Employee Name: _Jim Chancello_ _____

Social Security Number: _____    File Number: _____

## THE CHANGE(S)

Check all applicable boxes

| | From | To |
|---|---|---|
| Department | Selection | |
| Job | Selector/Trainer | |
| Shift | 2nd | |
| Rate | 13oo | |

## REASON FOR THE CHANGE(S)

| | |
|---|---|
| _____ Hired | _____ Probationary period completed |
| _____ Re-hired | _____ Length of service increase |
| _____ Promotion | _____ Re-evaluation of existing job |
| _____ Demotion | __X__ Resignation |
| _____ Transfer | _____ Retirement |
| _____ Merit Increase | _____ Layoff |
| _____ Union Scale | _____ Discharge |

Leave of absence: _____
                          (DATE)           to          (DATE)

Other (explain details) _____

_Voluntary Quit 2 days no call no Show_ _____

_____

_____

Change Submitted by: _Linda Aldrich_ _____    _11/18/03_
                          Name                                    Date

Change Approved by: _____    _____
                          Name                                    Date

Change Approved by: _____    _____
                          Name                                    Date

# SPRINGFIELD FOODSERVICE CORPORATION
## EMPLOYEE CHANGE FORM

TO:   Payroll Department

PLEASE ENTER THE FOLLOWING CHANGES IN YOUR RECORDS:

Effective Date & Time: _9/26/03_____ _12:00 n_____

Employee Name: _Gary Michaelis_____

Social Security Number: _____    File Number: _18338_____

**THE CHANGE(S)**
Check all applicable boxes

| | From | To |
|---|---|---|
| Department | | |
| Job | | |
| Shift | | |
| Rate | | |

REASON FOR THE CHANGE(S)

_____Hired                          _____Probationary period completed

_____Re-hired                       _____·Length of service increase

_____Promotion                      _____Re-evaluation of existing job

_____Demotion                       __X__Resignation

_____Transfer                       _____Retirement

_____Merit Increase                 _____Layoff

_____Union Scale                    _____Discharge

Leave of absence _____
                    (DATE)         to        (DATE)

Other   (explain details) _____
_____ No call No show for 2 cons. days. ONLY____
_Worked 1 day + Never Returned_____

Change Submitted by: _____ _9/28/03_
                              Name                        Date

Change Approved by: _____ _____
                              Name                        Date

Change Approved by: _____ _____
                              Name                        Date

# SPRINGFIELD FOODSERVICE CORPORATION
## EMPLOYEE CHANGE FORM

TO:   Payroll Department

**PLEASE ENTER THE FOLLOWING CHANGES IN YOUR RECORDS:**

Effective Date & Time: _____ 8/8/03 _____

Employee Name: _____ Shahied Harris _____

Social Security Number: _____    File Number: _____

**THE CHANGE(S)**

Check all applicable boxes

| | From | To |
|---|---|---|
| Department | Selection | |
| Job | Selector | |
| Shift | 2nd | |
| Rate | 13.00 | |

**REASON FOR THE CHANGE(S)**

| | |
|---|---|
| _____ Hired | _____ Probationary period completed |
| _____ Re-hired | _____ Length of service increase |
| _____ Promotion | _____ Re-evaluation of existing job |
| _____ Demotion | _____ Resignation |
| _____ Transfer | _____ Retirement |
| _____ Merit Increase | _____ Layoff |
| _____ Union Scale | ___✓__ Discharge |

Leave of absence: _____
(DATE)        to        (DATE)

Other  (explain details) _____

_____ no call no show  8/6 + 8/7 _____

_____

_____

Change Submitted by: _____ Ami Harris _____    8/11/03
                              Name                          Date

Change Approved by: _____    _____
                              Name                          Date

Change Approved by: _____    _____
                              Name                          Date

# PFG - SPRINGFIELD   EMPLOYEE CHANGE FORM

TO:   Payroll Department

**PLEASE ENTER THE FOLLOWING CHANGES IN YOUR RECORDS:**

Effective Date & Time: _____ 10/8/03 _____

Employee Name: _____ Miguel Gonzalas _____

Social Security Number: _____     File Number: _____

**THE CHANGE(S)**

Check all applicable boxes

| | From | To |
|---|---|---|
| ☐ Department | Selection | |
| ☐ Job | Selector | |
| ☐ Shift | 2nd | |
| ☐ Rate | 12 00 | |

**REASON FOR THE CHANGE(S)**

| | |
|---|---|
| ☐ Hired | ☐ Probationary period completed |
| ☐ Re-hired | ☐ Length of service increase |
| ☐ Promotion | ☐ Re-evaluation of existing job |
| ☐ Demotion | ☑ Resignation |
| ☐ Transfer | ☐ Retirement |
| ☐ Merit Increase | ☐ Layoff |
| ☐ Union Scale | ☑ Discharge |

☐ Leave of absence: _____ to _____
                              (DATE)           (DATE)

☐ Other  (explain details)

_No call no show  Fri 10/3  Mon 10/6_
_Haven't seen him since Wed night 10/9_

Change Submitted by: _Tami Aldrich_          10/8/03
                              Name                        Date

Change Approved by: _____          _____
                              Name                        Date

Change Approved by: _____          _____
                              Name                        Date

# *Partner Handbook*

EXHIBIT

(12) Davidson

5/18/06 *TB*



SPRINGFIELD FOODSERVICE CORPORATION

## INDEX

**The Power of Partnership:**
1 .  Who Is Springfield Foodservice Corporation
2 .  Why a Partner Handbook
3 .  Equal Employment Opportunity and Affirmative Action
4 .  Communication and Open Door Policy
5 .  Definition of Partner Status
6 .  Partner Expectations
7 .  Customer Service and Quality Standards
8 .  Merit and Performance Appraisals
9 .  Promotions

**Policies and Procedures:**
10 .  Wages and Salary
11 .  Overtime Pay
12 .  Payroll Deductions
13 .  Personnel Records
14 .  Requests for Partner Personnel Information
15 .  Sick Days and Personal Days

**Benefits:**
16 .  Major Medical Benefit
17 .  Dental Benefit
18 .  Life Insurance Benefit
19 .  Disability Insurance Benefit
20 .  Year End Attendance Bonus
21 .  401(k) Plan
22 .  Attendance
23 .  Leave of Absence
24 .  Military Leaves of Absence
25 .  Family and Medical Leave Policy
26 .  Bereavement Leave Policy
27 .  Paid Holidays
28 .  Vacation
29 .  Jury Duty
30 .  Partner Discount Purchases
31 .  Hours of Work
32 .  Meals and Breaks
33 .  Time Cards
34 .  Personal Presentation
35 .  Housekeeping and Cleanliness
36 .  Job Site Rules
37 .  Health and Safety
38 .  Physical Exams
39 .  Substance Abuse Policy
40 .  Worker's Compensation
41 .  Smoking
42 .  Company Confidential Information
43 .  Care and Maintenance of Equipment
44 .  Company Vehicles
45 .  Electronic Mail and Internet Policy

