UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------x
VERNE DAVIDSON,
    Plaintiff,

      v.                                    Docket No. 05-30094-MAP

SPRINGFIELD FOOD SERVICE
CORP. , PERFORMANCE FOOD
GROUP and PERFORMANCE FOOD
GROUP,
        Defendants.
----------------------------------------------x

## STATEMENT OF DISPUTED FACTS AS TO WHICH THERE IS A GENUINE ISSUE TO BE TRIED

### Plaintiff Verne Davidson's Background

1.    Verne Davidson is a 45-year-old man.  (Deposition of Verne Davidson (hereafter "Davidson Dep."), Exhibit 1 attached to the Affidavit of Suzanne Garrow, Esq. filed on this date (hereafter "Garrow Aff.") at 8.)

2.    He was born in Springfield, Massachusetts and other than spending approximately two years in Kansas City, Missouri to attend Junior College, has lived in Springfield all his life.  At all times relevant to his complaint he lived with only his school aged son.  (Davidson Dep. Exh. 1 at 8, 9.)

3.    Mr. Davidson began working for the defendants in August 1988; the company was then owned by Springfield Food Service Corp.  (Davidson Dep. Exh. 1 at 11.)

4.    He began as a loader, which meant that he loaded trucks with product. (Davidson Dep. Exh. 1 at 11, 12.)

5.     After three or four years with defendants, Mr. Davidson was promoted to the position of selector.  (Davidson Dep. Exh. 1 at 12.)

6.     After some time as a selector, Mr. Davidson was promoted to the position of stock handler and was switched from the night shift to the day shift. (Davidson Dep. Exh. 1 at 12.)

7.     Except for a brief period of a few months in the mid 1990s when Mr. Davidson served as a nighttime stock handler after being released to work after an injury, Mr. Davidson has worked as a stock handler on the day shift. (Davidson Dep. Exh. 1 at 13, 14.)

8.     Mr. Davidson worked a full-time schedule and would generally begin the workday at 6 to 7:30 a.m. and work until anywhere from 2 p.m. to 3:30 p.m., depending on the business need; his shift was 6 a.m. until 2 p.m. at the time of his work related injury in April 2003.  (Davidson Dep. Exh. 1 at 66, 68, 69.)

9.     As a stock handler, Mr. Davidson's job was to pick stock to ship to various locations. (Davidson Dep. Exh. 1 at 17.)

10.    Mr. Davidson worked in the PIR area of the operation until about the time that Performance Food Group ("PFG") took over operations. (Davidson Dep. Exh. 1 at 18.)

11.    Sometime after PFG took over operations, Mr. Davidson was moved to work in "I" aisle where he worked until he was terminated in May 2003. (Davidson Dep. Exh. 1 at 12, 19.)

12. When Mr. Davidson completed his daily duties he would routinely assist other stock handlers such as those working in "G" aisle or "H" aisle. (Davidson Dep. Exh. 1 at 61.)

13. At the time of his termination he was earning $14.25 per hour. (Davidson Dep. Exh. 1 at 66, 68, 69; SFC Payroll Department Change Forms Exhibit 2 attached to Garrow Aff., (hereafter "Payroll Change Forms.").)

14. Throughout his tenure with defendants, Mr. Davidson received merit and other wage increases including a merit increase as recently as three months prior to the April 24, 2003 back injury and May 2, 2003 termination. (Deposition of Charles Agganis, Exhibit 3 attached hereto, (hereafter "Agganis Dep.") at 99; Payroll Change Forms, Exh. 2.)

15. Mr. Davidson was a good performer and generally met or exceeded the company's expectations of him and adheres to company policy. (Performance Review dated 1/31/03, Exhibit 4 attached to Garrow Aff..)

16. Mr. Davidson enjoyed his job as a stock handler with defendants. (Davidson Dep. Exh. 1 at 21.)

### Mr. Davidson's April 24, 2003 Injury

17. Mr. Davidson was injured on or around April 24, 2003. (Davidson Dep. Exh. 1 at 65-66.)

18. At the time Mr. Davidson was injured he had finished his own work for the day and was assisting the stock handler in the adjacent aisle by stacking cases of pizza sauce. (Davidson Dep. Exh. 1 at 66.)

