UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------x
VERNE DAVIDSON,
    Plaintiff,

v.                                                    Docket No. 05-30094-MAP


SPRINGFIELD FOOD SERVICE
CORP. , PERFORMANCE FOOD
GROUP,
    Defendants.
------------------------------------------------x

## PARTIES' JOINT PRETRIAL MEMORANDUM

**1.**    **CONCISE SUMMARY OF THE EVIDENCE**

    **a.**    **Plaintiff's Concise Summary of the Evidence**

The Plaintiff, Verne Davidson, brings this action against his former employers, Springfield Food Service Corp. and Performance Food Group (collectively "defendants"), alleging that his employer's failure to grant him medical leave and its subsequent termination of his employment violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Mr. Davidson also alleges that his employer violated his rights under M.G.L. c. 151B when it failed to reasonably accommodate him after a work related injury and terminated his employment and retaliated against him for asserting his rights under M.G.L. c. 152.

Among the claims set forth in his complaint, Mr. Davidson maintains that defendants interfered with his rights under the FMLA by: (1) refusing to provisionally allow him FMLA leave when he was out of work for a work-related injury; (2) failing to

allow him a reasonable opportunity to provide FMLA-certifying, medical documentation; and (3) terminating his employment on May 2, 2003, for violation of the employer's alleged "two-day no-call no show" policy.  Mr. Davidson alleges that his employer retaliated against him for taking FMLA-qualifying leave.  He also alleges that: (1) he did not violate the no-call no show policy and that he was terminated in violation of M.G.L. 151B; and (2) the employer failed to reasonably accommodate Mr. Davidson's qualified handicap by not allowing him to return to work when he was released to do so by his doctor in violation of M.G.L. c. 151B.

    **b.**    **Defendant's Concise Summary of the Evidence**

Mr. Davidson alleges that he hurt his back at work on April 24, 2003. He was examined by Dr. Barry Magnus, who noted that Mr. Davidson could return to work on a light duty basis on May 1, 2003.  Mr. Davidson failed to do so.

Mr. Charles Agganis, Vice President of Operations, and Peter Brunault, Manager of Human Resources, terminated Mr. Davidson on May 2, 2003 because they believed that he had violated company policy by failing to give any notice of his absences from work on May 1 and 2, 2003 and because he had failed to report back to the company after his medical examination despite being directed to do so.  Mr. Davidson admits that he failed to give notice of his May 1, 2003 absence, and he also admits that he failed to report back to the company after his medical examination despite being directed to do so.

Messrs. Agganis and Brunault believed that Mr. Davidson did not report his May 2, 2003 absence because Mr. Sosnowich, a warehouse supervisor, informed them that Mr. Davidson had not left a voicemail for either him or for Mr. Pagan

reporting that day's absence. Messrs. Agganis and Brunault believed that the company's "No call, No show" policy provided for termination after two consecutive absences – not three - because they had recently implemented that policy change.

Defendants expect the credible evidence will indicate that its reasons for terminating Mr. Davidson were legitimate and non-discriminatory and that they did not fail to accommodate Mr. Davidson's handicap or interfere with his FMLA rights.

**2.    PLAINTIFF'S PROPOSED FACTS ESTABLISHED BY THE PLEADINGS OR BY STIPULATION**

1. Verne Davidson began working for the defendants in August 1988; the company was then owned by Springfield Food Service Corp.

2. He began as a loader, which meant that he loaded trucks with product.

3. After three or four years with defendants, Mr. Davidson was promoted to the position of selector.

4. After some time as a selector, Mr. Davidson was promoted to the position of stock handler and was switched from the night shift to the day shift.

5. Except for a brief period of a few months in the mid 1990s when Mr. Davidson served as a nighttime stock handler after being released to work after an injury, Mr. Davidson has worked as a stock handler on the day shift.

6. Mr. Davidson worked a full-time schedule and would generally begin the workday at 6 to 7:30 a.m. and work until anywhere from 2 p.m. to 3:30 p.m., depending on the business need; his shift was 6 a.m. until 2 p.m. at the time of his work related injury in April 2003.