46 .    Personal Mail
47 .    Company Bulletin Boards and Contents
48 .    No Solicitation and Distribution Rules
49 .    Resignation Procedures
50 .    Dismissal Procedures

## APPENDIX A

Springfield Foodservice's Partner Drug and Alcohol Policy

Springfield Foodservice's Partner Sexual Harassment Policy

## ACKNOWLEDGMENT AND RECEIPT PAGE

# SFC - SPRINGFIELD FOOD SERVICE CORPORATION
# PARTNER HANDBOOK

## 1      WHO IS SPRINGFIELD FOODSERVICE CORPORATION?

Springfield Foodservice Corporation (SFC) is New England's leading independently owned "broadline" food distributor. Built in the spirit of independent ownership, and focused on the creation of meaningful, long-lasting relationships with both suppliers and customers, SFC has demonstrated ten years of sales increases of 25% or more while becoming one of the top 50 foodservice distributors in the country. Through its affiliation with UniPro, the nation's largest cooperative foodservice distributor organization, SFC has dramatically increased its buying power in the marketplace, and systematically increased its customer base.

Partnership is an ongoing process within the company, with suppliers and customers as well as with internal partners. All of SFC's efforts are driven by a desire to provide its partners with superior service, quality products, and efficient business practices. The company strives to provide partners with a safe work environment where a passion for quality performance is visible through commitment to clear, open and ongoing communication and an unyielding expectation for extraordinary results in job performance.

### THE POWER OF PARTNERSHIP:

### 2.      Why a Partner Handbook?

Welcome to SFC!! This handbook is offered to you as one of the many means of communication, which we hope you will come to use and be familiar with during your association with us. We pride ourselves on being a company which seeks both to convey and to collect ideas from a variety of sources. Our "partnership" will seek to create an environment where that interaction occurs in an easy and fluid way. Please take the time to review the general description of expectations we have of ourselves, and of you, as we begin to create this purposeful partnership. We hope to provide you with opportunities to grow both personally and professionally. Together we can create a relationship which will allow us to continue providing our profitable commitment to customer service.

We have historically endeavored to operate as a company on the principles outlined in the section entitled "Who is Springfield Foodservice Corporation?" We are a company that has witnessed expansive growth and we believe that policies and procedures are needed as mechanisms to promote and facilitate orderly and meaningful change.

As such, this handbook should not be construed as an employment contract or an agreement for employment for any specific time period. It is designed to provide you with information about our benefit programs and policies which you can expect to apply to you in your new role within SFC. If you have any questions with regard to these policies, procedures, or descriptions of our benefit programs, please bring these up with your immediate supervisor or with our Payroll and Benefits Administrator.

### 3.    Equal Employment Opportunity and Affirmative Action

SFC prides itself on its commitment to employ the most qualified people to perform the many tasks necessary for the success of our business. Providing equal employment opportunity for all is an essential part of this policy. Employment decisions are made without regard to race, color, age, sex, ancestry, religion, creed, citizenship status, disability, national origin, marital status, military status, sexual orientation or any factors not related to the job.

We practice affirmative action through application of this nondiscrimination policy to all areas of employment, including assignment, transfer, promotion, separation, selection for training, discipline, promotion, compensation and other conditions of employment. Our Payroll and Benefits Administrator. will administer all policies and procedures to ensure that our Affirmative Action Program functions successfully.
It is the obligation of all partners in all locations of SFC to comply with this policy in both practice and spirit. SFC adheres to this policy not just because it is the law, but also because it is the right thing to do.

### 4.    Communication and Open Door Policy

SFC wants to ensure that you are comfortable and satisfied in your job and feel valued as a partner. Our open door management style encourages you to express suggestions, questions, and concerns. It will always be our policy to let partners tell their side of the story and we will consider all problems and complaints. There will be no discrimination against anyone for presenting a complaint or discussing a problem with supervisors or anyone on our management team. Your complaints or problems are of concern to us. It is our purpose to provide you an effective and acceptable means of bringing your problems and complaints concerning your well being while at work to our attention.

If you have a complaint to make or if you feel that any action by SFC or your supervisor is unjust, or something else you would like to discuss, go talk to your immediate supervisor first. Your supervisor knows more about you and your job than any other member of management, and is often in the best position to handle your complaint properly and quickly. If at any time you feel that it is not practical, ncluding if your complaint is against your supervisor, or you feel
your supervisor has not answered your complaint to your satisfaction, you should request an appointment for a personal interview with any of the SFC Management Team who will discuss the problem with you and review all aspects thoroughly. The SFC Manager or the Company Vice-President will respond within five days of the personal interview.

Please remember that the only purpose of our complaint procedure is to give you, our fellow partners, and SFC an opportunity to clear up any problems or complaints of any kind. In order for this open-door complaint policy to work, you must want it to work and use it. It's for your benefit. Our door is always open. When things go wrong, we would like to have the chance to fix them if we can.

Because the responsibility for the operations of SFC is the President's, any decision rendered in a problem situation by the President or the Vice-President, will be final and binding.

### 5.    Definition of Partner Status

A regular "full-time partner" is a partner who works a normal workweek, following an established schedule of at least 35 hours per week on an annual basis, with overtime hours as required.

A regular "part-time partner" is a partner who works under 30 hours per week.

A "temporary partner" is a partner who is hired for specified or limited periods during the year who may work less than 40 hours per week.

Part-time and temporary partners will receive some benefits, such as Worker's Compensation Insurance and Social Security Protection.

### 6.    Partner Expectations

Our mutual relationship is founded on clear expectations of performance.

SFC expects partners to:
Think and act with safety as a primary concern
- Think and act with respect for each other
- Think and act as professionals
- Think and act honestly

Partners can expect SFC to:
- Provide a safe and secure work environment
- Treat partners fairly and with respect
- Provide appropriate training and instruction to ensure professional performance
- Receive open and honest feedback

### 7.    Customer Service and Quality Standards

SFC's continued success is directly dependent upon having satisfied customers. For this reason, it is important that all partners of SFC understand the necessity of maintaining good relationships with our customers.