19.    Mr. Davidson was stacking a case of pizza sauce when felt a pull in his back. (Davidson Dep. Exh. 1 at 66.)

20.    At the time Mr. Davidson sustained his injury he did not experience excruciating pain and so he attempted to stretch his back and he continued working. (Davidson Dep. Exh. 1 at 66-67.)

21.    His back felt progressively tighter throughout the day; nonetheless Mr. Davidson continued working and did so for his entire shift that day. (Davidson Dep. Exh. 1 at 73.)

22.    After he left work on April 24, 2003, Mr. Davidson took two Tylenol and used a heating pad for his back. (Davidson Dep. Exh. 1 at 74.)

23.    Mr. Davidson had a second job at Sulco Industries to supplement his income at the time of the injury. (Davidson Dep. Exh. 1 at 76.)

24.    Mr. Davidson was supposed to report to work at Sulco at his usual starting time of 5 p.m. on April 24, 2003. (Davidson Dep. Exh. 1 at 74, 77.)

25.    He did not do so because his back continued to feel increasingly painful. (Davidson Dep. Exh. 1 at 74.)

26.    Mr. Davidson's back pain increased during the night on April 24, 2003, and he had trouble sleeping due to the pain. (Davidson Dep. Exh. 1 at 75.)

**Notice of Injury to Defendants**

27.    On April 25, 2003, which was the next morning that he was supposed to report to work, Mr. Davidson left a voicemail for his then supervisor Rolando Pagan to notify him that he had injured his back while at work with defendants

and that he would not be reporting to work that day.  (Davidson Dep. Exh. 1 at 75-76, 85-86.)

28.     On or around April 28, 2003, Mr. Davidson was in contact with SFC from home he both called in to Mr. Pagan and later spoke with Donna Szaban from SFC Human Resources and reported to her that that he had injured his back while at work with defendants.  (Davidson Dep. Exh. 1 at 88.)

29.     During the phone call, Ms. Szaban directed Mr. Davidson to see Barry Magnus, the doctor that the company used for workers' compensation injuries called "Occupational Health & Rehabilitation".  (Davidson Dep. Exh. 1 at 89.)

30.     It was part of normal procedure for Ms. Szaban to send an employee who was injured on the job to Occupational Health.  (Deposition of Donna Szaban, Exhibit 5 attached to Garrow Aff., (hereafter "Szaban Dep.") at 9-10)

31.     It was company policy that the person to whom the accident was reported would take the information necessary from the injured employee to prepare the forms to submit to the workers' compensation insurer, which Ms. Szaban did at that time. (Szaban Dep. Exh. 5 at 61-62; Employer's Notification to Insurer, at Exhibit 6.)

32.     As part of her job, Ms. Szaban routinely takes statements from employees of defendants injured at work and processes their workers' compensation claim. (Deposition of Pamela Burns, Exhibit 7 attached to Garrow Aff., (hereafter "Burns Dep.") at 53-55.)

33. After taking the information from Mr. Davidson, Ms. Szaban completed the paperwork that needed to be submitted to the company's Workers' Compensation insurance carrier. (Szaban Dep. Exh. 5 at 36.)

34. Ms. Szaban asked Mr. Davidson to provide her with the doctor's note after his appointment with Dr. Magnus. (Davidson Dep. Exh. 1 at 90.)

35. Because he was in excruciating pain at his appointment the nurse at Dr. Magnus' office told Mr. Davidson that she would fax the note to SFC on Mr. Davidson's behalf rather than having him have to report to work, which she immediately did. (Davidson Dep. Exh. 1 at 90-91; Szaban Dep. Exh. 5 at 46.)