7. As a stock handler, Mr. Davidson's job was to pick stock to ship to various locations.

8. Mr. Davidson worked in the PIR area of the operation until about the time that Performance Food Group ("PFG") took over operations. Sometime after PFG took over operations, Mr. Davidson was moved to work in "I" aisle where he worked until he was terminated in May 2003.

9. When Mr. Davidson completed his daily duties he would routinely assist other stock handlers such as those working in "G" aisle or "H" aisle.

10. At the time of his termination Mr. Davidson was earning $14.25 per hour.

11. Davidson received a merit increase as recently as three months prior to the April 24, 2003 back injury and May 2, 2003 termination.

12. Mr. Davidson generally met or exceeded the company's expectations of him and adheres to company policy.

13. Mr. Davidson was injured on or around April 24, 2003.

14. Mr. Davidson continued working and did so for his entire shift that day.

15. On April 25, 2003, which was the next morning that he was supposed to report to work, Mr. Davidson left a voicemail for his then supervisor Rolando Pagan to notify him that he had injured his back while at work with defendants and that he would not be reporting to work that day.

16. On or around April 28, 2003, Mr. Davidson was in contact with SFC from home he both called in to Mr. Pagan and later spoke with Donna Szaban from SFC

Human Resources and reported to her that that he had injured his back while at work with defendants.

17. During the phone call, Ms. Szaban directed Mr. Davidson to see Barry Magnus, the doctor that the company used for workers' compensation injuries called "Occupational Health & Rehabilitation".

18. It was company policy that the person to whom the accident was reported would take the information necessary from the injured employee to prepare the forms to submit to the workers' compensation insurer, which Ms. Szaban did at that time.

19. After taking the information from Mr. Davidson, Ms. Szaban completed the paperwork that needed to be submitted to the company's Workers' Compensation insurance carrier.

20. The nurse at Dr. Magnus' office told Mr. Davidson that she would fax the notes of his visit to SFC on Mr. Davidson's behalf rather than having him have to report to work, which she immediately did.

21. The nurse at Occupational Health also contemporaneously faxed all the documentation of Mr. Davidson's subsequent visits to PFG.

22. The note from Mr. Davidson's initial visit to the doctor that was faxed to SFC stated that Mr. Davidson could return to work on May 1, 2003, with certain restrictions including no lifting over 5-10 pounds.

23. At his first appointment with Dr. Magnus, Mr. Davidson was prescribed vicodin, and naprosyn and a course of physical therapy to begin on May 2, 2003.

24. The doctor scheduled Mr. Davidson for a follow up appointment for May 6, 2003.

25, It was appropriate for an employee to leave a voicemail message for his supervisor to let them know if he was not coming in to work if an employee could not speak with his supervisor directly, which was often the case.

26. Mr. Davidson followed the prescribed course of physical therapy and other treatment and attended a physical therapy appointment on May 2, 2003, with a physical therapist at Occupational Health to whom he reported his continued pain.

27. Ms. Szaban did not contact Mr. Davidson again after her one conversation with him on April 28, 2003, at any time while he remained out of work through his return on May 6, 2003.

28. Mr. Davidson had an answering machine at the time but never received any messages from Mr. Pagan or anyone at SFC while he was out of work for his back injury. No one from SFC called Mr. Davidson at all while he was out of work including to inquire about his condition prior to terminating him.

29. Mr. Davidson was out of work due to his back injury until May 6, 2003. Mr. Davison reported to work on May 6, 2003, and after working for about a half hour he saw his supervisor Mr. Pagan.

30. As soon as he saw Mr. Pagan, Mr. Pagan told Mr. Davidson that he should stop working and go home and that he had to call Peter Brunault, the then head of Human Resources.

31. Mr. Davidson did as he was directed to do and called Mr. Brunault in Human Resources who told Mr. Davidson that he had been terminated effective May 2, 2003.

32. When he was told this by Mr. Brunault, Mr. Davidson requested that Mr. Brunault please verify with the doctor that he had been under the doctor's care for the entire time he had been out in an attempt to keep his job with defendants.

33. Defendants did not call the doctor as Mr. Davidson requested.

34. Mr. Davidson received workers' compensation benefits for the injury he sustained on April 24, 2003, and for the subsequent treatment.