The existence of good customer relations makes friends, prevents misunderstandings, builds morale, improves our performance, and makes our daily jobs more pleasant. Also, since all of us meet our customers and the public, we should do everything we can to keep our relationships with them on as high a level as possible.

Here are a few ways we as partners can help maintain good customer and public relations:

- Be polite always, to all persons. The importance of this cannot be too highly emphasized.

- Put forth your best "personal image," such as neatness of dress, a pleasant smile, an interest in your work, and a willing and cooperative attitude toward your co-workers and our customers.

- Be aware that your telephone manners are very important. Treat customers and the public with respect and dignity when talking on the telephone just as you would in meeting people face to face.

- Remember that to gain and hold the respect of others, you must earn such respect by your own actions. Good reputations are built by the total of many acts but can be quickly lost by one inconsiderate or thoughtless act.

## 8.    Merit and Performance Appraisals

We take the development of our evolving partnership very seriously, and will endeavor to provide you with consistent and coherent feedback on your performance here at SFC. As mentioned, we also expect you to provide us with appropriate critiques of company performance whenever necessary. An open and consistent flow of communication is what we strive to generate.

At SFC, periodic performance reviews ensure optimal job performance. These performance reviews provide us with an opportunity to have face-to-face discussion, and share information about our common task – customer satisfaction. If you have any questions about how you are doing and what we can do to assist you in improving our efforts please ask your supervisor to v
visit with you to facilitate this process.

## 9.    Promotions

At SFC, management tries its best to select the best-qualified person for every job. It is our policy to promote, whenever possible, from among present, qualified partners.

Factors considered in the selection process include the following:

- Demonstrated skill and ability to accomplish the new position

- Prior and current work performance

- Past and current disciplinary record

- Past and current attendance record

- Cooperation with others

In order to assure that our business functions smoothly, appropriate expectations governing our work environment is necessary. It is expected that you conduct yourself in a professional manner while on the job. We feel that a mature person should respond positively to constructive commentary regarding their job performance. Some work environments spend inordinate amounts of time specifying actions, which require disciplinary re-actions. We believe that SFC partners should function on the job as self-regulating, professionals who:

- Are present for work in a prompt and prepared way
- Stay on the job until the job is done
- So your job thoroughly and thoughtfully, always bearing in mind that SFC is primarily directed toward customer service
- Treat SFC property and fellow partners with respect and care
- Are mindful of the safety of others and of the work environment

## POLICIES AND PROCEDURES:

### 10.    Wages and Salary

To attract and retain above-average partners, SFC offers salaries competitive with those paid by other employers in our industry and in the applicable labor market in which we operate. In line with this objective, we monitor our wage scales to ensure that they are kept in line with local and national economic conditions.

Your total compensation consists not only of the salary you are paid but also of the various benefits you are offered, such as the major medical benefit, dental benefit, disability benefit, life insurance and 401(k) benefit, all as described in a later section of this handbook.

Questions regarding your individual salary should be directed to your supervisor or the Payroll and Benefits Administrator.

### 11.    Overtime Pay

From time to time, as the need arises, you will be asked to work beyond your regular scheduled work period or workweek. For this extra work, all hourly partners will be paid overtime for all hours worked in excess of 40 hours during the regular workweek at one and one-half times their straight time rate. Commission and Bonuses are not considered in the computation of overtime.

A partner is required to work overtime when asked to do so unless the partner has a valid reason that is acceptable to the supervisor in charge.

### 12.    Payroll Deductions

SFC is required to deduct Federal and State Withholding Tax (income tax) from your paycheck. This deducted amount is turned over to the U. S. and State Treasuries and you are given credit for it on your income tax at the end of the year.

Your earnings and the number of your dependents determine the amount of the tax deduction. At the close of each year you will receive a slip (W-2) showing your total earnings for the year and the amount of taxes withheld.

Also, deductions for Social Security at the rate established by law are deducted from your paycheck. The company matches your contribution to the Social Security Tax.

SFC may also be required to deduct amounts in accordance with wage attachments and garnishments.

You must authorize other deductions, for items such as insurance, uniforms and 401K contributions in writing before they can be taken from your paycheck.

### 13.    Personnel Records

SFC maintains a personnel file for each partner. The contents of partner files are strictly confidential, and access will be limited to authorized individuals. The partner can ask to see his/her personnel files by contacting the Payroll and Benefits Administrator. The partner may review his/her file in the presence of the Payroll and Benefits Administrator and may make copies of any of its contents.

Your supervisor should be notified promptly of changes in the following:

- Address and telephone number

- Marital status

- Name

- Beneficiary of dependents listed in your insurance policy

- Number of dependents for withholding tax purposes

- Person to notify in case of accident

- Any change or restriction in your driver's license.

### 14.    Requests for Partner Personnel Information

SFC is committed to protecting the privacy of its current and former partners. To help partners, who want SFC to provide confidential information for them, the Payroll and Benefits Administrator will coordinate the response to requests for information about current and former partners. Only authorized representatives will respond to requests for salary, work history, and other confidential information.

Partners who receive calls or written requests for dismissal information about current or former partners should refer these requests to the Payroll and Benefits Administrator. Any partner who distributes information about a current or former partner without specific authorization by the partner will be subject to disciplinary action up to and including termination of employment.

Current partners who need verification of their employment and salary to obtain a mortgage, credit card or for other personal reasons should notify the Payroll and Benefits Administrator. Current partners may authorize their supervisor or other SFC representatives to provide a personal reference that includes an assessment of the partner's job performance and accomplishments.

### 15.    Sick Days and Personal Days

SFC realizes that inability to work because of illness or an occasional personal commitment may cause financial hardships to partners. For this reason, SFC provides a paid sick/personal day benefit plan for its partners. All full time SFC partners will be eligible for 5 paid sick/personal days. During the first year of service these days will be prorated based on how many months you will work in that year. For example, if your hire date was June 1, you would be entitled to 2.5 days of sick/personal time after you completed your 90 days, and the following January you would be entitled to 5 full days.

**Procedures:**

**Sick Days:**

A partner sick day is considered legitimate only when this procedure is followed:

A telephone call must be made by the partner, not a relative or friend, to their immediate supervisor explaining the health problem. The partner call-in must be made prior to their regular arrival time for business.

If a sickness keeps a partner out for two or more days in a row, prior to the start of each business day he/she is responsible for notifying their immediate supervisor through the procedure above. Your Supervisor may also request a written medical excuse.