36. The nurse at Occupational Health also contemporaneously faxed all the documentation of Mr. Davidson's subsequent visits to PFG. (Szaban Dep. Exh. 5 at 44; Occupational Health & Rehabilitation Patient Status Forms, (hereafter "Patient Status Forms") attached to Garrow Aff. as Exhibit 8.)

37. The note from Mr. Davidson's initial visit to the doctor that was faxed to SFC stated that Mr. Davidson could return to work on May 1, 2003, with certain restrictions including no lifting over 5-10 pounds. (Davidson Dep. Exh. 1 at 96.)

38. At his first appointment, Mr. Davidson was prescribed vicodin, a strong painkiller and naprosyn and a course of physical therapy to begin on May 2, 2003. (Davidson Dep. Exh. 1 at 98, 111, 129; Patient Status Forms Exh. 8, On line information from Physician Desk Reference, attached to Garrow Aff. at Exhibit 20.)

39. The doctor scheduled Mr. Davidson for a follow up appointment for May 6, 2003. (Davidson Dep. Exh. 1 at 98; Patient Status Forms Exh. 8.)

## **Mr. Davidson's need for additional leave time from work**

40.    On May 1, 2003, Mr. Davidson overslept his alarm due to the effects of the pain medication and, as a result, he awoke when his shift was over halfway completed for the day.   (Davidson Dep. Exh. 1 at 107-08, 110-11, 132, 160, 163.)

41.    When he finally awoke on May 1, 2003, Mr. Davidson was still in severe pain and was incapacitated; he testified that he felt "groggy" and "discombobulated".  (Davidson Dep. Exh. 1 at 107-108)

42.    Later that day he feeling a bit more cognizant and he called Dr. Magnus' office to report that he was in severe pain and trying to come to see him the following day to get some relief.  (Occupational Health & Rehabilitation Treatment Notes (hereafter "Treatment Notes"), attached to Garrow Aff. at Exhibit 9; Davidson Dep. Exh. 1 at 107, 109; Patient Status Form dated 5/06/03, Exh. 8.)

43.    Dr. Magnus received Mr. Davidson's message at the end of the day on May 1, 2003, and did not call Mr. Davidson back as Dr. Magnus was going to be out of the office on May 2, 2003, and could not see Mr. Davidson until their scheduled appointment.  (Treatment Note dated 5/06/03, Exh. 9.)

44.    Despite being under the influence of strong painkillers, Mr. Davidson took precautions to ensure that he would awake to call Mr. Pagan prior to his shift on May 2, 2003.  (Davidson Dep. Exh. 1 at 107, 108.)

45.     Prior to his shift on May 2, 2003, Mr. Davidson left a message for Mr. Pagan on his voicemail that his back was still very painful and that he would not be in work that day.  (Davidson Dep. Exh. 1 at 112.)

46.     It was appropriate for an employee to leave a voicemail message for his supervisor to let them know if he was not coming in to work if an employee could not speak with his supervisor directly, which was often the case.  (Deposition of Peter Brunault, Exhibit 10 to Garrow Aff., (hereafter "Brunault Dep.") at 40; Agganis Dep. Exh. 3 at 47)

47.     Jason Sosnowich was the supervisor on duty at the time of Mr. Davidson's termination because Mr. Pagan was not in work on May 2, 2003. (Agganis Dep. Exh. 3 at 80-82.)

 48.    Mr. Davidson followed the prescribed course of physical therapy and other treatment and attended a physical therapy appointment on May 2, 2003, with a physical therapist at Occupational Health to whom he reported his continued pain.  (Occupational Health & Rehabilitation Physical Therapy Notes (hereafter "Therapy Notes") attached to Garrow Aff. at Exhibit 11; Patient Status Forms, Exh. 8.)

49.     Ms. Szaban did not contact Mr. Davidson again after her one conversation with him on April 28, 2003, at any time while he remained out of work through his return on May 6, 2003. (Szaban Dep. Exh. 5 at 43.)

50.     Mr. Davidson had an answering machine at the time but never received any messages from Mr. Pagan or anyone at SFC while he was out of work for his back injury. (Davidson Dep. Exh. 1 at 165.)