35. During Mr. Davidson's 14 year tenure with defendants, the company had a progressive discipline policy in which people could be terminated after three offenses of no-call no show for work.

36. The company had a progressive discipline policy in place at the time of Mr. Davidson's termination.

37. It was company practice in 2003, that when a policy was announced to the workforce such policy was given in written form to each of the employees. Until such time as a new policy was announced and distributed to the workforce, the previously existing policy from the most recent handbook regarding each issue remained in place.

38. In November 2002, and after PFG purchased SFC, Charles Agganis became Vice President of Operations at SFC. When Mr. Agganis became Vice President of Operations in November 2002 there was an SFC employee handbook in use at the time.

39. The policy in the operative handbook at that time and at the time Mr. Davidson was terminated regarding no call no show was "Any time a partner is absent three (3) consecutive days without notice, the partner will be considered as voluntary quit." That handbook was operative until the June 2003 handbook was issued by PFG.

40. Mr. Brunault held multiple employee meetings to distribute the new PFG Handbook.

41. Mr. Agganis did not discuss Mr. Davidson's Family and Medical Leave Act Rights or consider not terminating him due to his work related injury when he spoke with Peter Brunault, the then head of Human Resources.

42. At no point before his termination was Mr. Davidson made aware of his rights under the FMLA, or was medical certification requested when he was out on leave for his back injury that occurred on or around April 24, 2003.

43. After Mr. Davidson's termination, Mr. Agganis became aware that Mr. Davidson was cleared to return to work with restrictions on May 6, 2003.

44. At no time, either prior to or at the time of termination did the company consider relaxing its claimed two day no-call no show policy for Mr. Davidson or any other accommodation, despite his work related injury.

45. According to Pamela Burns, the defendants' Regional Vice President of Human Resources it is a preferred practice for the company to call an individual who is out of work with an injury if the employee fails to return to work as anticipated and is a no-call no-show.

46. According to defendants' Regional Vice President of Human Resources it is a reasonable accommodation for an employee who is out with a work related injury when a no-call no show to allow them to provide additional documentation regarding their need to be out of work.

47. When Mr. Davidson was terminated he was replaced by a man named Santos who did not have a disability, nor a work related injury, nor did Santos file a workers' compensation claim or request a reasonable accommodation.

**3. DEFENDANTS' PROPOSED FACTS ESTABLISHED BY THE PLEADINGS OR BY STIPULATION**

1. Springfield Foodservice Corporation (SFC), located at 340 Taylor Street in Springfield, Massachusetts, is a food service marketer and distributor to restaurants; catering and banquet facilities; schools and colleges; hospitals, nursing homes and retirement communities; correctional facilities; government and military installations throughout all of New England, eastern New York, northern New Jersey, and northeastern Pennsylvania.

2. SFC was purchased by Defendant Performance Food Group, Inc. ("PFG") on September 12, 2001. SFC, which now does business as PFG-Springfield, is a wholly-owned subsidiary of PFG. PFG is a publicly-held corporation headquartered in Richmond, Virginia.

3. Mr. Davidson has resided at 1815 Roosevelt Avenue in Springfield, Massachusetts with his son Taron since 1998. Mr. Davidson's residence is located miles 2.82 miles from SFC.

4. Mr. Rolando Pagan, who as Warehouse Manager from February 2002

until February 2004 managed Mr. Davidson during the period of February 2002 to May 2003, helped Mr. Davidson get a pay raise; Mr. Davidson considered that an example of fair treatment.

5.  Mr. Charles Agganis served as SFC's Vice President of Operations from November 2002 until October 2005. In that capacity. Mr. Agganis was responsible for oversight of the shipping and receiving function. The shipping function included the selection and delivery of the product. And the receiving function involved the intake of the products that were sold to customers.

6.  Mr. Peter Brunault served as of Manager of Human Resources from the Summer of 2002 until September 2003.

7.  Mr. Brunalt and Mr. Agganis had the authority to fire warehouse employees.

8.  SFC required employees to notify their supervisors of their absences. Warehouse employees were required to call the warehouse manager or any warehouse supervisor.