**Personal Days:**

A partner personal day is considered legitimate only when the personal day is requested one week or more in advance through their supervisor. Every effort will be made to grant that specific date. However, possible reasons for not granting a personal day or canceling a previously scheduled personal day would be due to specific dates or periods of the year the company views as critical to the operation of the business. (i.e., heavy seasonal business, shortened holiday weeks pre-scheduled partner vacation weeks, physical inventory days, unusual partner sickness, etc.)

**Medical Appointments:**

Two medical appointments will be allowed per year as long as a partner is not away from his/her job for more than two hours. The company recognizes the need for medical appointments but also is trying to minimize the time away from job duties and encourages all partners to carefully consider the time of their appointments and the length at which they are away from their job. Immediate supervisors and/or the SFC Vice-president must be notified a day in advance of appointments and the estimated time that partners will be gone.

### 16.    Major Medical Benefit

SFC provides to its partners, and their immediate families, the option to participate in a comprehensive major medical benefit package. SFC pays a significant portion of your major medical benefit package, with your portion being deducted from your paycheck on your written authorization. Information outlining the above plan will be made available to you. The Payroll and Benefits Administrator can discuss our group insurance program with you and will be available to help you with enrollment material and calculation of your costs for your selected coverage. Partners should refer to the insurer's benefit booklet for specific details as it regards coverage, benefits, exclusions, etc.

All full time SFC partners that have been employed with SFC for a minimum of 90 days will be eligible to receive the major medical benefit on the first date of the month following completion of 90 days of employment.

### 17.    Dental Benefit

SFC provides to its partners, and their immediate families, the option to participate in a dental benefit package. All partners should review the insurer's benefit booklet for specific details as it regards coverage, benefits, exclusions, etc. You must participate in the major medical plan to be eligible for the dental benefit.

All full time SFC partners that have been employed with SFC for a minimum of 90 days will be eligible to receive the dental benefit package on the first date of the month following completion of 90 days of employment.

### 18.    Life Insurance Benefit

SFC provides to its partners a life insurance benefit plan to protect a partner's beneficiaries in case of death or dismemberment. All full time SFC partners that have been employed with SFC for a minimum of 90 days will be eligible to receive the life insurance benefit on the first date of the month following completion of 90 days of employment. All costs related to the SFC life

insurance benefit package would be incurred by SFC if the partner elects to participate in the Major Medical Benefit.

The life insurance benefit plan offered by SFC provides life insurance for the partner equivalent to one year's salary up to a maximum of $50,000.

**19.    Disability Insurance Benefit**

SFC provides to its partners a disability insurance benefit plan to insure income in the event of a non-occupational accident or serious illness. All full time SFC partners that have been employed with SFC for a minimum of 90 days will be eligible to receive the disability insurance benefit. All costs related to the SFC disability insurance benefit package will be incurred by SFC.

The SFC disability insurance benefit plan will pay the partner in accordance with the terms of that policy, in the event of a non-occupational accident or illness. The benefit will begin on the first (1st) day of an accident and on the eighth (8th) day of an illness and continue as short-term disability for a period of 13 weeks and continuing in accordance with the terms of the Long Term disability policy. Any questions regarding this policy should be referred to the Payroll and Benefits Administrator.

**20.    Year End Attendance Bonus**

SFC believes that it is essential to provide significant monetary awards for those individuals who recognize their importance to the SFC team by striving to maintain good health and well-planned personal time. Consistent with this philosophy, a year-end attendance bonus will be earned by qualifying partners.

All SFC full-time partners, excluding management and commissioned marketing representatives, after completing one full year of employment, are eligible to earn a Year End Attendance Bonus, which would equal up to one full weeks pay.

~~[redacted]~~ Essentially, every partner begins every January 1st with a potential extra week's pay ~~bonus payable by the~~ end of February of the subsequent year. Each sick or personal day taken throughout the year affects the year-end bonus by a reduction of one day's average pay. This does not affect a partner's regular pay -- only the potentially earned attendance bonus.

For example, if a partner does not use any sick or personal days, he/she will be rewarded for this commitment with one full week's base pay as his/her bonus payable at the end of the year. If a partner legitimately uses all of their sick and personal days throughout the year, no attendance bonus will be paid.

SFC does not wish to discourage partners with illness from staying home. A recuperated, healthy partner is more happy and productive than a sick one on the job. This progressive policy encourages partners to maintain good health, which favorably impact productivity and performance, and help promote a team building commitment to the SFC workplace.

**21.    401(k) Plan**

We have established a 401(k) savings plan that is available to all full-time partners who meet the requirements of the plan. A copy of the plan, a plan summary and all documents necessary to participate in the plan are available from the Payroll and Benefits Administrator.

Questions regarding our 401-(k) plan should be directed to the Payroll and Benefits Administrator.

**22.    Attendance**

Being on the job, ready to work and on time, is very important. Each of us was hired for a specific contribution to the total business. When you are absent or late, you are missed and SFC experiences some disruption. A partner with an unexcused absence will be subject to corrective action.
Any time a partner is absent three (3) consecutive days without notice, the partner will be considered as having voluntarily quit.

When a partner returns from any absence, he/she will report directly to his/her supervisor.

If you are going to be absent or late unexpectedly, you must call your supervisor or the Office (413) 733-3053, and the appropriate extension number, at or before the assigned starting time. Without this notification to your supervisor, your absence will be counted as unexcused.

**23.    Leave of Absence**

SFC does not allow Leaves of Absence except as otherwise required by state, federal and local laws or regulations.

**24.    Military Leaves of Absence**

SFC follows all applicable state, federal and local laws and regulations concerning Military Leaves of Absence.

**25.    Family and Medical Leave Policy**

SFC's Family/Medical Leave Policy is designed to meet both state and federal family/medical leave requirements. Where leave qualifies under both state and federal law, any leave taken shall apply against the partner's entitlement under both laws.

The Company's Family and Medical Leave Policy is briefly summarized below. Any questions regarding the policy or the applicable law should be directed to the Payroll and Benefits Administrator.

**Eligibility for Family/Medical Leave**

Partners who have been employed with SFC for at least twelve (12) months and who have at least 1,250 hours of service with the Company during the preceding twelve (12) month period are eligible for up to twelve (12) work weeks of unpaid family/medical leave within a twelve (12) month period for the following reasons:

1. The birth of a child of the partner and in order to care for such child;
2. The placement of a child with the partner for adoption or foster care;
3. To care for the spouse, child or parent of the partner with a serious health condition;
4. Because of a serious health condition of the partner that makes the partner unable to perform the functions of her/his position

   4a. Serious health condition is defined as follows:

   An illness, impairment, or physical or mental condition that involves either inpatient care, (meaning an overnight stay in a hospital, hospice, or residential care facility), or continuing treatment by a health care provider for three (3) or more consecutive days.