51. No one from SFC called Mr. Davidson at all while he was out of work including to inquire about his condition prior to terminating him. (Agganis Dep. Exh. 3 at 75; Brunault Dep. Exh. 10 at 53; Szaban Dep. Exh. 5 at 43; Deposition of Rolando Pagan, Exhibit 12 attached to Garrow Aff, (hereafter "Pagan Dep.") at 66.)

52. Mr. Davidson was out of work due to his back injury until May 6, 2003. (Davidson Dep. Exh. 1 at 81.)

## Mr. Davidson's return to work

53. Mr. Davison reported to work on May 6, 2003, and after working for about a half hour he saw his supervisor Mr. Pagan. (Davidson Dep. Exh. 1 at 82; Pagan Dep. Exh. 12 at 79.)

54. As soon as he saw Mr. Pagan, Mr. Pagan told Mr. Davidson that he should stop working and go home and that he had to call Peter Brunault, the then head of Human Resources. (Davidson Dep. Exh. 1 at 82-83; 136.)

55. Mr. Davidson asked Mr. Pagan if he had been fired to which Mr. Pagan did not respond. (Davidson Dep. Exh. 1 at 83-84.)

56. The reason was Mr. Davidson was concerned was because Mr. Pagan had not returned any of the voicemail messages he had left for him and had expected that he would have heard from Mr. Pagan at some point while he was out. (Davidson Dep. Exh. 1 at 84-87; 133-37; Agganis Dep. Exh. 3 at 72, 74.)

57. Mr. Davidson did as he was directed to do and called Mr. Brunault in Human Resources who told Mr. Davidson that he had been terminated effective May 2, 2003. (Davidson Dep. Exh. 1 at 106.)

58. When he was told this by Mr. Brunault, Mr. Davidson requested that Mr. Brunault please verify with the doctor that he had been under the doctor's care for the entire time he had been out in an attempt to keep his job with defendants. (Davidson Dep. Exh. 1 at 141.)

59. Defendants did not call the doctor as Mr. Davidson requested. (Agganis Dep. Exh. 3 at 74.)

## **Defendants' Operative Policies**

60. Mr. Davidson received workers' compensation benefits for the injury he sustained on April 24, 2003, and for the subsequent treatment. (Davidson Dep. Exh. 1 at 126.)

61. During Mr. Davidson's 14 year tenure with defendants, the company had a progressive discipline policy in which people could be terminated after three offenses of no-call no show for work. (Davidson Dep. Exh. 1 at 177-80; Brunault Dep. Exh. 10 at 90.)

62. The company had a progressive discipline policy in place at the time of Mr. Davidson's termination (Defendants' Employee Handbook (hereafter "Handbook"), attached to Garrow Aff. as Exhibit 13; Deposition of James Hagberg, Exhibit 14 attached to Garrow Aff., (hereafter "Hagberg Dep.") at 59-60; Burns Dep. Exh. 7 at 32-33), and could have engaged in progressive discipline with Mr. Davidson regarding his no-call no show but did not do so. (Burns Dep. Exh. 7 at 32- 33.)

63. Ms. Szaban, who was an HR Generalist at the time of Mr. Davidson's termination and who is now the Safety and Risk Manager understood the

operative no call no show policy when Mr. Davidson was terminated to be that an employee was terminated after the third day of no call no show. (Szaban Dep. Exh. 5 at 79-80, 94.)

64.    It was company practice in 2003, that when a policy was announced to the workforce such policy was given in written form to each of the employees. (Agganis Dep. Exh. 3 at 20; Szaban Dep. Exh. 5 at 32.)

65.    Until such time as a new policy was announced and distributed to the workforce, the previously existing policy from the most recent handbook regarding each issue remained in place. (Agganis Dep. Exh. 3 at 29, 34, 71.)

66.    In November 2002, and after PFG purchased SFC, Charles Agganis became Vice President of Operations at SFC. (Agganis Dep. Exh. 3 at 11-12.)