9.  A two-day "No call, No show" policy is the norm in the food distribution industry. SFC management knew of the revised "No call, No show" policy.

10. For instance, Mr. Pagan and Warehouse Supervisor Jason Sosnowich knew that the company's policy provided for termination after two consecutive days of "no call, no show."

11. Mr. Davidson went to Occu-Health in Springfield to be treated on Tuesday, April 29, 2003. He was examined there by Dr. Barry Magnus. Dr. Magnus diagnosed Mr. Davidson with a back strain for which he recommended rest and

physical therapy.  Dr. Magnus also prescribed Naproxsyn and Vicotin to Mr. Davidson.  Dr. Magnus advised that Mr. Davidson not report for work that day or the next (April 29th and 30th) but that Mr. Davidson could return to work on May 1, 2003, with some physical restrictions. Dr. Magnus completed a Patient Status form containing all this information which was faxed to SFC. However, Mr. Davidson never brought the report from Dr. Magnus to Ms. Szaban, although she had directed him to do so.

12.    Mr. Davidson read the Patient Status Form on Tuesday, April 29, 2003 and he understood that he was to return to work on May 1, 2003 with the specified restrictions.

13.    SFC planned to accommodate Mr. Davidson's restrictions with light duty work when he returned to work on May 1, 2003.  In fact, it was SFC's practice, at that time, to accommodate injured employees by providing light duty work.

14.    Despite Dr. Magnus's report indicating that he could return to work, Mr. Davidson did not report for work on Thursday, May 1, 2003.  Nor did Mr. Davidson attempt to telephone anyone at SFC to notify them that he would not be reporting for work that day.  He failed to do so because he was "out of it from the medicine." However, Mr. Davidson did telephone Dr. Magnus at Occu-Health at 10:00 a.m. or 11:00 a.m. right after waking up to get another doctor's note.

15.    Mr. Davidson also did not report for work on Friday, May 2, 2003 because he had back pain.

16.    Mr. Davidson did not call Dr. Magnus on Friday, May 2, 2003 for a new note excusing him from work on May 1st and 2nd.

-11-

17. Mr. Davidson did, however, drive himself to Occu-Health for his physical therapy evaluation on Friday, May 2, 2003. His physical therapy evaluation took place in the same place location where Mr. Davidson was treated by Dr. Magnus.

18. When Mr. Davidson did not report for work on the early morning of Friday, May 2, 2003, Mr. Sosnowich checked his voicemail to see if Mr. Davidson had called in, but he had no voicemail from Mr. Davidson. Mr. Sosnowich also checked Mr. Pagan's voicemail for a message from Mr. Davidson after getting Mr. Pagan's voicemail password from Mr. Pagan, who was at home because he had the day off. There was no message from Mr. Davidson on Mr. Pagan's voicemail either. Mr. Sosnowich checked Mr. Pagan's voicemail and his own again before 8:00 a.m. and there was still no message from Mr. Davidson. So Mr. Sosnowich informed Mr. Agganis that Mr. Davidson was absent again and that there was no word from him. Mr. Sosnowich checked the voicemails through the day but never heard a voicemail from Mr. Davidson. Mr. Sosnowich signed Mr. Davidson's termination form around 3:00 p.m. that afternoon right after being informed of the decision to terminate him.

19. Based on that information, Mr. Agganis and Mr. Brunault decided to terminate Mr. Davidson for failing to report his absences on two consecutive days (May 1st and 2nd) and for failing to bring in his medical paperwork from Occu-Health despite being specifically directed to do so by Ms. Szaban.

20. Between April 25, 2003 and May 5, 2003, Mr. Davidson did not speak to Mr. Pagan and he never attempted to notify anyone else at SFC that he would be absent. SFC did not have a practice or policy of calling employees who, like Mr. Davidson, had failed to call in to report their absences.

21. On May 5, 2003, Mr. Brunault mailed a letter to Mr. Davidson notifying him that his employment had been terminated because he failed to notify SFC of his absences on May 1 and 2, 2003 and because he had failed to report back to the company following his exam at Occu-Health as directed.