   - Any period of incapacity because of pregnancy or prenatal care even without treatment by a health care provider and even if the absence is less than three (3) days.

   - Any period of incapacity because of a chronic serious condition even without treatment by a health care provider and even if the absence is less than three (3) days, e.g., asthma attack.

   - Any period of absence to receive multiple treatments by health care providers for reconstructive surgery after an accident or injury, or for a condition that would likely result in a period of incapacity of more than three (3) consecutive days if untreated, e.g., cancer (chemotherapy), kidney disease (dialysis).

**Notification**

A partner seeking leave based upon the birth, adoption, or foster placement of a child must provide at least seven (7) days prior notice unless emergency circumstances reasonably justify shorter notice, in which case, the partner shall give such notice as is practicable.

Partners seeking leave because of the serious health condition of the partner or the partner's child, parent, or spouse must provide at lease fifteen (15) days prior to notice, unless emergent circumstances warrant shorter notice. Partners seeking leave because of planned medical treatment must make a reasonable effort, subject to the approval of the health care provider, to schedule the treatment so as not to unduly disrupt the operations of the Company.

**When Leave May Be Taken**

An eligible Partner shall be entitled to a total of 24 hours of leave during any 12-month period, in addition to leave available under the federal act, to:

(1) Participate in school activities directly related to the educational advancement of a son or daughter of the partner, such as parent-teacher conferences or interviewing for a new school.

(2) Accompany the son or daughter of the partner to routine medical or dental appointments, such as check-ups or vaccinations; and

(3) Accompany an elderly relative of the partner to routine medical or dental appointments or appointments for other professional services related to the elder's care, such as interviewing at nursing or group homes.

Leave under this policy may be denied if the partner has taken twelve (12) or more weeks of family or medical leave within the past twelve (12) month period.

Partners seeking leave because of the birth, adoption, or foster placement of a child must begin such leave within twelve (12) months after the date of such birth, adoption or foster placement.

**Intermittent Leave**

Leave for adoption, foster care, or birth of a child may NOT be taken intermittently or on a reduced schedule unless approved by the Payroll and Benefits Administrator.

Leave for a serious health condition may be intermittent if medically necessary and must be approved by the Payroll and Benefits Administrator.

Partner needing intermittent or reduced leave must attempt to schedule their leave so as not to unduly disrupt the operations of the Company.

Intermittent leave, based on a planned medical treatment, may require that partner transfer temporarily to another job, with equivalent pay and benefits, which better accommodates the partner's need for recurring periods of leave.

**Unpaid Leave/Exhaustion of Paid Leave**

Family/Medical leave is unpaid. However, partners taking leave for any reason MUST exhaust any accrued available paid time, such as paid vacation and paid personal leave, as part of their twelve (12) weeks of leave.

Partners taking leave as a result of their own serious health condition MUST also exhaust any applicable sick leave and medical leave. The remaining leave period will be unpaid.

**Duration of Family Leave**

A partner's accrued paid leave (vacation, sick, disability, personal days, or floating days) will be considered part of the twelve (12) week family leave. For example, if a partner uses six (6)

weeks of paid leave, the remaining family leave available is six (6) weeks for a total of twelve (12) weeks.

**Certification**

Partner seeking leave due to the partner's own serious health condition or the serious health condition of the partner's spouse, child or parent must provide a certification issued by the health care provider of the partner or family member. Leave will not be granted in the event that a certification is not submitted within fifteen days of the partner's request for leave, unless submission of such a certification within that time frame is not practicable.

**Confirmation of Certification**

In any case where SFC has reason to doubt the validity of a certification, it may require the partner to obtain the opinion of a second health care provider at the expense of the Company. In cases where the

second opinion differs from that of the original certification provided, SFC may require the partner to obtain a third opinion of a jointly designated or approved health care provider at its expense, which third opinion shall be considered final and binding upon both the Company and the partner.

**Restoration to Position**

Any eligible partner who takes family/medical leave shall be entitled, upon return from such leave, to be restored to her/his position of employment or to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment.

Where the leave taken is due to the serious health condition of the partner, the partner will not be able to return to work without first presenting a certification from a health care provider that states that the partner is fit to work.

**Continuation of Benefits**

Partner taking family/medical leave shall not lose any employment benefit accrued prior to the date the leave commenced. Seniority and employment benefits will not continue to accrue during the unpaid leave period.

SFC shall maintain coverage under its group health plan during the leave period under the same conditions of coverage as would have existed had the partner continued in employment for the duration of the leave. Partner on family/medical leave may continue participation in the group insurance plan, as allowed by the insurance carrier and must continue to pay the partner portion of the benefit premium cost by the 5th, day of each month.

SFC may recover the premium paid for maintaining said group health coverage during any period of unpaid leave if the partner fails to return to work upon expiration of the leave period for a reason other than continuation, recurrence or onset of a serious health condition that entitles the partner to leave or other circumstances beyond the control of the partner.

SFC may require any partner who claims to be unable to return to work because of the continuation, recurrence, or onset of a serious health condition to submit a certification by a health care provider.

**26.    Bereavement Leave**

SFC partners bereaved by the death of an immediate family member will be granted time off from work without loss of pay according to the provisions herein.  All full time SFC partners are eligible for paid time off for bereavement upon their first full day of active employment.

When a death occurs in an partner's immediate family, defined as the partner's spouse, child, grandchild, parent, grandparent, brother and sister, they will be compensated for the time actually lost from their regular scheduled work on the day of the death, and the days following it, up to and including the day of the funeral, but not to exceed three (3) work days per year.

When the death occurs outside of a partner's immediate family (as is defined above) a partner must take a personal day and obtain the approval of their supervisor.

**27.    Paid Holidays**

SFC recognizes certain days of the year as paid holidays for its partners.  All full time SFC partners are eligible to receive holiday pay after 90 days of employment.  The following nine (9) holidays will be observed as paid holidays for SFC partners:

New Year's Day

Memorial Day

Independence Day

Labor Day

Thanksgiving Day

Christmas Day

President's Day

Columbus Day

Veteran's Day

**Floating Holiday:**

At certain times of the year it will be necessary for SFC to remain open on a holiday and have its partners work, in which case, the holiday will be viewed as a "floating holiday" and may be taken at a later date. Commissioned marketing representatives may choose to work on certain holidays given the nature of their customers' business and the sales commission nature of their income.