67.    When Mr. Agganis became Vice President of Operations in November 2002 there was an SFC employee handbook in use at the time. (Agganis Dep. Exh. 3 at 30; Handbook.)

68.    The policy in the operative handbook at that time and at the time Mr. Davidson was terminated regarding no call no show was "Any time a partner is absent three (3) consecutive days without notice, the partner will be considered as voluntary quit." (Handbook Exh. 13 at page 11)

69.    That handbook was operative until the June 2003 handbook was issued by PFG. (Brunault Dep. Exh. 10 at 26; Pagan Dep. Exh. 12 at 48.)

70.    When Mr. Brunault began with the defendants had began working on a new handbook, which was to be the first to be issued from PFG in Springfield – it was the handbook issued in June 2003. (Brunault Dep. Exh. 10 at 21.)

71.   Mr. Brunault held multiple employee meetings to distribute the new PFG Handbook.  (Brunault Dep. Exh. 10 at 22-23.)

72.   There was no written two consecutive days no call no show policy at the time of Mr. Davidson's termination, rather the policy was the one cited above in paragraph 68.  (Agganis Dep. Exh. 3 at 76, 80; Hagberg Dep. Exh. 14 at 39-40.)

73.   If the no call no show policy changed at all from three days to two days, it had not changed by the time that Mr. Davidson was terminated and numerous employees were terminated around the time of Mr. Davidson's termination for three-day no call no show, including Carlos Sanchez who was terminated for three-day no-call no-show on the same day that Mr. Davidson was terminated. (SFC 2003 Employee Change Forms, attached to Garrow Aff. at Exhibit 15.)

74.   At no time prior to his termination was Mr. Davidson or his coworkers made aware that the no-call no-show policy had changed.  (Agganis Dep. Exh. 3 at 35-36; Davidson Dep. Exh. 1 at 179; Deposition of Bernie Carter, Exhibit 16 attached to Garrow Aff., (hereafter "Carter Dep.") at 40.)

75.   According to defendants, their policy regarding calling in sick to work is that an employee must call in to work prior to his shift to report that he will not be in work that day unless he is unconscious and, in that case, someone in his immediate family is required to call in to work.  (Agganis Dep. Exh. 3 at 85-86.)

76.   When PFG took over defendants' operations it was focused on decreasing the number of days out for its employees due to injury and, generally on increased productivity by each worker and to its employees seemingly had less

regard for individual health and safety. (Agganis Dep. Exh. 3 at 59-60; Carter Dep. Exh. 16 at 47.)

77.    When PFG took over it was aware that Mr. Davidson's had a bad back which he had previously injured on the job prior to PFG taking over operations. (Hagberg Dep. Exh. 14 at 58.)

### Interference with Mr. Davidson's FMLA rights

78.    Mr. Agganis did not discuss Mr. Davidson's Family and Medical Leave Act Rights or consider not terminating him due to his work related injury when he spoke with Peter Brunault, the then head of Human Resources. (Agganis Dep. Exh. 3 at 77.)

79.    At no point was Mr. Davidson made aware of his rights under the FMLA, or was medical certification requested when he was out on leave for his back injury that occurred on or around April 24, 2003. (Agganis Dep. Exh. 3 at 89; Szaban Dep. Exh. 5 at 55; Brunault Dep. Exh. 10 at 61-62)

80.    At all times relevant to the complaint anything regarding FMLA rights would have been handled by defendants' Human Resources department. (Agganis Dep. Exh. 3 at 89-90.)

81.    According to Mr. Brunault, the company's basis for failing to grant Mr. Davidson FMLA leave for May 1 and 2, 2003 is because Mr. Davidson did not request it by name. (Brunault Dep. Exh. 10 at 97.)

82.    No investigation was done into Mr. Davidson's need for leave either prior to or post termination. (Brunault Dep. Exh. 10 at 97.)