22. Mr. Davidson spoke to Mr. Brunault by telephone on the morning of May 6, 2003. Mr. Brunault told that Mr. Davidson that he was terminated on May 2nd because he did not report for work even though SFC had light duty work available for him.

23. SFC has terminated other employees for failing to call in on two consecutives days to report absences. On December 2, 2004, SFC terminated James McMillian for failing to call in on two consecutives days to report absences. SFC terminated a Hispanic employee in his thirties without any history of workers compensation injuries or claims because he had failed to call in on two consecutives days to report absences some time between 2001 and 2004. Another employee, Albert Larriu, was terminated because he failed to call in on two consecutives days to report absences as well.

24. In addition to Mr. Davidson, during the period of time that Mr. Agganis and Mr. Brunalt were both employed at SFC, the following employees were terminated for failing to call in on two consecutives days to report absences: Jim Chancellor; Shaheed Harris; and Miguel Gonzalez. SFC terminated Mr. Chancellor before Mr. Davidson.

25. Mr. Davidson did not expressly request FMLA leave and SFC did not provide Mr. Davidson any information relating to FMLA leave, following his April 24,

2003 injury. Mr. Davidson never informed anyone at SFC how long he would need to be out of work, following his April 24, 2003 injury.

26. SFC has granted other employees FMLA leave.

27. Mr. Davidson received workers compensation benefits to compensate him for his April 24, 2003 injury. Mr. Davidson had filed a workers compensation claim after he was verbally notified by Peter Brunault that he had been terminated on May 6, 2003. However, the only thing Mr. Davidson did about a workers' compensation claim before he was terminated was to go to Occu-Health for treatment on April 29, 2003, at Mr. Szaban's direction. Mr. Davidson never filled out an accident report regarding his April 24, 2003 workplace injury.

28. Mr. Davidson does not know of any employees, other than himself, who were fired after getting hurt at work. SFC has promoted employees who have previously had workers compensation injuries.

**4.   CONTESTED ISSUES OF FACT**

1. Whether the defendants had a legitimate non-discriminatory reason under the circumstances of this case for terminating Mr. Davidson when acting in violation of their own no call no show policy.

2. Whether the reasons proffered by the defendants for terminating Mr. Davidson were pretexts for discrimination.

3. Whether decisions by defendants to terminate Mr. Davidson's employment were motivated in any way by considerations relating to his handicap.

4. Whether the employer failed to reasonably accommodate Mr. Davidson's qualified handicap by not allowing him to return to work when he was released to do so by his doctor in violation of M.G.L. c. 151B.

5. Whether Mr. Davidson suffered a loss of pay and employee benefits as a result of the discriminatory actions and omissions of the defendants.

6. Whether Mr. Davidson has suffered emotional distress, mental anguish and related physical pain and suffering as a result of the discriminatory actions and omissions of the defendants.

7. Whether the actions and omissions of defendants resulted from malice or reckless indifference to Mr. Davidson's civil rights.

8. Whether the defendants violated the Family and Medical Leave Act ("FMLA") by refusing to provisionally allow him FMLA leave when he was out of work for a work-related injury.

9. Whether the defendants violated the FMLA by failing to allow Mr. Davidson a reasonable opportunity to provide FMLA-certifying, medical documentation.

10. Whether the defendants violated the FMLA by terminating Mr. Davidson's employment on May 2, 2003, for violation of the employer's alleged "two-day no-call no show" policy.

11. Whether the defendants violated the FMLA by retaliating against Mr. Davidson for taking FMLA-qualifying leave.

12. Whether Mr. Davidson a suffered a loss of wages as a result of a violation of the FMLA.

    13.    Whether the defendants' violation of the FMLA was willful.

    14.    Did Mr. Davidson provided defendants with sufficient notice that he was in need of FMLA qualifying leave?

    15.    Whether Mr. Davidson failed to comply with a directive to personally bring the note from Dr. Magnus to Ms. Szaban on or about April 29, 2003 and whether Mr. Davidson violated the company's "No Call, No Show" policy on or about May 2, 2003?

    16.    Whether Messrs. Agganis and Brunault decided to terminate Mr. Davidson because he failed to comply with a directive to personally bring the note from Dr. Magnus to Ms. Szaban on or about April 29, 2003 and whether he violated the company's "No Call, No Show" policy on or about May 2, 2003?