**Holiday During a Vacation Week:**

If a partner chooses to take a vacation week during a week in which a recognized holiday is observed, the holiday will be considered a paid holiday and not a paid vacation day. Should a holiday occur during your vacation period, an additional day of vacation will be allowed.

If any of these holidays fall on Saturday or Sunday, the following Monday will be observed unless your supervisor otherwise notifies you.

If you are a regular full-time partner who has been employed by the Company for the ninety (90) day period before the holiday, you will be paid for eight hours at your regular basic rate for each holiday, provided you worked your scheduled shift immediately preceding and your scheduled shift immediately following the holiday.

Holiday time off is not considered as time worked in the computation of overtime.

**28.    Vacation**

**Partners shall accrue vacation time as follows:**

A partner is entitled to five days of vacation one year after one full year of service.

A partner is entitled to ten days of paid vacation after two years of service.

A partner is entitled to fifteen days of paid vacation after seven years of service.

A partner is entitled to twenty days of paid vacation after fifteen years of service.

For the first year, and every additional week of earned vacation, the partner's anniversary date must be considered when choosing his/her vacation week. For example, if a partner begins his/her employment on September 1, 1998, in 1999 he/she could only schedule a vacation after his/her anniversary date of September 1, 1999.

After the first year, vacation weeks must be taken by calendar year (January 1 - December 31). Using the above example, the second year's vacation must be taken during the following calendar year beginning January 1, 2000 through December 31, 2000.

Temporary or part time partners are not eligible for paid vacation.

Any partner dismissed for cause will not be eligible for any unused paid vacation.

A partner vacation week shall be scheduled at least thirty days in advance.

A vacation calendar will be posted on January 1st of every year. All partners must schedule their vacations with their immediate supervisor by April 1st. Vacations taken before April 1st must be

requested with 30-day advance notice. Management will decide any disputes over the same week chosen.

Every effort will be made to grant a partner their requested vacation week. However, possible reasons for not granting a particular week would be due to specific dates or periods of the year the company views as critical to the operation of business (i.e., heavy seasonal business, holiday weeks, physical inventory weeks, weeks already scheduled by an individual in the same department). Additionally, there is a Company wide vacation blackout time between mid-August and mid-October, except with the approval of your immediate supervisor.



b.  A partner may not be given additional pay in lieu of not taking vacation days unless there is an extenuating circumstance and/or there is no interim replacement and the partner agrees to work during this period. Our SFC philosophy is that vacation time is for relaxing and re-energizing. The time is well deserved and should be used.

**Amount of Vacation Pay:**

For salaried partners, vacation pay will be their regular guaranteed weekly salary. Hourly waged partners will be paid their regular straight time hourly rate for each week of vacation. All partners paid on incentive (i.e., drivers, selectors, etc.) will be paid their average week's pay determined from the previous six months. Commissioned marketing representatives vacation pay will be their weekly base.

## 29. Jury Duty

If you are notified that your name has been drawn for jury service, inform your supervisor immediately so that it may be decided whether working conditions allow your absence from work. SFC encourages partners to carry out their responsibilities as citizens in this regard whenever circumstances allow. A leave of absence for jury duty will be granted to SFC full-time partners.

## 30.    Partner Discount Purchases

SFC grants substantial partner discounts on all SFC merchandise. After 30 days of employment, all SFC partners are entitled to a discounted purchase price on all SFC merchandise.

This price will be derived from SFC actual cost on the date of purchase, plus a 10% markup (to cover handling costs). All merchandise purchased by partners must be for personal use only. Products for resale or other commercial use will not be handled in this discounted manner.

All purchases must be processed as would any other order in the SFC system: written through the Customer Service Department, processed through data processing, and selected/loaded by regular

selection/loading procedures. Appropriate signed paperwork must be completed before merchandise may be removed from SFC. All partner purchases will be C.O.D.

### 31.   Hours of Work

The official payroll workweek for all partners of SFC begins Sunday at 12:01 a.m. and ends at 12:00 midnight the following Saturday. Naturally, your particular work schedule will depend on your job.

Your supervisor will explain your work schedule to you. Should you have any questions on when you are to be at your workstation and ready to work, please ask your supervisor.

Many partners are required to punch a time card each day. If you are, you have a time card with your name and partner number on it. This card is the official payroll record from which your pay is computed. You should punch your time card at the beginning and end of your workday and at the beginning and end of your lunch period. Do not punch in more than five (5) minutes before or after your scheduled starting or quitting time unless requested by your supervisor. Partners are prohibited from punching a time care of another partner.

All the time you work must be shown on your time card. In addition, all days not worked that are to be paid, such as vacation days and funeral leave, must be shown on your time card by your supervisor if payment is to be received.

Please be certain to punch your time card you are supposed to. If you forget or make an error, you are expected to notify your supervisor at once. Your supervisor will make the correction, and both you and the supervisor will initial the correction. When clocking out on the last day of the week, review your card carefully to see that all hours of work are recorded properly.

### 32.   Meals and Breaks

Partners are required to take a lunch break of thirty (30) minutes each workday and two fifteen-minute breaks.  Partners shall track the actual time taken for lunch and breaks and shall punch in and out for lunch and shall not include those times as hours worked when reporting hours worked to the Company, Partners are responsible for taking a second thirty (30) minute break for each additional six-hour period.

### 33.   Time Cards

Partners shall keep track of time worked and report that time to SFC.  The manner in which time shall be reported varies by position and your supervisor shall instruct you in the method that you shall use to report your hours worked.  All partners are responsible for the accuracy of the time reported and shall not include time spent at lunch as time worked.

Each partner fills out his/her own time attendance record. This card is the official payroll record from which pay is computed. Unless a partner is authorized overtime, he/she logs only the normal starting and ending time on his/her card.  Each partner will verify that all hours listed are hours worked before submitting.

Partners are not allowed to work before or beyond the normal starting/ending time without specific overtime authorization. Any time away from the premises during the work shift must be recorded (i.e., personal business, medical appointment, lunch periods).

### 34.    Personal Presentation

Because of the nature of our customer-oriented business, our partners are expected to present the professional image we wish to portray to the public. Partners contribute personally to this desired image by their dress and grooming.

Individuals are expected to present themselves in a way that is consistent with the professional standards of SFC. Since dress is a matter of individual taste, we do not wish to set-forth strict guidelines. However, all personnel will maintain a clean and neat appearance.

Certain partners must wear uniforms, which can be acquired through the Company. Wearing a clean uniform is important to the professional appearance of our team.