## **The reasonableness of accommodations sought by Mr. Davidson**

83. After Mr. Davidson's termination, Mr. Agganis became aware that Mr. Davidson was cleared to return to work with restrictions on May 6, 2003. (Agganis Dep. Exh. 3 at 91.)

84. At no time after he became aware of this did Mr. Agganis or Mr. Brunault consider reinstating Mr. Davidson to his position. (Agganis Dep. Exh. 3 at 91; Brunault Dep. Exh. 10 at 75.)

85. At no time, either prior to or at the time of termination did the company consider relaxing its claimed two day no-call no show policy for Mr. Davidson or any other accommodation, despite his work related injury. (Agganis Dep. Exh. 3 at 92-93; Szaban Dep. Exh. 5 at 65.)

86. According to Mr. Brunault who was the manager of the Human resources department and is a practicing lawyer, and according to the Regional Vice President of Human Resources for PFG, Pamela Burns, it could be a reasonable accommodation to relax the no-call no policy of PFG for an injured worker; also according to Mr. Brunault Mr. Davison timely complied with requirements under the Workers' Compensation laws.  (Burns Dep. Exh. 7 at 41-43; Brunault Dep. Exh. 10 at 56, 28-30; Worker's Guide to Massachusetts Workers' Compensation System, attached to Garrow Aff. at 17.)

87. According to Pamela Burns, the defendants' Regional Vice President of Human Resources it is a preferred practice for the company to call an individual who is out of work with an injury if the employee fails to return to work as anticipated and is a no-call no-show. (Burns Dep. Exh. 7 at 24.)

88.     According to defendants' Regional Vice President of Human Resources it is a reasonable accommodation for an employee who is out with a work related injury when a no-call no show to allow them to provide additional documentation regarding their need to be out of work.  (Burns Dep. Exh. 7 at 73.)

### Mr. Davidson's termination

89.     At no time did Mr. Brunault speak with Mr. Pagan about Mr. Davidson's termination or inquire as to whether Mr. Davidson had in fact called in to work on May 1, 2003 or at all.  (Brunault Dep. Exh. 10 at 69-73.)

90.     Mr. Agganis reviewed Mr. Davidson's medical paperwork prior to making the decision to terminate him. (Agganis Dep. Exh. 3 at 88-89.)

91.     Mr. Agganis made the decision to fire Mr. Davidson in consultation with Mr. Brunault.  (Brunault Dep. Exh. 10 at 16.)

92.     Mr. Davidson was terminated because Mr. Davidson was a no-call no-show on May 1 and 2, 2003.  (PFG Employee Corrective Action Form; Agganis Dep. Exh. 3 at 90.)

93.     The letter that was later sent to Mr. Davidson informing him of his termination from employment contains a number of pretextual reasons for his termination including that he failed to timely notify work of his injury. (Brunault Dep. Ex. 10 at 82-85; Termination letter from Peter Brunault to Verne Davidson dated 5/5/06, attached to Garrow Aff. at Exhibit 19.)

94.     The reasons set forth in the letter for Mr. Davidson's termination could be the subject of progressive discipline which policy was not followed with regard to

Mr. Davidson's termination. (Handbook Exh. 13 at page 11; Burns Dep. Exh. 7 at 32- 33.)

95.     When Mr. Davidson was terminated he was replaced by a man named Santos who did not have a disability, nor a work related injury, nor did Santos file a workers' compensation claim or request a reasonable accommodation. (Agganis Dep. Exh. 3 at 41, 45.)

                PLAINTIFF VERNE DAVIDSON
                By:

                ____/s/ Suzanne Garrow_____
                His attorney
                Suzanne Garrow BBO# 636548
                Heisler, Feldman, McCormick
                    & Garrow, PC
                1145 Main Street, Ste. 508
                Springfield, MA  01103
                sgarrow@comcast.net
                Phone (413) 788-7988

Dated:  January 3, 2007

                CERTIFICATE OF SERVICE

    I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

                ___/s/ Suzanne Garrow_____
                Suzanne Garrow