    17.    Whether Mr. Davidson's alleged handicap was a motivating factor in Messrs. Agganis and Brunault's decision to terminate Mr. Davidson?

    18.    Whether Mr. Davidson exercised any rights under M.G.L.c. 152 prior to Messrs. Agganis and Brunault's decision to terminate him? And, if so, whether Mr. Davidson exercise of rights under M.G.L.c. 152 was a motivating factor in Messrs. Agganis and Brunault's decision to terminate him?

**5.    JURISDICTIONAL QUESTIONS**

None.

**6.    PENDING MOTIONS**

None.

**7.    ISSUES OF LAW**

    **a.    Plaintiff's Issues of Law**

The Plaintiff has not identified any contested issues of law at this time.

    **b.    Defendant's Issues of Law**

Defendants have not identified any contested issues of law at this time.

**8.    REQUESTED AMENDMENTS TO PLEADINGS**

None.

**9.    ADDITIONAL MATTERS**

Potential Motions in Limine are to be filed one week before the commencement of trial.

**10.    PROBABLE LENGTH OF TRIAL**

Five trial days.

**11.    WITNESSES**

    **a.    Plaintiff's Witnesses**

Verne Davidson

Charles Agganis

Donna Szaban

Pamela Burns

Peter Brunault

Rolando Pagan

James Hagberg

Bernie Carter

Vincent Henry

Carrie Henry

Lisa Troy

Dr. Barry Magnus

The plaintiff reserves the right to amend this list as allowed by the Court.

    **b.**    **Defendant's Witnesses**

In addition, to the potential listed above, the defendants expect to call:

Jason Sosnovich

Defendants reserve the right to amend this list.

**12.**    **PROPOSED EXHIBITS**

    **a.**    **Plaintiff's Proposed Exhibits**

The plaintiff reserves the right to amend this list as allowed by the Court.

Verne Davidson's SFC Payroll Change forms and Employee change forms for Mr. Davidson

.    Verne Davidson's Performance Reviews and merit notes and recognition    Employer's Notification to Insurer

Occupational Health & Rehabilitation Patient Status Forms

Occupational Health & Rehabilitation Treatment Notes

Defendants' operative handbook at the time of the termination and subsequent handbook from June 2003

SFC 2003 Employee Change Forms and corrective action forms for Mr. Davidson and other employees

Worker's Guide to Massachusetts Workers' Compensation System

PFG Employee Corrective Action Form produced by defendants pursuant to discovery in this matter.

Termination letter from Peter Brunault to Verne Davidson dated 5/5/06

Documents relating to employment at R.M. Sullivan Sulco, Hippodrome

and Valley Employment Group

Additional exhibits may become necessary for impeachment purposes

**b.     Defendant's Proposed Exhibits**

In addition, to the potential listed above, the defendants expect to call:

Documents supporting Defendants defense that they do not discriminate against employees on account of handicap or the exercise of rights under M.G.L. c. 152;

Documents supporting Defendants defense that they do not interfere with, discriminate or retaliate against employees in violation of FMLA;

Documents indicating that Defendants seek to accommodate the limitations of injured employees so that they may return to work;

Documents relating to Mr. Davidson's claim for compensatory damages, including those referenced above; and

Deposition transcripts, or portions thereo, should witnesses become unavailable for trial.

Defendants also reserve the right to amend this list and to introduce additional

exhibits for purpose of impeachment, if necessary.

Respectfully submitted,

THE PLAINTIFF
By his Attorneys,


/s/ Suzanne Garrow
Suzanne Garrow, Esq.
BBO#  636548
Heisler, Feldman, McCormick &
     & Garrow, P.C.
1145 Main Street, Suite 508
Springfield, MA 01103
(413) 788-7988

THE DEFENDANTS
By their Attorneys,

/s/ Timothy F. Murphy
Timothy F. Murphy, Esq.
BBO# 556429
Skoler, Abbott & Presser, P.C.
One Monarch Place, Suite 2000
Springfield, MA 01144
(413) 737-4753

CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF).

  /s/ Suzanne Garrow
Suzanne Garrow