The partner rents these uniforms and cleaning is arranged through SFC. The cost is deducted from the partner paycheck. Please make sure they are turned in for cleaning on the days specified by your supervisor. Upon separation of employment, your final settle-up pay cannot be decided until your uniforms have been turned in. For uniforms that are not returned, partners will be assessed the current cost at prevailing rates.

### 35.    Housekeeping and Cleanliness

SFC prides itself in maintaining a clean state-of-the-art work facility. We are proud to be HACCP certified, and we ask that you join with us in making an ongoing effort to ensure that our place of work demonstrates our commitment to quality and professionalism.

### 36.    Job-site Rules

Many partners spend a portion of their time on customer sites. Partners are responsible for knowing and obeying the rules of each customer site where they are to do services for SFC. Professional behavior is expected of all SFC Partners.

### 37.    Health and Safety

SFC is vitally interested in your safety and health, both on and off the job. Teamwork and cooperation are expected from each partner in safety matters, the same as they are in all other operational activities. No operating condition or urgency of service can ever justify endangering the life of anyone.

### 38.    Physical Exams

Each Driver Partner must have a physical examination. The Driver partner shall obtain a physical from their personal physician. In the event that a Driver does not have a personal physician, the Driver may use Occupational Health & Rehabilitation, Inc. SFC shall pay for this examination. Each partner is also screened for drugs as part of SFC's partner drug and alcohol policy. Any Driver partner who has a separation of service exceeding six months, regardless of the reason, must have a pre-employment physical examination before returning to work for the Company.

Driver partners must also have a physical examination every two years, required by the DOT which shall be paid for by the Company. Each partner is also screened for drugs as part of SFC's partner drug and alcohol policy.

Accidents are preventable, and SFC takes every possible precaution to make your working conditions safe. Safety guards, personal protective devices, equipment, and special tools are provided to eliminate

specific job hazards. But, finally, the real safety job is up to you—you need to think, act, and work safely always.

All accidents, whether resulting in a personal injury or not, must be reported to your supervisor, despite how minor they may be. The accident is to be reported to the supervisor on the shift during which the accident occurred. Even minor accidents may show an unsafe condition that should be corrected.

You are expected to report to your immediate supervisor any unsafe conditions you may observe. Your suggestions and ideas toward improving methods and making conditions safer are earnestly sought. If you have any ideas or suggestions regarding safety or the safety programs, report them to your supervisor immediately.

## 39.    Substance Abuse Policy

If we are to continue to fulfill our responsibility to provide reliable and safe service to our customers and a safe working environment for our partners, SFC partners must be physically and mentally fit to do their duties in a safe and efficient manner. These matters are of vital concern due to the operation of motor vehicles, heavy equipment and dangerous tools and machinery by many of our partners. Partners using substances that impair their abilities are not only endangering themselves, but they are also endangering other partners who work with them.

In view of this, partners are expected to protect their own welfare and to participate in SFC's efforts to provide a safe working environment by notifying their supervisors of apparent violations of this policy on drug and alcohol abuse. Further, many of our partners are subject to Department of Transportation and Federal Highway Administration rules and regulations.

Therefore, no partner shall work or report to work while under the influence of alcohol, illegal drugs, or drugs that affect his/her ability to do the job in a safe and efficient manner.

No partners shall consume, display, or have in their possession alcoholic beverages or illegal drugs while on SFC property.

Should a partner be required to take any kind of prescription or nonprescription medication that may potentially affect job performance, the partner is required to report this to his/her supervisor. The supervisor will decide if it is necessary to temporarily place the partner on another assignment to ensure his/her safety and the safety of other partners and the public. A letter from a physician may be required to confirm it is safe to continue working while on medication.

Intoxication at work is grounds for disciplinary action, including immediate dismissal. As used in this policy, intoxication means being under the influence of drugs or alcohol, or physical evidence that suggests that drugs or alcohol have been consumed.

The Company reserves the right to test applicants and partners for the presence of drugs or alcohol, and a refusal to take such a test is grounds for refusal to hire or dismissal. The specifics of the SFC'S Partner Drug and Alcohol Policy will answer most of your questions regarding testing.

NOTE:  A copy of the SFC's Partner Drug and Alcohol Policy is included with this Handbook as Appendix A.

## 40.    Workers' Compensation

If you should be injured at work, we provide Workers' Compensation insurance to cover your accident or injury. Any on-the-job injury must be reported to your supervisor when it occurs. If the injury is deemed serious enough to require medical attention, seek that attention, and the appropriate forms may be completed later.

If, by a doctor's recommendation, you must miss work because of a work-related injury, notify your supervisor. You may be eligible to receive weekly Workers' Compensation payments and medical treatment at no cost to you.

### Medical and Dental Coverage Continuation For Inactive Partners

Partners who are inactive because they are on leave from work for any reason including military leave of absence, family leave, or injury will remain eligible to receive company provided medical and dental coverage as long as they continue to contribute the required employee partner contribution. Employee partner contribution amounts currently in effect are as follows:

    Single Coverage  - $ 65  /month
    Double Coverage  - $ 143 /month
    Family Coverage  - $ 156 /month

        Contribution rates are subject to change.

The following terms and conditions will apply in order to continue medical and dental benefits.

While any sick days or vacation time is being used, the Partner contributions for benefits will continue to be deducted from the Partner paycheck.

When a Partner goes into inactive status, the Partner will be notified of the costs that pertain to their participation status as listed above. Each partner on inactive status who wishes to continue coverage under the SFC medical and dental benefit package must pay the appropriate monthly amount to the company. Partner contributions must be received no later than the fifth of each month. Partner contributions must be received at the company no later that the fifth of each month..

If a Partner fails to pay the Partner contribution to the company by the fifth of each month, the Partner is subject to termination from any and all company medical and dental benefit coverage. If coverage is terminated, , any applicable termination provisions that apply to any of those benefit programs will apply.

Partner participation and coverage in other benefit plans that are offered by the company will be governed by the terms and conditions as documented in those plans.

### 41.    Smoking

Because we are expected to maintain the highest possible safety conditions and because we are concerned for our partners' health, you are encouraged not to smoke and are expected not to do so in restricted areas. Safe smoking habits must be observed always.

No smoking is allowed in any enclosed area on SFC property, except for those areas specifically designated for smoking. Smoking is prohibited in the presence of any flammable or explosive materials.

When you smoke in authorized areas, please be sure to extinguish your cigarettes in the proper receptacles.

### 42.    Company Confidential Information

Many of our SFC partners have been placed in a position of trust because of the work they do and are, therefore, exposed to or have access to SFC funds, partner payroll data, personnel record information, partner billing records, customer records, credit management, vendor contracts, computerized information, financial information, competitive bidding information and other types of sensitive information considered confidential in nature.

You are reminded that revealing any type of confidential information to unauthorized persons or tampering with or altering SFC records and/or property is a violation of that trust that can result in disciplinary action up to and including dismissal. Should you have doubts about what is considered confidential information or a violation of trust, you should seek advice from your supervisor.

### 43.    Care and Maintenance of Equipment

Your cooperation in the care and use of SFC equipment is necessary to maintain it in good operating condition. You should use it only for the purpose intended and as instructed by your supervisor. If any of our equipment is defective or not in safe working order, please notify your supervisor so that a repair or replacement can be made.

Company vehicles are for business use only and are to be driven only by authorized partners. Partner drivers must have with them, always, a valid driver's license and are expected to practice safe and courteous driving habits. A partner whose right to operate a motor vehicle is revoked cannot drive a Company motor vehicle. Any accident must be reported to the appropriate police departments and your supervisor immediately.

Failure to use SFC property and vehicles properly can result in disciplinary action, up to and including dismissal. Partnership with the Company requires the operation of specialized machinery and equipment. This machinery and equipment requires constant attention, skillful use, and regular maintenance. As a partner, it is your responsibility to provide all machinery and equipment you use with the required levels of attention, skill, and maintenance.

You must not attempt to use any machinery or equipment with which you are not familiar without first getting instructions from your supervisor. If any of our tools or equipment are defective, broken, or are not the best for the job, notify your supervisor immediately so that repairs can be made or replacements considered.

44.    **Company Vehicles**

Partners are not allowed to use SFC vehicles for personal use without appropriate permission. Partners shall follow all traffic laws while operating SFC vehicles and shall be appropriately licensed to operate SFC Vehicles. Partners are also required to follow all instructions and training on the safe operation of all equipment and shall only use equipment as intended.

45.    **Electronic Mail and Internet Use Policy**

Partners should understand that SFC provides e-mail and Internet access for company use, and should not consider these venues to be private and beyond company access. SFC Company encourages partner use of the Internet:

- To communicate with fellow partners and clients regarding matters within an partner's assigned duties;

- To get information related to, or designed to help the performance of regular assigned duties; and

- To ease performance of any task or project as approved by a partner's supervisor.

Your use of the Internet access provided by SFC Company expressly prohibits:

- Distribution or printing of copyrighted materials (including articles and software) that violates copyright laws.

- Offensive or harassing statements or language including disparagement of others based on their race, marital status, national origin, sex, sexual orientation, age, disability, religious or political beliefs.

- Sending of proprietary information about SFC, or information on others to whom SFC is bound to preserve confidentiality.

46.    **Personal Mail**

The handling of personal mail is not a SFC responsibility. Should mail be received that is specifically addressed to a partner, SFC would distribute it to the partner. However, since it is sometimes difficult to distinguish personal mail from business mail SFC reserves the right to open any mail received.

Should the partner not be at work to receive his or her personal mail, SFC reserves the right to open such unclaimed mail on the premise that it could contain a business communication.

SFC cannot and will not assume any responsibility for the contents of personal mail.

47.    **Company Bulletin Boards and Contents**

SFC maintains a bulletin board to furnish you with up-to-date information on events and matters of interest that is important to its partners. You should check the bulletin board regularly so that you will be well informed on Company matters. Only Company information and materials approved by the Company may be posted on the bulletin boards.

48.    **No Solicitation and Distribution Rules**

In the interest of maintaining a focus on our respective tasks during the workday, we do not allow solicitation or distribution of materials unrelated to SFC's primary mission – the accurate and timely delivery of products and services to customers.

49.    **Resignation Procedures**

Anyone wishing to be dismissed in good standing from their association with SFC should give their supervisor two weeks written notice. All benefits are ended on the last day of employment.

If a partner ends his/her employment with SFC and later wishes to be rehired, he will be treated as a new partner.

Your final paycheck will be ready and mailed to you on the next regular payday for the immediate past period worked.

50.    **Dismissal Procedures**

Dismissals are always unpleasant and costly, so you can be sure that they won't be considered lightly. If, however, dismissal becomes necessary, advance notice may or may not be given depending on the circumstances surrounding the termination. Unused vacation will NOT be paid upon termination of your employment

## APPENDIX A

SFC Drug and Alcohol Policy

We believe that it of paramount importance that we maintain a substance abuse policy that promotes a safe, healthy work environment for all our partners here at Springfield Foodservice Corporation. Beyond that, the added purposes for such a policy are:

1. To ensure the continued good reputation of the company and its partners within the community and industry at large.
2. To reduce the number of accidental injuries to people or property.
3. To reduce absenteeism and tardiness and to improve productivity.
4. To provide information about rehabilitation assistance for any partners who seek help.

Accordingly, it is the policy of SFC to:

1. Prohibit partners from being under the influence of alcohol or illegal drugs during working hours.

2. Prohibit the use, sale, possession, transfer or purchase of illegal drugs on Company property or while performing company business.

3. Advise any partner whose off-duty abuse of alcohol or illegal drugs results in excessive absenteeism or tardiness or is the cause of accidents or poor work may be referred to a partner assistance program for rehabilitation and may face termination if he or she rejects the program.

4. For purposes of the above, an "alcoholic beverage" is one that may be legally sold and consumed and has an alcoholic content in excess of 3 percent by volume.

5. "Drug" means any substance other than alcohol capable of altering an individual's mood, perception, pain level, or judgment. A prescribed drug is any substance prescribed for individual consumption by a licensed medical practitioner. An "illegal drug" is any drug or controlled substance the sale or consumption of which is illegal.

**APPENDIX B**

SFC Sexual Harassment Policy

It is illegal in the United States, and against the policies of SFC, for any SFC Partner, male or female, to sexually harass another Partner by:

- Making unwelcome sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature as a condition of an Partner's continued employment;
- Making submission to or rejection of such conduct the basis for employment decisions affecting the Partner
- Unreasonably interfering with a Partner's work performance or creating an intimidating, hostile or offensive work environment by such conduct.

Any harassing or discriminatory conduct, including but not limited to the preceding examples, will not be tolerated and will result in appropriate disciplinary action up to and including dismissal. In the event that a Partner has a complaint concerning sexual harassment or is aware that conduct of the nature prohibited by this policy may be occurring, the Partner should immediately report the complaint or incident to their Supervisor or to the Director of Training. The Director of Training will investigate the facts and the company will take corrective action when an allegation is determined to be valid. Such conduct may lead to personal legal and financial liability for the implicated individual.